**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
:
**IN RE PAYMENT CARD**     :  Case No. 1:05-md-1720-MKB-JAM
**INTERCHANGE FEE AND MERCHANT** :
**DISCOUNT ANTITRUST LITIGATION** :
 :
This Document Applies to:     :
 :
*Palladino, et al. v. JPMorgan Chase & Co., et al.,* :
Case No. 1:23-cv-1215-MKB-JAM   :
 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

### DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
### MOTION TO DISMISS THE COMPLAINT AND COMPEL ARBITRATION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ....................................................................................................................4

      A.    Plaintiffs' Own Pleadings Allege That Interchange Fees Are Set by
            Card Networks and Paid by Acquiring Banks to Issuing Banks ................4

      B.    Merchants Have Brought Lawsuits against Visa, Mastercard, and
            Member Banks for Allegedly Conspiring to Fix Interchange Fees ............5

      C.    Cardholders Previously Brought Lawsuits against Member Banks
            for Allegedly Conspiring to Fix Interchange Fees.......................................6

      D.    Plaintiffs File This Action against Visa, Mastercard, and Member
            Banks for Allegedly Conspiring to Fix Interchange Fees...........................7

ARGUMENT ..........................................................................................................................8

   I.    PLAINTIFFS LACK STANDING TO ASSERT CLAIMS UNDER THE
        CARTWRIGHT ACT (CAUSES OF ACTION I-IV, VI-VII)...............................8

      A.    Plaintiffs' "Direct Purchaser" Theory Fails.................................................9

      B.    Plaintiffs' Indirect Purchaser Theory Fails ................................................11

  II.    PLAINTIFFS' CLAIMS UNDER THE CALIFORNIA UNFAIR
        COMPETITION LAW FAIL FOR THE SAME REASONS (CAUSES OF
        ACTION V-IX)........................................................................................................22

  III.    PLAINTIFFS' CLAIMS ARE LARGELY TIME-BARRED..............................23

  IV.    SEPARATELY, THE PNC DEFENDANTS SHOULD BE DISMISSED
        FOR LACK OF PERSONAL JURISDICTION ...................................................25

      A.    There Is No General Personal Jurisdiction over PNC Defendants in
            California Because They Are Not Domiciled or "At Home" There..........25

      B.    No Specific Jurisdiction Exists Because Plaintiffs Do Not Allege,
            as to PNC Defendants, an Affiliation between the Forum and the
            Underlying Controversy..............................................................................26

  V.    THE COURT SHOULD COMPEL ARBITRATION OF PLAINTIFFS'
        CLAIMS ..................................................................................................................29

i

A.      Plaintiffs' Arbitration Agreements ............................................................29

B.      Plaintiffs Should Be Estopped from Avoiding Arbitration......................30

C.      The Court Should Stay This Case Pending Arbitration ...........................35

CONCLUSION...........................................................................................................35

## TABLE OF AUTHORITIES

**Cases**                                                                               **Page(s)**

*In re Aluminum Warehousing Antitrust Litigation*,
    2023 WL 7180648 (2d Cir. Nov. 1, 2023)...................................................................13, 14

*In re American Express Anti-Steering Rules Antitrust Litigation*,
    19 F.4th 127 (2d Cir. 2021) ........................................................................14, 20, 23

*In re American Express Anti-Steering Rules Antitrust Litigation*,
    433 F. Supp. 3d 395 (E.D.N.Y. 2020) .................................................................12, 13, 21

*Apple Inc. v. Pepper*,
    139 S. Ct. 1514 (2019)................................................................................................7

*Aryeh v. Canon Business Solutions, Inc.*,
    55 Cal. 4th 1185 (2013) ........................................................................................24, 25

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)................................................................................................8

*Associated General Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)..........................................................................................2, 18, 19

*In re Automobile Antitrust Cases I & II*,
    135 Cal. App. 4th 100 (2005) ................................................................................27

*Bartlett v. BP West Coast Products LLC*,
    2019 WL 2177655 (S.D. Cal. May 17, 2019)..................................................................25

*Beckler v. Visa U.S.A., Inc.*,
    2004 WL 2115144 (N.D. Dist. Aug. 23, 2004) ...............................................................16

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................14

*Belyea v. Greensky, Inc.*,
    2021 WL 1338549 (N.D. Cal. Apr. 9, 2021) ...................................................................25

*Boccardo v. Safeway Stores, Inc.*,
    134 Cal. App. 3d 1037 (1982) ................................................................................16

*Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco County*,
    582 U.S. 255 (2017)....................................................................................... passim

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977)................................................................................................9

*Camferdam v. Ernst & Yong International*,
    2004 WL 307292 (S.D.N.Y. Feb. 13, 2004) ................................................. 33

*Cellular Plus, Inc. v. Superior Court of San Diego County*,
    14 Cal. App. 4th 1224 (1993) ..................................................................... 20

*Community Cause v. Boatwright*,
    124 Cal. App. 3d 888 (1981) ...................................................................... 24

*Crouch v. Crompton Corp.*,
    2004 WL 2414027 (N.C. Super. Ct. Oct. 28, 2004) ....................................... 16

*In re Currency Conversion Fee Antitrust Litig.*,
    361 F. Supp. 2d 237 (S.D.N.Y. 2005) ................................................. passim

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ................................................................................... 26

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ................................................................ 12, 19

*Epic Systems Corp. v. Lewis*,
    584 U.S. 497 (2018) ................................................................................... 29

*Formula One Licensing, B.V. v. Purple Interactive Ltd.*,
    2001 WL 34792530 (N.D. Cal. Feb. 6, 2001) .............................................. 23

*G.H.I.I. v. MTS, Inc.*,
    147 Cal. App. 3d 256 (1983) ........................................................................ 9

*Galvez v. Ford Motor Co.*,
    2018 WL 4700001 (E.D. Cal. Sept. 30, 2018) ............................................. 25

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011) .............................................................................. 26, 27

*Grisham v. Philip Morris U.S.A., Inc.*,
    40 Cal. 4th 623 (2007) ............................................................................... 24

*Hirsch v. Arthur Andersen & Co.*,
    72 F.3d 1085 (2d Cir. 1995) ....................................................................... 11

*Ho v. Visa U.S.A. Inc.*,
    3 Misc. 3d 1105(A) (Sup. Ct. N.Y. Cnty. 2004) ............................. 2, 15, 17, 18

*Hu v. City of New York*,
    927 F.3d 81 (2d Cir. 2019) ....................................................................... 4, 8

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977)..................................................................................6, 16

*International Shoe Co. v. Wash.*,
326 U.S. 310 (1945)......................................................................................26

*JLM Indus., Inc. v. Stolt-Neilson SA*,
387 F.3d 163 (2d Cir. 2004).....................................................................30, 31

*Johnson v. Glock, Inc.*,
2021 WL 1966692 (N.D. Cal. May 17, 2021) ..........................................24, 25

*Kalama v. Matson Navigation Co.*,
875 F.3d 297 (6th Cir. 2017) ........................................................................26

*Kamin Health LLC v. Halperin*,
2021 WL 964949 (E.D.N.Y. Mar. 15, 2021) ..................................................36

*Kanne v. Visa U.S.A. Inc.*,
723 N.W.2d 293 (Neb. 2006)................................................................... passim

*Klehr v. A.O. Smith Corp.*,
521 U.S. 179 (1997)......................................................................................25

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
232 F.3d 979 (9th Cir. 2000) ..........................................................................9

*Kolling v. Dow Jones & Co.*,
137 Cal. App. 3d 709 (1982) .....................................................................20, 21

*Kuklachev v. Gelfman*,
600 F. Supp. 2d 437 (E.D.N.Y. 2009) ............................................................34

*Learning Evolution, LLC v. CPG Catnet Inc.*,
2022 WL 484999 (S.D. Cal. Feb. 16, 2022) ...................................................28

*Lexmark International, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014).......................................................................................3

*Lorenzo v. Qualcomm Inc.*,
603 F. Supp. 2d 1291 (S.D. Cal. 2009)......................................................20, 21

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
269 F. Supp. 2d 1213 (C.D. Cal. 2003) .....................................................16, 22

*Meyer v. Qualcomm Inc.*,
2009 WL 539902 (S.D. Cal. Mar. 3, 2009) ........................................3, 9, 20, 21

*Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*,
    460 U.S. 1 (1983)................................................................................................29, 33

*Nass-Romero v. Visa U.S.A. Inc.*,
    279 P.3d 772 (N.M. Ct. App. 2012) .......................................................... passim

*Ohio v. American Express Co.*,
    138 S. Ct. 2274 (2018)....................................................................................7, 10, 11

*Oliver v. American Express Co.*,
    2020 WL 2079510 (E.D.N.Y. Apr. 30, 2020) .......................................3, 12, 23

*In re Packaged Seafood Products Antitrust Litigation*,
    2020 WL 2747115 (S.D. Cal. May 26, 2020)...............................................28

*Paulus v. Bob Lynch Ford, Inc.*,
    139 Cal. App. 4th 659 (2006) ........................................................................23

*Peterson v. Visa U.S.A., Inc.*,
    2005 WL 1403761 (D.C. Super. Ct. Apr. 22, 2005)....................................16

*In re Platinum & Palladium Antitrust Litigation*,
    61 F.4th 242 (2d Cir. 2023) ...........................................................................13

*Project Stewart LLC v. JPMorgan Chase Bank, N.A.*,
    2022 WL 971478 (W.D. Wash. Mar. 31, 2022) ...........................................26

*Racek v. Rady Children's Hospital of San Diego*,
    2012 WL 2947881 (Cal. Ct. App. July 20, 2012)........................................23

*Salveson v. JP Morgan Chase & Co.*,
    2014 WL 12770235 (E.D.N.Y. Nov. 26, 2014)..................................1, 2, 6, 10

*Salveson v. JP Morgan Chase & Co.*,
    2020 WL 4810704 (E.D.N.Y. July 16, 2020) ...........................................7, 11

*Salveson v. JP Mogan Chase & Co.*,
    166 F. Supp. 3d 242 (E.D.N.Y. 2016) .................................................. passim

*Salveson v. JP Mogan Chase & Co.*,
    663 F. App'x 71 (2d Cir. 2016) .................................................................2, 7

*Salveson v. JP Mogan Chase & Co.*,
    860 F. App'x 207 (2d Cir. 2021) ...............................................................7, 11

*Saxer v. Philip Morris, Inc.*,
    54 Cal. App. 3d 7 (1975) ..............................................................................20

*Schwab Short-Term Bond Market Fund v. Lloyds Banking Group PLC*,
  22 F.4th 103 (2d Cir. 2021) ................................................................3, 9, 12, 17

*SEC v. Stone*,
  2023 WL 6387276 (S.D.N.Y. Sept. 29, 2023)...................................................1

*Smith/Enron Cogeneration Partnership v. Smith Cogeneration International, Inc.*,
  198 F.3d 88 (2d Cir. 1999).................................................................................33

*Southard v. Visa U.S.A. Inc.*,
  734 N.W.2d 192 (Iowa 2007) ..............................................................2, 15, 17

*Stark v. Visa U.S.A. Inc.*,
  2004 WL 1879003 (Mich. Cir. Ct. July 23, 2004).........................................15

*Stegemann v. Rensselaer County Sheriff's Office*,
  2019 WL 3765597 (N.D.N.Y. Aug. 8, 2019) ....................................................1

*Vinci v. Waste Management, Inc.*,
  36 Cal. App. 4th 1811 (1995) .....................................................................12, 22

*In re Visa Check/MasterMoney Antitrust Litigation*,
  297 F. Supp. 2d 503 (E.D.N.Y. 2003) ..............................................................21

*In re Vitamin C Antitrust Litigation*,
  2012 WL 2930109 (E.D.N.Y. July 18, 2012)...................................................27

*Walden v. Fiore*,
  571 U.S. 277 (2014).............................................................................................29

*In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*,
  2013 WL 12130034 (C.D. Cal. July 19, 2013)...................................................9

## STATUTES

9 U.S.C. § 3.............................................................................................................36

15 U.S.C. § 22.........................................................................................................27

Cal. Bus. & Prof. Code § 16720 ...........................................................................8

Cal. Bus. & Prof. Code § 16750.1 ..................................................................3, 23

Cal. Bus. & Prof. Code § 17200 ......................................................................8, 23

Cal. Bus. & Prof. Code § 17208 (UCL)..............................................................23

N.M. Stat. Ann. § 57-1-3 ................................................................................................15

N.Y. Gen. Bus. L. § 340(6) ............................................................................................15

Neb. Rev. Stat. Ann. § 59-821 .......................................................................................15

## RULES

Federal Rule of Civil Procedure Rule 12(b)(2)..........................................................1, 48

Federal Rule of Civil Procedure 12(b)(6) ........................................................................1

Federal Rule of Civil Procedure Rule 12(c) .....................................................................1

Federal Rule of Civil Procedure 60(b)(6) ......................................................................11

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the First Amended Class Complaint ("FAC" or "Complaint") and compel arbitration.[1]

## PRELIMINARY STATEMENT

Plaintiffs' action is the latest attempt by the same counsel to bring claims on behalf of credit and debit cardholders over interchange fees. Courts around the country have uniformly barred claims similar to plaintiffs' here because cardholders do not directly pay interchange fees and any supposed harm they may have suffered is far too attenuated from any allegedly anticompetitive conduct. This Court itself has dismissed cardholder claims in an earlier case also brought by plaintiffs' counsel, and the Second Circuit affirmed. *See Salveson v. JP Morgan Chase & Co.*, 2014 WL 12770235, at *3 (E.D.N.Y. Nov. 26, 2014) ("*Salveson I*"), *on reconsideration in part*, 166 F. Supp. 3d 242 (E.D.N.Y. 2016) (Brodie, J.) ("*Salveson II*"), *aff'd*, 663 F. App'x 71 (2d Cir. 2016) ("*Salveson III*"). These precedents compel dismissal of plaintiffs' claims under California's Cartwright Act for lack of antitrust standing, which in turn mandates dismissal of plaintiffs' claims under California's Unfair Competition Law ("UCL").

First, plaintiffs allege that they have standing because each cardholder acts "as direct purchaser and direct payer" of a "transaction" involving interchange fees (FAC ¶ 82), but this standing theory was unequivocally rejected by this Court and the Second Circuit in *Salveson*: "[T]he structure of these transactions demonstrates that cardholders do not directly pay interchange fees." *Salveson III*, 663 F. App'x at 75.

---

[1] Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(6), except Visa moves under Rule 12(c) since it has already answered the Complaint. *See, e.g.*, *SEC v. Stone*, 2023 WL 6387276, at *13 (S.D.N.Y. Sept. 29, 2023); *Stegemann v. Rensselaer Cnty. Sheriff's Off.*, 2019 WL 3765597, at *2 (N.D.N.Y. Aug. 8, 2019). PNC defendants additionally move to dismiss under Rule 12(b)(2) for lack of personal jurisdiction and, in the alternative, join in defendants' joint motion.

Second, plaintiffs cannot manufacture standing with their even more attenuated assertion that each cardholder "is damaged as an indirect purchaser [that] pay[s] inflated prices for everything because interchange is built into ticket prices." (FAC ¶ 81.)  This indirect purchaser theory readily fails the applicable "efficient enforcer" test for antitrust standing because (among other things) plaintiffs' alleged injuries are necessarily derivative of supposed injuries borne by merchants, who have sought to recover damages stemming from the same conduct.  *See Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519 (1983) ("*AGC*"). Indeed, the exact same theory has been addressed by numerous courts, including state supreme and appellate courts, *see, e.g.*, *Ho v. Visa U.S.A. Inc.*, 3 Misc. 3d 1105(A) (Sup. Ct. N.Y. Cnty. 2004); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293 (Neb. 2006); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772 (N.M. Ct. App. 2012); *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192 (Iowa 2007), and summarily dismissed on the pleadings after applying the *AGC* analysis.  The same result holds here because the Second Circuit has scrupulously enforced *AGC* standing requirements and held that "California law substantially incorporates" them.  *See Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 120 (2d Cir. 2021).

Consistent with federal law, California courts agree that plaintiffs cannot establish antitrust injury under California law where (a) plaintiffs' alleged injury is "secondary, consequential, [and] remote," or (b) it "occurred in a different market from the allegedly anticompetitive conduct." *Meyer v. Qualcomm Inc.*, 2009 WL 539902, at *9 (S.D. Cal. Mar. 3, 2009).  That is precisely the case here.  Plaintiffs' alleged economic injury from paying merchant prices that may incorporate interchange fees, which "represent a transfer of value between the financial institutions" (FAC ¶ 127), is "secondary," "consequential," and "remote" to the alleged conspiracy to fix interchange fees.  Moreover, cardholders' payments for goods and services occur in an entirely "different"

2

market from the one in which issuing and acquiring banks assess fees for payment card network transactions. *Meyer*, 2009 WL 539902, at \*9; *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (antitrust standing is limited to "plaintiffs whose injuries were proximately caused by a defendant's antitrust violations").

<u>Third</u>, plaintiffs' UCL claims, based on the same allegations underlying their Cartwright Act claims, fare no better:  "Under California law, [w]here a plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the same allegations, such state claims are properly dismissed." *Oliver v. Am. Express Co.*, 2020 WL 2079510, at \*17 (E.D.N.Y. Apr. 30, 2020) (internal quotations omitted).

<u>Finally</u>, at a minimum, this Court should bar any claims that accrued before December 30, 2018—four years before plaintiffs filed the Complaint.  *See* Cal. Bus. & Prof. Code § 16750.1 (Cartwright Act) (four-year statute of limitations); Cal. Bus. & Prof. Code § 17208 (UCL) (same). Plaintiffs' claim for damages back to 2004 relies on a facially implausible statement that they "could not have uncovered the alleged violations" before bringing this lawsuit.  (FAC ¶¶ 88, 206-07.)  This Court should give this no weight:  The Complaint plainly rests on allegations that merchant plaintiffs made in this Court starting in 2005.  Indeed, plaintiffs' own counsel made similar allegations on behalf of cardholders in *Salveson* <u>10 years ago</u>.

Separately, the Complaint should be dismissed as against the non-California resident PNC defendants for lack of personal jurisdiction because (i) they are not "fairly regarded as at home" in the forum, and (ii) none of the named plaintiffs has a PNC payment card, and this lawsuit does not "aris[e] out of or relat[e] to the defendant's contacts with the forum."  *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017) (alterations in original).

In any event, as explained below, plaintiffs' claims against defendants belong in arbitration.

## BACKGROUND[2]

### A. Plaintiffs' Own Pleadings Allege That Interchange Fees Are Set by Card Networks and Paid by Acquiring Banks to Issuing Banks

A typical Visa or Mastercard payment card transaction involves at least five parties: (i) the cardholder, who uses a payment card to purchase a product or service; (ii) the merchant selling the product or service; (iii) the bank that issued a payment card to the cardholder (often referred to as the "issuer" or "issuing bank"); (iv) the merchant's bank that handles cardholder transactions (often referred to as the "acquirer" or "acquiring bank"); and (v) the payment card network (Visa or Mastercard), which "suppl[ies] the channels that move transaction data and funds among cardholders, merchants, merchants' banks, [and] cardholders' banks." (*See* FAC ¶¶ 2-5.)

This case focuses on interchange fees, which "represent a transfer of value <u>between the financial institutions</u> participating in" the payment card networks. (*Id.* ¶ 127 (quoting Visa Rules) (emphasis added).) Specifically, they represent "an amount paid by the Acquirer to the Issuer"— that is, paid by the merchant's bank to the cardholder's bank "to reimburse the expenses [the cardholder's bank] sustained in processing the cardholder's transaction." (*Id.* ¶ 63; FAC Addendum at 123 (quoting Mastercard Rules); *id.* at 113 ("An Interchange Reimbursement Fee is a default transfer price between Acquirers and Issuers within the Visa system.") (quoting Visa Core Rules); FAC ¶ 124 (noting that interchange fees are "set by the network, <u>charged to acquirers</u> and received by debit card issuers as part of a debit card transaction") (emphasis added); *see also id.* at 9, 45 (charts illustrating interchange fees running between issuer and acquirer).)

---

[2] The facts are drawn from the allegations in the Complaint (which are accepted as true for purposes of this motion), documents incorporated in the Complaint by reference, and matters of which the Court may take judicial notice. *See Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019).

A merchant's cost of accepting a payment card transaction is known as "the merchant discount fee or merchant discount rate," and interchange fees are allegedly the "largest priced fee within the merchant discount rate." (*Id.* ¶ 62.)  According to plaintiffs, merchants "mark[] up prices and shift[] their inflated interchange costs to cardholders (and all customers)," who consequently "pay[] inflated prices for everything because interchange is built into ticket prices." (*Id.* ¶¶ 5, 80, 81.)  Because merchants allegedly pass the cost of card acceptance to customers, plaintiffs accuse "[l]iterally all retail merchants that accept credit or debit cards [of being] co-conspirators in the illegal conduct alleged" in the Complaint.  (*Id.* ¶ 55.)

### B. Merchants Have Brought Lawsuits against Visa, Mastercard, and Member Banks for Allegedly Conspiring to Fix Interchange Fees

As the Complaint notes, "[m]erchants have sued under the Sherman Act similarly alleging price-fixing of interchange fees" (FAC ¶ 69), and "seeking redress . . . against [many of] these same" defendants (*id.* ¶ 199).  In the *Merchant Discount Antitrust Litigation* before this Court, the merchant plaintiffs alleged that Visa and Mastercard, along with their member banks, conspired to "collectively fix" interchange fee schedules at uniform, elevated levels.  In addition, the merchant plaintiffs alleged that the defendants conspired to impose certain "Anti-Steering Restraints," which allegedly prevent merchants from incentivizing customers to use alternative payment methods.  (*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, No. 1:05-md-1720-JG-JO, ECF No. 1153, SAC ¶¶ 8(d), 104 (incorporated by reference in FAC ¶ 200).)  The merchant plaintiffs asserted that these fees and rules "restrain[ed] competition between Visa and MasterCard Member Banks."  (*Id.* ¶ 246.)  Ultimately, as plaintiffs allege, the merchant damages class action has settled.  (*See* FAC ¶ 69.)

### C. Cardholders Previously Brought Lawsuits against Member Banks for Allegedly Conspiring to Fix Interchange Fees

Almost a decade after the merchant plaintiffs' lawsuits, a putative class of cardholders (represented by plaintiffs' counsel) brought the *Salveson* action, alleging that credit and debit cardholders "paid supracompetitive price-fixed Interchange Fees" and seeking relief under federal law and the Cartwright Act.  Like the merchant plaintiffs, the *Salveson* plaintiffs alleged that "the defendants—financial institutions that issued Visa and/or MasterCard payment cards—knowingly participated in a conspiracy to fix interchange fees."  *Salveson I*, 2014 WL 12770235, at *1.

In *Salveson I*, Judge Gleeson dismissed the plaintiffs' federal-law claims under the indirect purchaser doctrine established in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), and then, on the defendants' motion for reconsideration, this Court held that the cardholder plaintiffs also lacked standing under California's Cartwright Act.  "As with the federal claim, Plaintiffs' state law claim [was] based on allegations that cardholders are the direct payors of interchange fees that were inflated through anti-competitive behavior."  *Salveson II*, 166 F. Supp. 3d at 254.  This Court reasoned that:  (1) cardholders were "neither consumer[s] nor competitor[s] in the market in which trade was restrained"; (2) "the allegedly anticompetitive conduct of the issuing banks was not directed at cardholders and has not resulted in an injury for the Court to assess for its directness"; and (3) even assuming cardholders had been harmed, "there remains a large and predictable risk of duplicative recovery against the issuing banks as well as the need for 'long and complicated proceedings' to determine the damages due to cardholders and merchants."  *Id.* at 259-64.  On that basis, the Court held that the plaintiffs "failed to assert a direct antitrust injury that confers standing

to bring a claim under the Cartwright Act." *Id.* at 264.  Plaintiffs appealed, and the Second Circuit

affirmed in all respects.  *Salveson III*, 663 F. App'x 71.[3]

### D. Plaintiffs File This Action against Visa, Mastercard, and Member Banks for Allegedly Conspiring to Fix Interchange Fees

Plaintiffs in this case reprise the cardholder interchange claims that failed in *Salveson*.  As

observed by the Judicial Panel on Multidistrict Litigation when transferring this action to this

Interchange MDL docket, it "involve[s] questions of fact that are common to the actions previously

transferred" to the Interchange MDL docket (Transfer Order, *Palladino v. JP Morgan Chase &

Co.*, ECF No. 9, No. 23-cv-01215 (E.D.N.Y. Feb. 10, 2023)), including *Salveson*.[4]

Plaintiffs seek to represent a putative class of "[a]ll Visa and Mastercard cardholders who

are California citizens, each of whom has made retail purchases of goods and services in California

using a Visa or Mastercard credit or debit card during the period from at least January 1, 2004, up

to and including the date of filing this action." (FAC ¶ 211.)  They assert claims under California's

Cartwright Act, Cal. Bus. & Prof. Code § 16720 *et seq.*, and UCL, Cal. Bus. & Prof. Code § 17200

*et seq.*  Plaintiffs seek monetary damages, disgorgement, and injunctive relief.  (*Id.* at 95-96.)  And

they allege that defendants—Visa, Mastercard, and their member banks—have conspired "to fix

interchange fees for various merchant-transactions" at "artificially high 'default'" rates, which

---

[3] More than three years later, the plaintiffs moved this Court for relief from final judgment under Federal Rule of Civil Procedure 60(b)(6), based on the Supreme Court's decisions in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), and *Apple Inc. v. Pepper*, 139 S. Ct. 1514 (2019).  This Court denied that motion, plaintiffs appealed, and the Second Circuit again affirmed.  *See Salveson v. JP Morgan Chase & Co.*, 2020 WL 4810704 (E.D.N.Y. July 16, 2020) (Brodie, J.) ("*Salveson IV*"), *aff'd*, 860 F. App'x 207 (2d Cir. 2021) ("*Salveson V*").

[4] Apparently attempting to sidestep this Court's and the Second Circuit's *Salveson* decisions, plaintiffs filed their original complaint in California state court. (*See* Class Action Compl., *Palladino v. JPMorgan Chase & Co*., No. CGC-22-603801 (Cal. Super. Ct. Dec. 30, 2022).)  Soon after, plaintiffs filed an amended complaint asserting the same claims. (*See* FAC, *Palladino v. JPMorgan Chase & Co*., No. CGC-22-603801 (Cal. Super. Ct. Jan. 11, 2023).)  On January 30, 2023, this action was removed to the United States District Court for the Northern District of California.

merchants then "absorb" and pass along to consumers in the form of higher retail prices for goods and services.  (*Id.* ¶¶ 9, 55.)  According to plaintiffs, "[d]efendants have succeeded in suppressing competition in the relevant market," which "includes General Purpose Card Network Services," and "markets for merchant acceptance" of credit and debit cards.  (*Id.* ¶¶ 71, 100).  Echoing allegations in the merchant cases and *Salveson*, plaintiffs here assert that Visa's and Mastercard's rules mandating "merchant-acceptance of their trademarked cards . . . are at the center of the conspiracy" by "provid[ing] the essential mechanism for the operation and enforcement of the price-fixing conspiracy alleged herein."  (*Id.* ¶ 6.)  More specifically, plaintiffs allege that Visa's and Mastercard's "Rules and merchant-rate schedules," coupled with "a regimen of Rules and regulations that prevent merchants from lowering their transaction costs," lift interchange fees to supracompetitive levels.  (*Id.* ¶¶ 77-79, 198.)

## ARGUMENT

To survive a motion to dismiss, plaintiffs' complaint must "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted).  Allegations reflecting mere "labels and conclusions" or "naked assertion[s] devoid of further factual enhancement" are insufficient.  *Id.*  "California courts similarly demand a 'high degree of particularity in the pleading of Cartwright Act violations.'"  *Meyer*, 2009 WL 539902, at *5 (quoting *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 265 (1983)).  Plaintiffs cannot allege a claim for which they are efficient enforcers under the Cartwright Act or Unfair Competition Act, so their claims should be dismissed with prejudice.

## I.  PLAINTIFFS LACK STANDING TO ASSERT CLAIMS UNDER THE CARTWRIGHT ACT (CAUSES OF ACTION I-IV, VI-VII)

Plaintiffs lack standing under the Cartwright Act to recover for claimed injuries derived from interchange fees allegedly set by card networks and paid by acquiring banks.  "[A]ntitrust

8

standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement, the claim must be dismissed as a matter of law." *Salveson II*, 166 F. Supp. 3d at 256 (addressing standard applicable to Cartwright Act claims). "Antitrust standing is required under the Cartwright Act," *In re WellPoint, Inc. Out-of-Network "UCR" Rates Litig.*, 2013 WL 12130034, at *11 (C.D. Cal. July 19, 2013) (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th Cir. 2000)), and the Second Circuit has held that "California's antitrust standing analysis tracks its federal analog." *Schwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 114 (2d Cir. 2021). Therefore, "[t]o establish antitrust standing" under the Cartwright Act, "a plaintiff must show (1) antitrust injury, which is 'injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful,' and (2) that he is a proper plaintiff in light of four 'efficient enforcer' factors." *Id.* at 115 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). Plaintiffs' "direct" and "indirect" theories of harm both fail these well-settled standards for antitrust standing.

### A.  Plaintiffs' "Direct Purchaser" Theory Fails

Because acquiring banks—not cardholders—pay interchange fees, the Court can quickly dispatch with plaintiffs' conclusory claim that they are "a direct purchaser and first payer"—the same claim this Court and the Second Circuit rejected in *Salveson*. Plaintiffs assert that "[t]he cardholder, as direct purchaser and direct payer, is damaged" because "[o]n authorization of the cardholder's card, the [payment card] network simultaneously sells the transaction to both merchant and cardholder, who jointly share that single transaction." (FAC ¶ 82 (citing *Ohio v. Am. Express Co.*, 138 S. Ct. 2274 (2018) ("*Amex II*"); *see also id.* ¶ 57). But as Judge Gleeson explained in 2014, the structure of payment card transactions cannot support an allegation that cardholders pay interchange fees directly:

9

> Because the interchange fee runs between financial institutions within the card services market, consumers do not directly pay interchange fees and are not directly injured by their imposition. **The plaintiffs' facile contention that cardholders pay interchange fees directly is refuted by their own allegations about how transactions over these two networks occur.** It also bears no resemblance to the transaction structure at the heart of this nine-year-old case.

*Salveson I*, 2014 WL 12770235, at *3 (emphasis added), *aff'd*, *Salveson III*, 663 F. App'x at 75 ("[T]he structure of these transactions demonstrates that cardholders do not directly pay interchange fees."); *see also Salveson II*, 166 F. Supp. 3d at 252.

The same basic "transaction structure" remains at the center of this case. The Complaint recognizes that interchange fees "represent a transfer of value between the financial institutions" participating in the card payment networks (FAC ¶ 127 (quoting Visa Rules))—specifically, "an amount paid by the Acquirer to the Issuer." (FAC Addendum at 123 (quoting Mastercard Rules); *see also id.* at 113 ("An Interchange Reimbursement Fee is a default transfer price between Acquirers and Issuers within the Visa system." (quoting Visa Core Rules)); *see* FAC ¶ 124 (noting that interchange fees are "set by the network, charged to acquirers and received by debit card issuers as part of a debit card transaction"); *id.* at 9, 45 (charts illustrating interchange fees running between issuer and acquirer).) In light of this structure, as this Court held in *Salveson*, plaintiffs' "conclusory, contradictory and insufficient" allegations that cardholders are direct purchasers of interchange (*see, e.g.*, FAC ¶ 249 (stating that "interchange fees [are] paid directly from Plaintiffs' accounts to Plaintiffs' card-issuing banks and subsequently withheld from amounts merchants banks transmit to merchants")), cannot forestall dismissal. *Salveson II*, 166 F. Supp. 3d at 251; *see also Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995) (affirming dismissal where "attenuated allegations . . . are contradicted both by more specific allegations . . . and by facts of which we may take judicial notice") (cited by *Salveson II*, 166 F. Supp. 3d at 252).

Plaintiffs try to sidestep this conclusion by claiming they were "direct joint purchasers" (alongside merchants) in a two-sided market under *Amex II*. (FAC ¶¶ 82, 105.) But as this Court already held in *Salveson IV* (and the Second Circuit affirmed in *Salveson V*), this argument misconstrues *Amex II* by confusing its discussion of <u>market definition</u> with plaintiffs' <u>standing</u>. The *Amex* court found that credit card markets are "two-sided transaction platforms," and "courts must include both sides of the platform—merchants and cardholders—when <u>defining the credit-card market</u>." *Amex II*, 138 S. Ct. at 2286 (emphasis added). As *Salveson* explained, however, no matter how one defines the markets at issue in payment card transactions, cardholders "do not directly pay the [allegedly] heightened interchange fees," *Salveson V*, 860 F. App'x at 209, because "nothing about the structure of the transaction at issue has changed," *Salveson IV*, 2020 WL 4810704, at *11. So too here: Because plaintiffs did not directly pay the interchange fees, they cannot rely on *Amex II* to manufacture antitrust standing.

## B. Plaintiffs' Indirect Purchaser Theory Fails

### 1. <u>Plaintiffs Are Not "Efficient Enforcers" of the Cartwright Act</u>

Plaintiffs' "indirect purchaser" theory—that allegedly supracompetitive interchange fees lead, somewhere down the line, to consumers "paying inflated prices for everything" (FAC ¶ 81)—also fails the test for "efficient enforcer[ ]" standing. "At its core, the efficient enforcer analysis requires a court to decide if the 'plaintiff is a proper party to perform the office of a private attorney general and thereby vindicate the public interest in antitrust enforcement.'" *Schwab*, 22 F.4th at 115. "In *AGC*, the Supreme Court outlined four factors to guide this analysis: (1) the directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self-interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying

11

damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Id.* (cleaned up). All four *AGC* factors point decisively against plaintiffs' standing to bring indirect purchaser claims under the Cartwright Act.[5]

### a. *Plaintiffs' Alleged Injuries Are Not Direct*

First, plaintiffs' alleged injuries as indirect purchasers are necessarily derivative, not direct. "To assess the directness of a plaintiff's injury, . . . the court 'look[s] to the chain of causation between [the plaintiff's alleged] injury and the alleged restraint in the market.'" *Salveson II*, 166 F. Supp. 3d at 262 (internal quotations omitted); *accord Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 541 (9th Cir. 1987) (finding no standing where "injuries were merely derivative" and as "[t]he chain of causation between the injury and the alleged restraint in the market should lead directly to the 'immediate victims' of any alleged antitrust violation"). That is why the Second Circuit "has repeatedly followed the first-step rule in the antitrust context," which "draw[s] a line between those whose injuries resulted from their direct transactions with the [defendants] and those whose injuries stemmed from their deals with third parties." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 259-60 (2d Cir. 2023). When a plaintiff's alleged injury stems from the "independent decision" of a third party, it "breaks the chain of causation." *In re Aluminum Warehousing Antitrust Litig.*, 2023 WL 7180648, at *2 (2d Cir. Nov. 1, 2023).

Plaintiffs' attempt to draw a connection between interchange fees and cardholders' wallets winds through layer after layer of intermediate events: (1) The payment card networks allegedly

---

[5] As the Second Circuit confirmed in *Schwab*, "California law substantially incorporates the *AGC* factors." *Id.* at 120; *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1814 n.1 (1995) (applying *AGC* factors "[b]ecause the Cartwright Act has objectives identical to the federal antitrust acts, the California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act"); *Oliver v. Am. Express Co.*, 2020 WL 2079510, at *13 (E.D.N.Y. Apr. 30, 2020); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d 395, 414 (E.D.N.Y. 2020) (similar), *aff'd*, 19 F.4th 127 (2d Cir. 2021).

set default interchange fees at supracompetitive rates (FAC ¶¶ 62-63), <u>leading to</u> (2) the issuing banks charging supracompetitive interchange fees to the acquiring banks (*id.* ¶ 124), <u>leading to</u> (3) the merchants "absorb[ing]" the allegedly inflated interchange fees as part of a "package of fees" charged to them by acquiring banks (*id.* ¶¶ 5, 62, 66), <u>leading to</u> (4) the merchants "passing on" some proportion of those fees to consumers by raising prices on at least some goods and services they sell (*id.* ¶¶ 9, 55), <u>finally leading to</u> (5) consumers allegedly paying inflated prices for "everything" they purchase (*id.* ¶¶ 80, 81).[6]  Under this theory, any economic impact felt by plaintiffs derives wholly from effects felt more directly by several layers of other economic actors —including merchants.  And because "California law does not allow recovery for an antitrust injury that is a 'secondary, consequential, or remote' result of the allegedly unlawful conduct," plaintiffs' attenuated theory cannot support standing under the Cartwright Act.  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d at 416 (holding that sub-class failed to allege standing under Cartwright Act because any injuries based on effects of non-steering provisions were "simply too remote").

The exact same result follows independently from what the Second Circuit has termed the "first-step rule" for proximate cause in antitrust cases.  *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 141 (2d Cir. 2021) (dismissing plaintiffs' "price umbrella" theory for lack of antitrust standing because "Amex 'enabl[ing]' other credit card companies to raise the appellants' fees does not establish the 'direct relation' between injury and antitrust violation that the first-step rule requires").  Plaintiffs fail that test because, as demonstrated above, plaintiffs "did not suffer a direct injury from the alleged antitrust violation."  *Id.* at 140; *see In re Aluminum*

---

[6] Oftentimes, alleged overcharges would also need to pass through a third-party processor such as Elavon, First Data, Global Payments, or WorldPay.  (FAC ¶ 54.)

*Warehousing Antitrust Litig.*, 2023 WL 7180648, at *2 (first-step rule not satisfied where plaintiffs "claim that they purchased aluminum from non-conspiring third parties at prices that incorporated an inflated benchmark component" because "incorporation of the benchmark price into [the plaintiffs'] transactions with third parties was . . . an 'independent decision' that breaks the chain of causation").

Plaintiffs cannot plead around this deficiency by recasting those intermediaries, including "[l]iterally all retail merchants that accept credit or debit cards," as "involuntary co-conspirators." (FAC at 8, ¶¶ 54-55.) That conclusory label ignores what the rest of the Complaint actually alleges—that plaintiffs' injury derives from an alleged antecedent <u>injury to the merchants</u>, supposedly "passed along to consumers." (*Id.* ¶¶ 152, 228; *see also id.* ¶ 87 ("seek[ing] damages based upon merchants' pass-through").) As plaintiffs themselves point out (*id.* ¶¶ 199-200), the merchants have spent nearly two decades suing their so-called "involuntary co-conspirators" over the same alleged conspiracy animating this Complaint. *See In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, Case 1:05-md-01720-MKB-JAM. In the end, plaintiffs' "bare assertion of conspiracy will not suffice" to transfigure their derivative injury into a direct one. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Other courts agree. State-law antitrust cases brought by cardholders challenging interchange fees predicated on similarly attenuated theories of injury have been dismissed on the pleadings under the *AGC* framework, including in states adopting so-called *Illinois Brick* "repealer statutes."[7] *See, e.g.*, *Ho v. Visa U.S.A. Inc.*, 3 Misc. 3d 1105(A), at *2 (Sup. Ct. N.Y. Cnty. 2004) ("[P]laintiffs' claims, as general consumers at stores which accept Visa and MasterCard, are clearly derivative of the stores' claims against those companies.") (dismissing New York Donnelly

---

[7] *See* N.Y. Gen. Bus. L. § 340(6); Neb. Rev. Stat. Ann. § 59-821; N.M. Stat. Ann. § 57-1-3.

Act claims for lack of antitrust standing), *aff'd*, 16 A.D.3d 256 (1st Dep't 2005); *Kanne v. Visa U.S.A. Inc.*, 723 N.W.2d 293, 296-99 (Neb. 2006) (holding "that appellants lack standing for their antitrust claims because their alleged injuries are derivative and remote" under Nebraska law where plaintiffs "assert a derivative injury based on a theory that merchants passed on the cost of an alleged tying of debit processing services to increase the prices of thousands of unrelated retail goods the merchants sold to consumers such as appellants"); *Nass-Romero v. Visa U.S.A. Inc.*, 279 P.3d 772, 778-79 (N.M. Ct. App. 2012) ("Plaintiff's injury is better characterized as remote or derivative" because "[t]he alleged harm caused by Defendants' tying scheme takes an abrupt left turn after reaching the merchants and branches off into supposed higher prices for all goods throughout New Mexico, mutating into a different form of harm to consumers.") (affirming dismissal of New Mexico Antitrust Act claims for lack of antitrust standing); *Southard v. Visa U.S.A. Inc.*, 734 N.W.2d 192, 199 (Iowa 2007) (affirming dismissal of cardholders' claims under Iowa law where "the injuries alleged by the plaintiffs are not even indirect, as the plaintiffs are not in the chain of distribution," but "are better described as derivative").[8]

It makes no difference that—as plaintiffs argued in their remand motion—the Cartwright Act "free[s]" them "from under the onerous penumbra of *Illinois Brick*'s federal Sherman Act

---

[8] The list goes on. *See also, e.g.*, *Stark v. Visa U.S.A. Inc.*, 2004 WL 1879003, at *4 (Mich. Cir. Ct. July 23, 2004) ("[T]he Court notes that courts in other states that have repealed the *Illinois Brick* rule have continued to apply antitrust standing requirements to dismiss the claims of plaintiffs who assert only derivative or remote injuries."); *Crouch v. Crompton Corp.*, 2004 WL 2414027, at *25–26 (N.C. Super. Ct. Oct. 28, 2004) ("Considering all five factors, [the plaintiff] lacks standing to pursue indirect purchaser claims" where, among other things, "it is apparent from the pleadings that any analysis will either be speculative or allocations enormously complex"); *Peterson v. Visa U.S.A., Inc.*, 2005 WL 1403761, at *6 (D.C. Super. Ct. Apr. 22, 2005) (finding that the plaintiff "lacks standing under [D.C. statute] because of the following *Associated General Contractors* factors:  (1) his claims are remote and speculative; (2) more direct victims exist to enforce the antitrust laws; and (3) he has not shown that his harm is the type for which the antitrust laws provide redress"); *Beckler v. Visa U.S.A., Inc.*, 2004 WL 2115144, at *3 (N.D. Dist. Aug. 23, 2004) ("As 'non-purchasers' of defendants' debit card services to merchants, the Court believes that plaintiffs lack standing to sue for the alleged restraint of trade in such services.  Their alleged injury is simply too remote.").

standing restrictions in federal price-fixing cases."  (ECF No. 15-1 ¶ 4; *see also* plfs.'  Jan. 24, 2024 pre-motion letter, ECF No. 66 at 2 (similar).)  Plaintiffs' argument conflates two distinct doctrines.  The California legislature did amend the Cartwright Act so that it would not apply the Supreme Court's decision in *Illinois Brick*, which addressed whether "indirect purchasers" are categorically barred from recovery.  But the *Illinois Brick* doctrine is "analytically distinct from the question of which persons have sustained injuries too remote to give them standing to sue." *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 728 n.7 (1977); *see Boccardo v. Safeway Stores, Inc.*, 134 Cal. App. 3d 1037, 1042 (1982) ("[T]he holding of *Illinois Brick* is not a rule of standing"). Thus, courts in California—and in other *Illinois Brick* "repealer" states—continue to apply the *AGC* factors in dismissing state-law antitrust claims deemed too derivative or remote to confer standing.  *See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 269 F. Supp. 2d 1213, 1218-25 (C.D. Cal. 2003) (party asserting Cartwright Act counterclaim lacked standing because it did "not participate, directly or indirectly, in the relevant market" and otherwise failed to satisfy *AGC* factors).  Put differently, "[b]ecause *Illinois Brick* did not alter the Court's antitrust standing jurisprudence, *Illinois Brick*'s repeal should imply nothing about standing."  *Nass-Romero*, 279 P.3d at 781.

### b.  Merchants Have Sued Based on the Same Alleged Conduct

Second, "this is obviously not a situation where the antitrust violators will go unpunished, because the parties who are directly injured will not sue."  *Ho*, 3 Misc. 3d 1105(A), at *3; *Nass-Romero*, 279 P.3d at 779 ("Preventing Plaintiff here from bringing a claim under the [antitrust law] will not 'leave a significant antitrust violation undetected or unremedied.'").  Quite the opposite, "there is no shortage of other parties" who have spent nearly two decades seeking damages stemming from the same alleged conduct.  *See Schwab*, 22 F.4th at 118; *Southard*, 734 N.W.2d at

199 (recognizing that "the action brought by merchants against Visa and MasterCard was settled by the defendants' payment of **more than three billion dollars**") (emphasis added).  Plaintiffs recognize as much in their allegations referencing the merchants' own lawsuits about interchange fees and the resulting $5.6-billion-dollar settlement.  (FAC ¶¶ 228, 69 n.8.)  Plaintiffs' alleged dissatisfaction with the amount the merchants obtained (*id.* ¶ 69) does not grant them standing under the antitrust laws, which seek to ensure that violations not go "undetected or unremedied"— not to give pile-on plaintiffs a shot at duplicative downstream damages.  *Kanne*, 272 Neb. at 495– 96 (holding this factor weighed against standing where "it is undisputed that [merchants] settled a class action challenging the very same tying alleged here").  Nor can plaintiffs deny that a separate class of merchants is seeking injunctive relief.  *See Barry's Cut Rate Stores Inc., et al. v. Visa, Inc., et al.*, No. 05-md-01720 (E.D.N.Y.).

### c.  *Plaintiffs' Alleged Injuries Are Speculative*

Third, plaintiffs' alleged injuries are inherently, and incurably, speculative.  In practice, plaintiffs' damages theory asks a fact finder to calculate the alleged price overcharge on each and every transaction involving a Visa or Mastercard cardholder in California over the past nineteen years.  For each purchase of a retail good from a California merchant, plaintiffs would need to demonstrate that (1) the merchant actually paid to its acquiring bank a merchant discount rate that included a supracompetitive default interchange rate, (2) the merchant did not absorb the cost of interchange (or some of that cost) by reducing profits or cutting costs, and (3) the merchant increased the price of that particular good because of the interchange fee and, if so, by how much.  (*See* FAC ¶¶ 3, 5, 114.)  *See Ho*, 3 Misc. 3d 1105(A), at *3 (ruling in a similar case brought by cardholders that "[t]he complexity and speculative nature of plaintiffs' claims are overwhelming"); *Kanne*, 723 N.W.2d at 299 (dismissing as "speculative" plaintiffs' "assert[ion] that they paid an

overcharge on every retail good that they purchased from every Nebraska merchant that accepted Visa or MasterCard, over the course of several years, regardless of the form of payment used to make their purchases").

### d.  Plaintiffs' Alleged Injuries Cannot Be Apportioned

<u>Fourth</u>, and finally, plaintiffs' indirect purchaser theory would invite duplicative recoveries and devolve into an unworkable apportionment of damages.  *See AGC*, 459 U.S. at 543-44 ("stress[ing] the importance of avoiding either the risk of duplicate recoveries on the one hand, or the danger of complex apportionment of damages on the other").   Those impermissible consequences stem from plaintiffs' sweeping allegations, which purport to tie supracompetitive interchange fees in the card network services market to "inflated prices for everything."  (FAC ¶ 81.)  "The complexity and speculative nature of plaintiffs' claims are overwhelming," and "[t]o determine what portion of any overcharge was passed on by any given merchant, with respect to which products, and to which consumers is a task of monumental uncertainty and complexity." *Ho*, 3 Misc. 3d 1105(A), at *3; *Nass-Romero*, 279 P.3d at 779.  The Complaint proposes no workable method to isolate the supposed effect of interchange fees on consumer prices, thus ignoring the "myriad independent reasons" for pricing goods and services "unrelated to the alleged violation of the" antitrust laws, and "apportioning damages would be a nightmare." *Kanne*, 723 N.W.2d at 299.[9]

The merchant damages class settlement, as well as ongoing litigation in the *Interchange MDL*, makes these problems "not merely hypothetical," but rather creates "a large and predictable risk of duplicative recovery against the issuing banks [and networks] as well as the need for 'long

---

[9] Indeed, the Complaint alleges that rates of pass through to customers vary not just by merchant, but also by time period and product category.  (FAC ¶ 201.)

and complicated proceedings' to determine the damages due to cardholders and merchants." *Salveson II*, 166 F. Supp. 3d at 264 (quoting *Eagle*, 812 F.2d at 543).  To reiterate, plaintiffs contend they suffer economic harm from "inflated anticompetitive interchange fees" because merchants pass those fees on to customers "in the form of higher prices."  (FAC ¶ 199; *id.* ¶ 228 ("The elevated fees charged to merchants are damaging to Plaintiffs because Plaintiffs pay the merchants' pass-through.").)  Because, as the Complaint admits, the economic impact of this alleged overcharge is borne more directly by merchants than cardholders, plaintiffs threaten to duplicate the recovery already obtained by merchants based on the same fees.  *See In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*  And ongoing suits by merchants who chose to opt out of the settlement only increase the "danger of duplication of evidence, facts, and damages."  *See Eagle*, 812 F.2d at 542-43.  All told, these risks further undermine plaintiffs' case for standing.  *See AGC*, 459 U.S. at 544 (holding "that potential plaintiffs at each level in the distribution chain" should not "be in a position to assert conflicting claims to a common fund, the amount of the alleged overcharge, thereby creating the danger of multiple liability").

### 2.  Plaintiffs Fail to Allege Antitrust Injury

Although the Court need not reach the antitrust injury requirement in light of plaintiffs' failure to satisfy the *AGC* factors, *see In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th at 139 ("not address[ing] antitrust injury . . . [b]ecause the four efficient-enforcer factors do not establish antitrust standing"), this requirement nevertheless provides an independent basis for dismissing plaintiffs' Cartwright Act claims.  "In order for a private plaintiff to have standing to sue under the Cartwright Act, the plaintiff must prove antitrust injury."  *Meyer*, 2009 WL 539902, at *8 (quoting *Cellular Plus, Inc. v. Superior Ct. of San Diego Cnty.*, 14 Cal. App. 4th 1224, 1235 (1993)).  At bottom, this requirement reflects "a rule that an action for violation of the antitrust

laws may be maintained only by a party within the 'target area' of the antitrust violation, and not by one incidentally injured thereby." *Kolling v. Dow Jones & Co.*, 137 Cal. App. 3d 709, 723-24 (1982). To that end, antitrust injury under the Cartwright Act is limited to those that "were not secondary, consequential, or remote, but the direct result of the unlawful conduct and were the kind of injuries the antitrust laws seek to prevent." *Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302 (S.D. Cal. 2009) (internal quotations omitted). A corollary is that "'secondary or 'consequential'" injuries, which "result from injury to third parties," *Saxer v. Philip Morris, Inc.*, 54 Cal. App. 3d 7, 26 (1975), cannot confer standing under the Cartwright Act.

Applying those principles here, plaintiffs do not allege a cognizable antitrust injury under California law, for at least two reasons. <u>First</u>, as explained above, the injury plaintiffs assert is quintessentially "secondary and consequential." It derives wholly from "injury to third parties"— the merchants who allegedly "absorb" interchange fees as part of the merchant discount fees paid to their acquiring bank. (FAC ¶¶ 3, 5, 9, 114, 201; *see* § B.1, *supra*.) On this score, a pair of related antitrust lawsuits—*Meyer v. Qualcomm Inc.* and *Lorenzo v. Qualcomm Inc.*—are particularly instructive. In those cases, as in this one, the plaintiffs alleged both that they purchased products at inflated retail prices due to anticompetitive practices upstream and that the allegedly anticompetitive practices rippled through "at least three intermediaries" before reaching the end-consumer plaintiff. *Meyer*, 2009 WL 539902, at *9; *Lorenzo*, 603 F. Supp. 2d at 1302. On those analogous facts, the plaintiffs' Cartwright Act claims were dismissed in both cases because the injury alleged was "secondary, consequential, or remote." *Meyer*, 2009 WL 539902, at *9 (noting that consumer good "also contains other technology which impacts the final price actually paid by Plaintiff"); *Lorenzo*, 603 F. Supp. 2d at 1302; *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 433 F. Supp. 3d at 416 (dismissing Cartwright Act claim because the plaintiffs'

"injury is—definitionally—secondary" where they alleged "higher merchant fees because of reactions to Amex's rate-setting by independent actors") (citing *Meyer*, 2009 WL 539902, at *8). So too here.

Second, because plaintiffs are so far removed from the allegedly anticompetitive conduct, "[their] injuries occurred in a different market from the allegedly anticompetitive conduct." *Meyer*, 2009 WL 539902, at *9; *Lorenzo*, 603 F. Supp. 2d at 1303.  As a result, conferring standing on plaintiffs here would violate the "rule that an action for violation of the antitrust laws may be maintained only by a party within the 'target area' of the antitrust violation." *Kolling*, 137 Cal. App. 3d at 723-24.  The Complaint alleges anticompetitive conduct by Visa, Mastercard, and its member banks in the network services market.  (*See, e.g.*, FAC ¶ 150 (alleging "[t]he member banks have remained separate entities situated horizontally in the relevant market" where "[i]nstead of competing for merchant acceptance . . . they have perpetuated the anticompetitive Rules")); *id.* ¶ 187 ("Visa had market power in the relevant market" (citing *In re Visa Check/MasterMoney Antitrust Litig.*, 297 F. Supp. 2d 503 (E.D.N.Y. 2003)).)  But the Complaint does not even suggest that cardholders compete or otherwise participate in that market.  (*See id.* ¶ 259 (alleging that interchange fees "have had the purpose and effect of excluding competition from, and limiting the competitive opportunities of, other sellers in the relevant market") (emphasis added).)  Nor would such an allegation be plausible:  If a cardholder purchased a good (say, socks) at an allegedly inflated retail price, that purchase occurred in the market for socks—not in the market for network services—whether or not a payment card is used.  Plaintiffs concede this fact by alleging that a customer paying cash is charged the same allegedly inflated retail price.  (*Id.* ¶¶ 72, 200.)  *See also Metro-Goldwyn-Mayer Studios Inc.*, 269 F. Supp. 2d at 1224 (dismissing Cartwright Act claims for lack of standing where plaintiff "does not participate, directly or

indirectly, in the relevant market"); *Vinci v. Waste Mgmt., Inc.*, 36 Cal. App. 4th 1811, 1816 (1995) (dismissing Cartwright Act claim for lack of standing where plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").

In *Salveson II*, the Court rejected a similar attempt by cardholder-plaintiffs to obscure the distinction between separate payment-card markets:

> Although cardholders and issuing banks transact in the Payment Card Market, that is insufficient to overcome the fact that the allegedly anticompetitive interchange fee is set and paid between financial institutions in the Card Network Services Market, not between issuing banks and cardholders in the Payment Card Market.

*Salveson II*, 166 F. Supp. 3d at 261.  The same principle—applied to substantially the same facts— forecloses plaintiffs' indirect purchaser claims here.  If anything, plaintiffs' indirect purchaser theory here is even more remote than the one this Court addressed in *Salveson II* because the alleged harm occurs in markets for retail goods that are even more attenuated from card network services.  At most, a cardholder "is a consumer of goods sold by merchants who happen to be part of the affected market," which is insufficient to confer standing.  *Nass-Romero*, 279 P.3d at 778.

## II.   PLAINTIFFS' CLAIMS UNDER THE CALIFORNIA UNFAIR COMPETITION LAW FAIL FOR THE SAME REASONS (CAUSES OF ACTION V-IX)

Plaintiffs' claims under the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.*, are based on the same allegations underlying their Cartwright Act claims and therefore also warrant dismissal.[10]  "[U]nder California law, '[w]here a plaintiff fails to state an antitrust claim, and where an unfair competition claim is based upon the same allegations, such state claims are properly dismissed.'"  *Oliver v. Am. Express Co.*, 2020 WL 2079510, at *13 (E.D.N.Y. Apr. 30, 2020) (quoting *Formula One Licensing, B.V. v. Purple Interactive Ltd.*, 2001

---

[10] Indeed, the allegations are identical with respect to Causes of Action V-VII, which are asserted under both the Cartwright Act and the California Unfair Competition Law.

WL 34792530, at *4 (N.D. Cal. Feb. 6, 2001)); *In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th at 144 n.12 ("Because the UCL claim is predicated on violations of the Sherman and Cartwright Acts, we affirm the dismissal of that claim as well."); *Racek v. Rady Child.'s Hosp. of San Diego*, 2012 WL 2947881, at *6 (Cal. Ct. App. July 20, 2012) (similar).[11]

## III.   PLAINTIFFS' CLAIMS ARE LARGELY TIME-BARRED

While the Court need not reach the issue of timeliness because plaintiffs' claims should be dismissed in full for the reasons above, the majority of plaintiffs' claims are also time-barred. Claims under the Cartwright Act and the UCL are subject to four-year statutes of limitations. *See* Cal. Bus. & Prof. Code § 16750.1 (Cartwright Act); Cal. Bus. & Prof. Code § 17208 (UCL). Plaintiffs seek to bring claims based on credit and debit card transactions dating as far back as January 1, 2004.   (FAC ¶ 211.)   Trying to avoid the effect of the applicable limitations periods, plaintiffs make the facially implausible assertion that they "could not have uncovered the alleged violations at an earlier date . . . due to the fraudulent concealment of activities through various means and methods designed to avoid detection."   (*Id.* ¶ 207; *id.* ¶ 206 (similar).)

The Complaint plainly fails to plead the elements of fraudulent concealment.   "The doctrine of fraudulent concealment tolls the statute of limitations where a defendant, through deceptive conduct, has caused a claim to grow stale."   *Aryeh v. Canon Bus. Sols., Inc.*, 55 Cal. 4th 1185, 1192 (2013).   "But 'that tolling will last as long as a plaintiff's reliance on the misrepresentations is reasonable.'"   *Johnson v. Glock, Inc.*, 2021 WL 1966692, at *3 (N.D. Cal. May 17, 2021) (quoting *Grisham v. Philip Morris U.S.A., Inc.*, 40 Cal. 4th 623, 637 (2007)).   And that, in turn,

---

[11] Additionally, plaintiffs' failure to allege direct injury, standing, or a plausible claim that defendants conduct was otherwise fraudulent, unlawful, or unfair is independently fatal to any claim under the UCL. *See Paulus v. Bob Lynch Ford, Inc.*, 139 Cal. App. 4th 659, 678 n.14 (2006) (explaining there is no "standing by a private UCL plaintiff except where that person has suffered direct injury as a result of the act of unfair competition complained of").

"requires the plaintiff [to] (1) plead with particularity the facts giving rise to the fraudulent concealment claim and (2) demonstrate that he or she used due diligence in an attempt to uncover the facts."  *Id.* (internal quotation omitted).  "To satisfy the second element, 'the complaint must allege (1) when the fraud was discovered; (2) the circumstances under which it was discovered; and (3) that the plaintiff was not at fault for failing to discover it or had no actual or presumptive knowledge of facts sufficient to put him on inquiry.'"  *Id.* (quoting *Cmty. Cause v. Boatwright*, 124 Cal. App. 3d 888, 900 (1981)).

Here, by contrast, the Complaint stands on boilerplate allegations devoid of detail and fails to allege (let alone with particularity) why plaintiffs "could not have uncovered the alleged violations at an earlier date."  (FAC ¶ 207.)  If anything, the Complaint's own allegations compel dismissal of the fraudulent concealment claim, as it chronicles "nearly two decades" of publicly-accessible "legislation and litigation" aimed at interchange fees.  (*Id.* ¶¶ 203-05.)

Importantly, plaintiffs' own counsel brought the *Salveson* action over 10 years ago, alleging on behalf of cardholders that defendants' conduct concerning interchange fees violated the Cartwright Act.  Yet plaintiffs "have not attempted to explain why it took them years longer than the plaintiffs in [other interchange cases] to discover the same facts."  *Bartlett v. BP W. Coast Prods. LLC*, 2019 WL 2177655, at *1, *3 (S.D. Cal. May 17, 2019) (referring to another action where "the named Defendants, factual allegations and legal claims asserted in this action are nearly identical"); *Galvez v. Ford Motor Co.*, 2018 WL 4700001, at *5 (E.D. Cal. Sept. 30, 2018) (rejecting fraudulent concealment defense to statute of limitations where "three class actions demonstrate[d] that during [plaintiff's] several years of inaction, other similarly situated consumers identified the fraud alleged here and pursued their claims").  Under these circumstances, "a conclusory allegation that [plaintiffs] would not have discovered the alleged

24

violations through reasonable diligence . . . is insufficient." *Johnson*, 2021 WL 1966692, at \*4. Plaintiffs have not "pled any <u>facts</u> regarding [their] discovery of the alleged fraud," *Belyea v. Greensky, Inc.*, 2021 WL 1338549, at \*3 (N.D. Cal. Apr. 9, 2021) (emphasis added), an essential element of fraudulent concealment, *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–96 (1997).

Accordingly, plaintiffs "cannot recover alleged excess charges preceding the four-year limitations period." *Aryeh*, 55 Cal. 4th at 1200–01. That means plaintiffs cannot recover damages from transactions before December 30, 2018.

## IV.   SEPARATELY, THE PNC DEFENDANTS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION

Non-California resident defendants PNC Bank, National Association ("PNC Bank") and its indirect holding company, PNC Financial Services Group, Inc. ("FSG") (collectively, the "PNC defendants") additionally move to dismiss the Complaint for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2). They are not "fairly regarded as at home" in the forum.

### A.   There Is No General Personal Jurisdiction over PNC Defendants in California Because They Are Not Domiciled or "At Home" There

Where a case has been transferred to a multidistrict litigation proceeding, personal jurisdiction depends on whether the transferor court had such jurisdiction. *See, e.g.*, *Kalama v. Matson Navigation Co.*, 875 F.3d 297, 302 (6th Cir. 2017). It did not.

The United States Constitution limits the exercise of personal jurisdiction by courts over non-resident defendants. *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945); *Bristol-Meyers Squibb v. Superior Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 261 (2017). The defendant must be subject to either general or specific jurisdiction. *Id.* at 262. For there to be general jurisdiction over a corporation, the forum must be "one in which the corporation is fairly regarded as at home." *Id.* at 262. That is typically where a corporation is incorporated or has its principal place of

business; it is not simply where the corporation does business.  *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014).

The Supreme Court has declared emphatically that doing business in a state does not render it subject to the general jurisdiction of that forum.  California does not have general jurisdiction over PNC defendants unless their affiliations are "so 'continuous and systematic' as to render them essentially at home in the forum state."  *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe*, 326 U.S. at 317).  For PNC defendants to be subject to general jurisdiction, they must have their "domicile, place of incorporation, [or] principal place of business" in California.  *Goodyear*, 564 U.S. at 924.  This is not the case.  PNC defendants are domiciled, incorporated, and operate their principal places of business in Pennsylvania and Delaware—not California.  *See* Declaration of Regis Ramos.  Accordingly, PNC defendants are not "at home" in California nor subject to general jurisdiction there.[12]

## B. No Specific Jurisdiction Exists Because Plaintiffs Do Not Allege, as to PNC Defendants, an Affiliation between the Forum and the Underlying Controversy

Nor is plaintiffs' stream-of-commerce averment sufficient to establish specific jurisdiction. Specific jurisdiction requires a connection between the forum and the underlying controversy: "principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation."  *Goodyear*, 564 U.S. at 919.  When there is no such connection, specific

---

[12] *See, e.g., Project Stewart LLC v. JPMorgan Chase Bank, N.A.*, 2022 WL 971478, *3 (W.D. Wash. Mar. 31, 2022) (concluding that "as a national banking association, [JPMC] engages in business in many other jurisdictions and cannot be at home in all of them").  At the pre-motion conference, plaintiffs also suggested that jurisdiction could be found over the PNC defendants under the Clayton Act's nationwide service-of-process provision.  15 U.S.C. § 22.  Plaintiffs reiterated that position in their February 6, 2024 letter objections to the court.  (ECF No. 68.)  Plaintiffs want it both ways.  They assert only state-law claims to seek to conjure antitrust standing where none exists.  But the Clayton Act only applies to federal antitrust claims.  *See, e.g., In re Vitamin C Antitrust Litig.*, 2012 WL 2930109, at *8 (E.D.N.Y. July 18, 2012) ("Because the Audette plaintiffs do not bring federal antitrust claims, the Clayton Act cannot serve as a basis for this Court's jurisdiction over CPG in that action.").

jurisdiction is lacking regardless of the extent of a defendant's unconnected activities in the State. *See id.* at 931 n.6.

California does not have specific jurisdiction over the PNC defendants because plaintiffs' state-law antitrust claims' allegations of a national conspiracy do not arise out of, or relate to, PNC defendants' contacts with California. Specific jurisdiction, regardless of a defendant's unconnected activities in a state, requires an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State." *Bristol-Myers Squibb Co*., 582 U.S. at 264 (alteration in original) (quoting *Goodyear*, 564 U.S. at 919). Regarding plaintiffs' Cartwright Act claims, any specific jurisdiction over PNC defendants "must be substantially connected to or arise out of the defendant's contacts with this state." *In re Auto. Antitrust Cases I & II*, 135 Cal. App. 4th 100, 115 (2005). Plaintiffs must therefore make jurisdictional allegations regarding PNC defendants' <u>specific</u> contacts with or "<u>forum-related acts</u>" in California for the purpose of furthering the alleged conspiracy. *Id*. at 271 (emphasis added). They have not and cannot do so here.

Indeed, the quantity of the PNC defendants' contacts or activities in California unrelated to the alleged conspiracy are immaterial because the Supreme Court has rejected the "sliding-scale" approach that some courts had previously used to find jurisdiction in the absence of an "affiliation between the forum and the underlying controversy." *Bristol-Myers Squibb Co.*, 582 U.S. at 264 (rejecting "the California approach, [in which] the strength of the requisite connection between the forum and the specific claims at issue is relaxed if the defendant has extensive forum contacts that are unrelated to those claims"). Plaintiffs establish no affiliation between California and PNC defendants with regard to their state-law antitrust claims; they base jurisdiction simply on a conclusory averment of defendants' marketing of cards within California, referring only to

PNC defendants' (non-California) location, size and revenues.  (FAC ¶¶ 24, 45-46, 59.)  Plaintiffs have made no allegations that the PNC defendants have done anything in California in furtherance of the alleged Cartwright Act violations, and thus jurisdiction is lacking.

While plaintiffs do allege a conspiracy with nationwide effect,[13] that does not suffice to satisfy the purposeful direction prong.  *See, e.g.*, *Learning Evolution, LLC v. CPG Catnet Inc.*, 2022 WL 484999, at *4 (S.D. Cal. Feb. 16, 2022) (finding no basis for specific jurisdiction over defendants in Cartwright Act case because plaintiffs did not show that defendants expressly aimed their intentional conduct at California, and "effects from [a] nation-wide price fixing conspiracy. . . create no connection to any particular forum" (alterations in original) (citation omitted)); *In re Packaged Seafood Prods. Antitrust Litig.*, 2020 WL 2747115, at *58 (S.D. Cal. May 26, 2020) (finding Kansas transferor court had no specific jurisdiction over defendant for national conspiracy claims because the plaintiff "'would have experienced' the same injury from overpaying 'in California, Mississippi, or wherever else' it might have purchased the price-fixed tuna." (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014))).

Further, none of the named plaintiffs has a PNC payment card.  *See* Ex. A.  Therefore, no plaintiff is alleged to have paid, even indirectly, PNC's interchange fees.  Thus, assuming *arguendo* that a California PNC cardholder's purported injuries in California from an alleged nationwide conspiracy would be sufficient to confer jurisdiction, there are no such plaintiffs here. And pursuant to the Supreme Court's due process jurisprudence, the fact that PNC Bank has credit card customers in California who would have allegedly suffered the injuries complained of is of

---

[13] Plaintiffs contend that the interchange fee is fixed "across all general purpose debit and credit cards[,]" (FAC Introduction), draining "nearly a trillion dollars from the nation's economy" (*id.* ¶ 68), due to the prices charged on "every Visa and Mastercard transaction" (*id.* ¶ 72) (emphasis added).  They reference the MDL (*id.* ¶ 69), use national market share data (*id.* ¶ 193), and even seek injunctive relief to the same extent as the federal MDL, which alleges a national conspiracy (*id.* ¶ 86).

no moment, because "a defendant's relationship with a . . . third party, standing alone, is an insufficient basis for jurisdiction." *Walden*, 571 U.S. at 286.  This remains true even when the third parties are residents of the forum.  *Bristol-Myers Squibb Co.*, 582 U.S at 265.  In sum, just as there is no general jurisdiction there is no specific jurisdiction over PNC defendants, and so the claims against them in the Complaint must be dismissed.

## V.     THE COURT SHOULD COMPEL ARBITRATION OF PLAINTIFFS' CLAIMS

In any event, plaintiffs' claims are subject to arbitration.  The liberal policy favoring arbitration agreements creates a strong presumption in favor of enforcement and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 505-506 (2018).  Here, each plaintiff has entered into an arbitration agreement with at least one bank defendant.  Under well-settled Second Circuit precedent, plaintiffs are estopped from avoiding these arbitration agreements and applicable class waivers by bringing class claims against purported co-conspirators of the bank defendants with whom they have arbitration agreements.[14]

### A.  Plaintiffs' Arbitration Agreements

Each plaintiff in this case has an agreement containing a mandatory arbitration clause with at least one bank defendant ("Arbitration Agreement") that require arbitration of all cardholder disputes on an individual, non-class basis.  Specifically:

- ▪ John Palladino has had an Arbitration Agreement with Bank of the West since 2014 and Wells Fargo since 2006 that contain mandatory arbitration provisions and class action waivers. (Nagin Decl. Exs. A, E.)

---

[14] Defendants anticipate that many unnamed, putative class members will also have card agreements with mandatory arbitration clauses, class action waivers, and jury trial waivers.  Defendants reserve their rights to enforce these provisions as to putative class members and to assert such defenses at the appropriate time.

- <u>Steve Palladino</u> has had Arbitration Agreements with Bank of the West since 2014 that contain a mandatory arbitration provision and class action waiver.  (Nagin Decl. Ex. A.)

- <u>John Nypl</u> has had Arbitration Agreements with Chase since 2009 that contain mandatory arbitration provisions and class action waivers.  (Nagin Decl. Exs. B, C, D.)

- <u>Garib Karapetyan</u> has had Arbitration Agreements with Bank of the West since 2014 and Wells Fargo since 2014 that contain mandatory arbitration provisions and class action waivers. (Nagin Decl. Exs. A, E.)

> In the Complaint, plaintiffs concede that they are bound by their Arbitration Agreements:

> No Plaintiff class member seeks relief herein or makes a claim against any banking institution that issued such Plaintiff a credit or debit card with which bank that Plaintiff has executed an Arbitration Agreement.  No Plaintiff class member seeks relief herein or makes a claim against any banking institution that issued such Plaintiff a credit or debit card with which bank that Plaintiff has executed an arbitration agreement.

(FAC ¶ 16; *see also id.* ¶ 212.)  Thus, by their own admission, plaintiffs are not pursuing claims against the banks listed above.  And for the reasons that follow, plaintiffs' claims against non-signatory bank and network defendants are also subject to arbitration.

### B.  Plaintiffs Should Be Estopped from Avoiding Arbitration

Plaintiffs cannot circumvent their agreements to arbitrate by pursuing joint and several liability claims against non-signatory defendants who allegedly conspired with banks with whom plaintiffs admit having binding Arbitration Agreements.  The Second Circuit has held that "a non-signatory to an arbitration agreement may compel a signatory to that agreement to arbitrate a dispute where . . . the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed."  *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004).

*JLM* involved joint and several liability claims against defendants who allegedly conspired to violate competition laws.  And shortly after it was decided, the Southern District of New York applied it to compel arbitration in circumstances nearly identical to the instant case.  *See In re*

*Currency Conversion Fee Antitrust Litig.*, 361 F. Supp. 2d 237, 262-65 (S.D.N.Y. 2005). *Currency Conversion* followed the Second Circuit's decision in *JLM* and found that cardholder plaintiffs were estopped from litigating joint and several conspiracy claims that were "intertwined with the underlying contract" which requires arbitration and "there is a close relationship between the non-signatory and the plaintiff's actual counter-signatory" to that contract. *Id.* at 260–61. This reasoning applies with even greater force here.

The plaintiffs in *Currency Conversion* alleged a conspiracy among the card payment networks and their member banks with respect to foreign currency conversion fees. The court reasoned that (1) the plaintiffs alleged a "close relationship" between the signatory and non-signatory banks and networks; (2) the plaintiffs' antitrust claims against the non-signatory banks "concerned that relationship"; and (3) the plaintiffs' antitrust claims against the non-signatory banks were "closely linked" to the disputes that were subject to arbitration in the underlying contract. *Id.* at 263-64 (citing *JLM*, 387 F.3d at 178 n.7 (quotation marks omitted)). So, any plaintiff with a valid arbitration agreement with <u>any</u> defendant bank was estopped from litigating claims against <u>all</u> non-signatory banks and the networks. *Id.* at 264-65. The same result follows here.

***Relationship between Arbitration Signatories and Non-Signatories.*** First, just like the plaintiffs in *JLM* and *Currency Conversion*, plaintiffs here allege a close relationship among the bank and network defendants. With respect to the non-signatory network defendants, the court in *Currency Conversion* found that, "more than simply an agency relationship, the Complaint alleges that the issuing banks control the network defendants" and "that the banks have insinuated themselves into the network defendants to such a degree that the networks are effectively part of the member banks' operations." *Id.* at 262-63. With respect to non-signatory bank defendants,

the court in *Currency Conversion* found a "close relationship" based on plaintiffs' allegation "that the issuing banks operate collectively through the network associations and that this relationship incubated the conspiracy." *Id.* at 264.

Like the complaint in *Currency Conversion*, plaintiffs here allege that defendants are closely linked through the bank defendants' allegedly conspiratorial and controlling relationship over the networks. Plaintiffs assert that following the IPOs of Visa and Mastercard, "the defendant banks retain control of two parallel networks, enabling Visa and Mastercard to place anticompetitive tariffs on the relevant market" (FAC ¶ 147), and that the "combined power that top Visa / Mastercard issuers possess in the relevant market enables them to collectively control the interchange levels that Visa and Mastercard set" (*id.* ¶ 180). Plaintiffs also allege that the "member banks executed a number of related agreements structured to make certain that member banks would retain significant control over major decisions" and that "[a]greements were drawn to prevent the new 'MasterCard' entity from becoming a genuine competitor capable of diluting the banks' and Visa's market power." (*Id.* at 110-11.) Similarly, with respect to Visa, plaintiffs allege, as "was the case with Mastercard, Visa's transformation ensured that its member banks retained significant control over its corporate and competitive decisions." (*Id.* at 112-13.) Just as in *Currency Conversion*, estoppel is warranted here because plaintiffs allege that the issuing banks' relationship with the networks render the networks "effectively part of the member banks' operations." 361 F. Supp. 2d at 262-63.

The Complaint here similarly alleges a number of purported "collusive acts" among the defendant networks and banks that represent precisely the type of "close relationship," that precluded the plaintiffs in *Currency Conversion* and other cases from avoiding arbitration. These alleged collusive acts include agreeing to written contracts, agreeing to coordinate interchange

32

fees, participating in conversations and meetings to discuss what interchange fees to charge, and exchanging information regarding fees and other business information.  (FAC ¶¶ 224, 235); *see also Camferdam v. Ernst & Yong Int'l*, 2004 WL 307292, at *6-7 (S.D.N.Y. Feb. 13, 2004).

The close relationship that plaintiffs allege among the bank defendants is equally clear. Indeed, the alleged relationship is so close that plaintiffs' Complaint fails to distinguish the conduct of the defendant banks with whom plaintiffs have Arbitration Agreements from the conduct of the banks against which they purport to bring their joint and several conspiracy claims.  Courts have consistently compelled arbitration via estoppel where a plaintiff's claims against signatories and non-signatories are undifferentiated.  *See Smith/Enron Cogeneration P'ship v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88, 98 (2d Cir. 1999) ("[B]y treating [defendants] as a single unit in its complaint," plaintiff "is estopped from claiming that the current signatories to the [contract containing an arbitration clause] are distinct from the [non-signatory] defendants"); *see also Kuklachev v. Gelfman*, 600 F. Supp. 2d 437, 459 (E.D.N.Y. 2009) (similar).

***Nexus of Plaintiffs' Claims to Defendants' Relationship.***  Second, as in *Currency Conversion*, the Complaint establishes that "plaintiffs' antitrust claims stem from the banks' close relationship through the networks."  361 F. Supp. 2d at 264.  In *Currency Conversion*, this factor was satisfied where plaintiffs alleged that "the bank defendants 'jointly, through their [network] associations, agreed to charge a floor price of 1% for the transaction fee charges denominated in a foreign currency.'"  *Id.*  The same is true here.  Plaintiffs claim that defendants formed a "joint alliance" and "mutual pact" in an alleged effort to "jointly set[] Interchange Fees in both [Visa and Mastercard] networks."  (FAC ¶¶ 73, 139.)  Plaintiffs allege that the "Defendant Banks combined collectively with the networks to formulate and agree to each network's bylaws, rules and regulations" and that these alleged agreements remain "among Mastercard/Visa and their member

33

banks to fix, enforce, and maintain the unlawfully fixed interchange fees that Defendants lock into place with Rules." (*Id.* ¶ 20.)  These allegations alone establish that plaintiffs' claims arise out of the "close relationship" among the signatory banks and non-signatory banks and networks.

**Nexus between Plaintiffs' Claims and Arbitrable Disputes.**  Third, plaintiffs' antitrust claims against the non-signatory banks are "closely linked"—and in fact, identical—to claims covered by the Arbitration Agreements with the signatory banks.  As in *Currency Conversion*, "plaintiffs' claims against the non-signatory bank defendants are 'closely linked' to their claims against their issuing banks because both are intertwined with the cardholder agreements" that require arbitration of fee disputes that "arise under the subject matter of the underlying agreement between plaintiffs and the issuing banks."  361 F. Supp. 2d at 264-65 (internal marks omitted).

Plaintiffs try to sidestep this conclusion by disavowing any "claims against their issuing banks."  This attempt fails because their arbitration agreements with these banks turn on the substance, not semantics, of the claims raised in this suit.  Here, as in *JML* and *Currency Conversion*, plaintiffs' claims against all defendants are joint and several conspiracy claims that are entirely dependent on plaintiffs' status as holders of cards issued by banks with whom plaintiffs signed arbitration agreements.  Plaintiffs allege that as cardholders they are harmed as "direct purchaser[s] and first payer[s]" of the fees that all defendants, including their issuing banks and arbitration counterparties, allegedly fixed.  (FAC ¶ 82.)  They further allege that the issuing banks failed to disclose "that the cardholder is a joint direct purchaser of each payment-card transaction, or that an interchange fee is applied to the transaction and withdrawn from the cardholder's payment account."  (*Id.* ¶ 83.)  Plaintiffs are therefore situated just like the cardholder plaintiffs in *Currency Conversion*, whose claims the court found to "arise under the subject matter of the underlying [arbitration] agreement between plaintiffs and the issuing banks" because "plaintiffs

34

allege that all of the defendants conspired, each with the others, to inflate the fees imposed under every cardholder agreement."  361 F. Supp. 2d at 265 (cleaned up).

In sum, plaintiffs treat defendants as interchangeable participants in a conspiracy among the banks and networks made possible by their close relationship to one another and assert joint and several liability claims that plaintiffs admit are covered by their Arbitration Agreements with certain bank defendants.  This is the exact factual scenario under which plaintiffs were estopped from avoiding arbitration with non-signatories in *Currency Conversion* based on the Second Circuit's controlling analysis in *JML*.  Plaintiffs are estopped from avoiding arbitration here.

### C.  The Court Should Stay This Case Pending Arbitration

Section 3 of the Federal Arbitration Act provides that a district court, upon determining that an action before it is subject to an enforceable arbitration provision, "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement."  9 U.S.C. § 3; *see Kamin Health LLC v. Halperin*, 2021 WL 964949, at *9 (E.D.N.Y. Mar. 15, 2021) ("Because Plaintiff must arbitrate its claims, the Court stays this case pending the results of arbitration.").  Defendants respectfully request that the Court stay this case pending any arbitrations that are filed on any claims that survive defendants' concurrent motion to dismiss.

### CONCLUSION

For the foregoing reasons, this Court should dismiss the Complaint in its entirety and with prejudice or, alternatively, limit plaintiffs' claims to those accrued as of December 30, 2018 or, alternatively, compel individual arbitrations of plaintiffs' claims.

Dated:  New York, New York
       February 9, 2024

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP

By:  /s/ *Boris Bershteyn*
    BORIS BERSHTEYN
    KAMALI WILLETT
    One Manhattan West
    New York, NY 10001
    Telephone: 212-735-3000
    Boris.Bershteyn@skadden.com
    Kamali.Willett@skadden.com

*Counsel for JPMorgan Chase & Co. and*
*JPMorgan Chase Bank, N.A*

MORRISON & FOERSTER

By:    /s/ *Michael B. Miller*
    MICHAEL B. MILLER
    NATALIE FLEMING NOLEN
    250 West 55th Street
    New York, NY 10019
    Telephone: 212-468-8000
    MBMiller@mofo.com
    2100 L Street NW, Suite 900
    Washington, DC 20037
    Telephone: 202-887-1500
    NFlemingNolen@mofo.com

*Counsel for Bank of America Corporation,*
*Bank of America, National Association, and*
*Bank of America, N.A.*

O'MELVENY & MYERS LLP

By:  /s/ *Abby F. Rudzin*
    ABBY F. RUDZIN
    ANDREW J. FRACKMAN
    Times Square Tower
    7 Times Square
    New York, NY 10036
    Telephone: 212-326-2033
    Telephone: 212-326-2017
    arudzin@omm.com
    afrackman@omm.com

*Counsel for Capital One Financial*
*Corporation, Capital One, F.S.B., Capital*
*One Bank (USA), National Association and*
*Capital One National Association*

SIDLEY AUSTIN LLP

By:    /s/ *Benjamin R. Nagin*
    BENJAMIN R. NAGIN
    787 Seventh Avenue
    New York, NY 10019
    Telephone: 212-839-5300
    bnagin@sidley.com
    tpaskowitz@sidley.com

*Counsel for Citigroup Inc. and Citibank, N.A.*

36

PATTERSON BELKNAP WEBB &
TYLER LLP

By: /s/ Amy Neda Vegari
    AMY NEDA VEGARI
    WILLIAM F. CAVANAUGH, JR.
    1133 Avenue of the Americas
    New York, NY 10036
    Telephone: 212-336-2216
    Telephone: 212-336-2793
    avegari@pbwt.com
    wfcavanaugh@pbwt.com

*Counsel for Wells Fargo & Company and
Wells Fargo Bank, N.A.*

REED SMITH LLP

By:    /s/ Michelle Ann Mantine
    MICHELLE ANN MANTINE
    225 Fifth Avenue
    Pittsburgh, PA 15222
    Telephone: 412-288-4268
    mmantine@reedsmith.com

*Counsel for PNC Financial Services Group,
Inc., PNC, and PNC Bank, National
Association*

GIBSON, DUNN & CRUTCHER LLP

By: /s/ Elizabeth P. Papez
    ELIZABETH P. PAPEZ
    1050 Connecticut Avenue, N.W.
    Washington, DC 20036
    Telephone: 202-955-8608
    epapez@gibsondunn.com

    RACHEL S. BRASS
    JULIAN W. KLEINBRODT
    One Embarcadero Center,
    Suite 2600
    San Francisco, CA 94111
    Telephone: 415-393-8293
    Telephone: 415-393-8382
    rbrass@gibsondunn.com
    jkleinbrodt@gibsondunn.com

*Counsel for BMO Harris Bank N.A.,
successor-in-interest to Bank of the West*

ALSTON & BIRD, LLP

By:    /s/ Teresa T. Bonder
    TERESA T. BONDER
    KARA F. KENNEDY
    560 Mission Street, Suite 2100
    San Francisco, CA 94105
    Telephone: 415-243-1000
    teresa.bonder@alston.com
    1201 W. Peachtree Street
    Atlanta, GA 30309
    Telephone: 404-881-7000
    kara.kennedy@alston.com

*Counsel for U.S. Bancorp and U.S. Bank
National Association*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP

By: /s/ *Kenneth A. Gallo*
 KENNETH A. GALLO
 DONNA M. IOFFREDO
 2001 K Street, NW
 Washington, DC 20006
 Telephone: 202-223-7300
 kgallo@paulweiss.com
 dioffredo@paulweiss.com

 NINA KOVALENKO
 BRETTE TANNENBAUM
 GARY R. CARNEY
 1285 Avenue of the Americas
 New York, NY 10019
 btannenbaum@paulweiss.com
 nkovalenko@paulweiss.com
 gcarney@paulweiss.com

*Counsel for Mastercard International
Incorporated*

ARNOLD & PORTER KAYE SCHOLER
LLP

By: /s/ *Matthew A. Eisenstein*
 ANNE P. DAVIS
 MATTHEW  EISENSTEIN
 600 Massachusetts Avenue, NW
 Washington, DC 20001
 Telephone: 202-942-6197
 Telephone: 202-942-5000
 anne.davis@arnoldporter.com
 matthew.eisenstein@arnoldporter.com

 ROBERT J. VIZAS
 Three Embarcadero Center,
 10th Floor
 San Francisco, CA 94111
 Telephone: 415-471-3100
 robert.vizas@arnoldporter.com

*Counsel for Visa Inc., Visa U.S.A. Inc., and
Visa International Service Association*