UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JOHN PALLADINO, GARIB KARAPETYAN,
STEVE PALLADINO, AND JOHN NYPL,
Individual Plaintiffs and on behalf of themselves
and all others similarly situated,       PLAINTIFFS' OBJECTIONS
                                         TO REPORT AND
                                         RECOMMENDATION

                Plaintiffs,       23-CV-1215
                v.                (Brodie, C.J.)
                                  (Marutollo, M.J.)

                JP MORGAN CHASE & CO., *et al.*,

                Defendants.
-------------------------------------------------------------X
**MAGISTRATE JOSEPH A. MARUTOLLO, MAGISTRATE JUDGE:**

**I.    INTRODUCTION**

        The First Amended Complaint is found by Magistrate Marutollo (the Court) to lack factual allegations sufficient to provide standing to the Plaintiffs, when the "efficient enforcer" provisions of the *Associated General Contractors v. California State Council of Carpenters* ("*AGC*")(citation omitted) case are applied.  The Court recommends dismissal pursuant to FRCP Rule 12(b)(6) premised exclusively upon *AGC* standing grounds. It is undisputed that California has not formally adopted *AGC* standing rules as a condition to affording standing to sue in California. We are not told why the Court adopted the *AGC* criteria given that they are determinative of the outcome in this major antitrust *Illinois Brick* repealer case.

**II.    THE PROCEDURAL BACKGROUND**

        Plaintiffs allege by their First Amended Complaint (FAC) a broad conspiracy to fix and maintain the price of interchange fees throughout the state of California. In its Report and Recommendations (Report) as to Defendants' FRCP Rule 12(b)(6) motion to dismiss, the Court

1

found conclusively that: "Plaintiffs have satisfactorily alleged unlawful conduct – by way of Defendants' conspiracy to fix the price of interchange fees – and that such conduct caused them injuries in the form of having paid high prices for goods and services." Report at page 47. Accordingly, the adequacy of the facts alleged in support of Plaintiffs' allegations of conspiratorial and related unlawful conduct in violation of California' s Cartwright Act by Defendants together with the resulting injury to plaintiffs, have been satisfactorily alleged and are not in dispute in this Rule 12 motion to dismiss.

The Defendants' companion motion to compel arbitration was denied. Report at 34. Their motions to dismiss the Unfair Competition Claims and Statute of Limitations Defenses were granted as dependent on the finding of Plaintiffs' lack of antitrust standing.  The dismissal recommended is premised exclusively upon  standing grounds set for the in *Associated General Contractors v. California State Council of Carpenters* ("*AGC*"), 459 U.S. 519, (1983) (*AGC*). The findings as to standing are objected to in their entirety herein. The cornerstone of the findings submitted is that Plaintiffs' complaint fails to demonstrate that the California's consumers participate in the relevant market affected by the price-fix alleged. Their allegations describe conduct that although wrongful, was too remote, speculative and derivative to be considered the cause of Plaintiffs' damage.  As such Plaintiffs are not "efficient enforcers" as required under the parameters laid down by the Supreme Court in AGC.   See Report at 47.

### III.   SPECIFIC OBJECTIONS TO FINDINGS AND RECOMMENDATIONS

Plaintiffs object to the following findings upon which the recommendation for dismissal is based:

1. Plaintiffs dispute and object to the finding that the four *AGC* standing requirements are applicable in California.  Report at 37.

2

2.     As to facts relating to the *AGC* factors, the Plaintiffs dispute and object to the finding that the "transaction structure" is the same as the structure alleged in *Salveson v. J.P. Morgan Chase et al I – V.* Report at 43.

3.     Plaintiffs dispute and object to the inherently factual finding that although Plaintiffs are indirect purchasers they do not participate in the "payment Card Market" are not "efficient enforces" as described in *ACG*. They further object to the finding that because Plaintiffs do not participate in the Network Services Market, Plaintiffs have not alleged an antitrust injury. Id. at 30-31." Report at 43, 48-55.

4.     Plaintiffs dispute and object to the finding that: "While in some circumstances it might be relevant whether a plaintiff has interacted directly with the alleged wrongdoer, here it is not because the fact remains, as alleged in the amended complaint, that Plaintiffs' injuries derive from an alleged antecedent injury to the merchants that was "passed along to consumers." Dkt. No. 1-3 ¶¶ 87" Report at page 54.

5     Plaintiffs object and dispute the finding that: "At bottom, the allegations in the amended complaint are insufficient to establish a direct link between the alleged price-fixing conspiracy and the injuries purportedly suffered by Plaintiffs. Report at 49-57.

6.     Plaintiffs object to the finding that "Here, like the plaintiffs in *In re ATM Fee Antitrust Litig.*, Plaintiffs do not allege a plausible conspiracy between Defendants and the merchants to illegally fix the only price that cardholders are alleged to pay directly—*i.e.*, the price of the goods and services purchased using a Visa or Mastercard payment card. Indeed, Plaintiffs do not allege that Defendants have any involvement with the prices set by merchant. The Court finds that the damage alleged is speculative based upon a number of factors. Report at 58 – 59. The finding misconstrues the facts alleged and is disputed.

7.     The court concluded that the damages alleged are duplicative and difficult to apportion. Plaintiffs dispute and object to this conclusion both factually and legally. Report at 50-54

8.     The Plaintiffs dispute and object to the finding that the Unfair Competition claims must fall for the same reason as those set out in the Report. Report at 54-56

## IV. ARGUMENT

### A. The Conspiracy Claims Are Unique And Adequately Alleged.

Plaintiffs will address below each of the objections cited above. The Court is asked to review the facts describing the conspiracy alleged here in assessing these objections. At the outset, it is to be emphasized that this is an indirect purchaser case brought by millions of California card holding consumers. Plaintiffs allege no reliance on or even similarity with *Salveson. v. J.P.Morgan Chase et al., supra*. Much of the Court's analysis of this action refers to and often relies upon allegations and holdings by the court in *Salveson I – V*. That reliance is

3

misplaced. The parties are different, the claims alleged were federal, the merchants were not alleged to be co-conspirators, and the damages were not alleged to be the purchase of increased retail prices paid by the Plaintiffs. .

At the heart of Plaintiffs' action here is the allegation that California's merchants were and continue to be indispensable participants in the price-fixing conspiracy alleged here. The court has found this claim to be sufficiently alleged. Report at 47.

### B. Overview Of The Credit/Debit Market Conspiracy As Alleged In The First Amended Complaint.

Plaintiffs allege a large conspiracy to fix and maintain the price and related enforcement of interchange fees. The players in the conspiracy are alleged to be the networks, (Visa and MasterCard), the Banks, named and unnamed, and the merchants who accept credit/debit cards issued by the Defendant banks. The relevant market is alleged to be the *General Purpose Card Network Services* and *Merchant Acceptance of Credit and of Debit Cards.* FAC ¶ 2.

Interchange fees have been developed as the means of providing payment to the network providers to cover the costs of the services provided. They are necessitated in order to meet the card usage demand of the consumer. (There are other payment elements on both merchant and consumer sides of the transaction but they are not in issue here.) Importantly, interchange fees are intended to compensate the banks for providing access to consumers and merchants to the Visa/MasterCard payment networks. None would be necessary without the consumer's demand for access to card payment. FAC ¶61-64.

### C. The Merchants As Co-Conspirators

The Defendant Banks have made agreement with the networks and the merchants to facilitate the payment to them of interchange fees ostensibly to compensate the Banks for the providing access by the merchants and consumer to the network payment processing services the

4

Banks provide. (These agreements are alleged herein to violate of the Cartwright Act as price fixing agreements.) A number of fees were devised but the largest is the interchange fee. It is a flat, non-negotiable rate required to be calculated as percentage of all gross sales inclusive of taxes, tips and all other monies paid by credit/debit cards. It is set and published twice per year by Visa and MasterCard separately.

Both merchants and banks agree *by contract* with each other and with Visa MasterCard to accept and pay the fees set by the network Defendants. FAC 55, 66. Without the merchants' universal participation at every level in the Rules and practices related to interchange fees the conspiracy simply could not survive. *Id* Although given short shrift by the Court in its Report, California's merchants have been alleged to be un-named albeit unwilling co-conspirators in antitrust cases. There is abundant authority for the claim. *United States v, Paramount Pictures* 334 U.S. 131 (1948)*; Va. Vermiculite v ltd v. W.R. Grace* 156 F.3d 535 (1998); *Duplan Corp. v. Deering Milliken Inc.,* 594 F.2d 979, 982 (4th Cir. 1979).) See also *Dickson v. Microsoft Corp* 309 F.3d 193, 205. (4th Cir 2002).

Retail merchants in California operate under the established belief that they will be able to pass the interchange fee on to their customers in the form of higher prices. *The merchant knows its competitors must do the same*. All the competitors sign the same card acceptance agreements. And the Banks know their merchant clients *must* pass the fees on to their customers to remain profitable. The ability to pass the fee to the consumer with impunity is fundamental to the efficacy of the conspiracy. FAC ¶55; 121; 122

The merchant is required to include the interchange fee as a cost in its pricing structure. Indeed, it has no way not to include the charge in its pricing. The fee is calculated upon the *gross purchase amou*nt charged by the merchant to the consumer. Moreover, every merchant knows

5

and relies upon the fact that interchange fees will be charged uniformly and without exception to its competitors. The fee is non-negotiable by contract. He must follow the Rules to be sure, but he also participates the agreement not to disclose the fee to the retail customer who would surely balk if he knew the price he was paying would be two to three percent lower if he paid in cash or used a less expensive card. .

### D. The Impact And Damages Are Properly Alleged.

The Court acknowledges that a conspiracy and resulting damage to the consumer have been adequately alleged. Report at 47-48.

Critical here is that the fee is calculated as a percentage not only of the gross product price offered and paid by the consumer but all monies included in the amount processed. A restaurant menu price of one hundred dollars results in a payment inclusive of tips (15% +/-), sales tax (7%), parking charges, and any other incidentals not on the menu but paid by credit card. The total actually paid is closer to one hundred twenty five dollars when the charge goes over the network. And the restaurant merchant will not receive the tips and tax yet he pays the interchange fee charged on them.

Inherent in this policy is the understanding and contractual requirement that the merchant will include the processing charge as a cost in its product pricing, and that despite the fact that the consumer's money is in use in the transaction, he is not told of the expense the use of his card has generated. The merchant agrees to the arrangement reluctantly to be sure. FAC at 109, 110. But its need for access to the benefits of card acceptance overrides its reticence to accept the conspiratorial fee collecting arrangement. Legally, its reluctance is not relevant. *United States v, Paramount Pictures* 334 U.S. 131 (1948)*; Va. Vermiculite v ltd v. W.R. Grace* 156 F.3d 535 (1998)

6

Expert testimony will show that because the interchange fee charged is calculated upon the gross sales amount regardless of the product purchased it is necessarily incumbent upon the merchant to include the fee a as cost and to account for it in its pricing. It matters not whether the merchant increases its price or lowers it. The fee is deducted from the gross amount paid by the processing network. This fact distinguishes the arrangement from more common price fix agreements. The interchange fee affects the cost to purchase *all retail products*. Since it is included in full in all prices charged, the calculation of the increase is arithmetical.

E. **The Parties Need Each Other.**

Each credit debit card market participant needs the other and each pays consideration for the access to the various levels of convenience and cost savings provided in the market. Cardholders seek efficient low processing cost in their purchase of goods from merchants. FAC ¶56. Merchants seek cardholder business provided by their acceptance of the cardholder's payment cards, and the Banks act as intermediaries between the merchant and cardholders. They seek compensation for their transaction processing service. Each member of the market participates in the transaction every time a retail sale is made. Without the retail sale, the card processing market would serve no function.

Defendants claim and the court apparently accepts the suggestion that the pass on amount will be complicated to ascertain and the amount actually included in the selling price will be difficult to calculate. Report at 54. Not true. A merchant's pricing will always include the interchange fee. The conspiracy is vast and extremely costly to California's consumers. Only the Banks benefit from the anticompetitive arrangement. It has gone on long enough.

Given this background alleged in greater detail in the Plaintiffs' Complaint herein we address the findings and conclusions reached by the Court.

7

### F. The Four AGC Standing Criteria Have Not Been Accepted In California And Should Not Be Relied Upon Here.

#### 1. The Application Of AGC Is Contrary To California Antitrust Policy.

The Court found that the principles adopted in defining standing under the antitrust laws set out in *Associated General Contractors v. California State Council of Carpenters ("AGC")*, 459 U.S. 519, 537-544 (1983) (*AGC*) should be adopted as controlling of standing requirements in this motion. Report at 36. Applicability of *AGC* aside, the Court finds that first two AGC factors needed for standing have been shown. Illegal conduct and resulting damage are properly alleged. Report at 47.

The U.S. Supreme Court in *California v. ARC America* 490 U.S. 93 (1989) rejected a preemption challenge to California's *Illinois Brick* repealer provisions and affirmed the right of the states to provide indirect purchasers with economic redress for their antitrust injuries. Despite this prevailing grant of authority to states to determine their local antitrust issue the Court ignores the prevailing majority of recent federal court decisions addressing the issue of the applicability of *AGC* standing criteria in California antitrust cases.

The Report also concludes and recommends that this court look to federal law to determine the reach of the *AGC* factors in this state court Cartwright repealer action. Report at 36. This conclusion appears at odds with the California Supreme Court's finding that: "The second and third premises, construing state law, are each wrong. Interpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century. (*State of California ex rel. Van de Kamp v. Texaco, Inc.* (1988)." *Aryeh v Canon Business Sols* 55 Cal 4th 1185, 1194-1195 (2013).

8

Much reliance is placed on S*chwab Short-Term Bond Mkt. Fund v. Lloyds Banking Grp. PLC*, 22 F.4th 103, 115 (2d Cir. 2021). That case dealt with issues pertaining to Plaintiffs who did not deal with the alleged conspirators. It is distinguishable from this action because Plaintiffs here dealt at all times relevant with the members of the unlawful conspiracy.

The Report acknowledges that *AGC* has not been formally accepted by federal courts in California as applicable to price fixing antitrust actions framed under the Cartwright Act. Report at 37.

Despite the Court's contrary conclusion, most California federal courts in recent years have regularly declined to apply *AGC* in antitrust *Illinois Brick* repealer cases. See *In Re Broiler Chickens Antitrust Litigation* wherein the court held: "The Court finds that any state with an *Illinois Brick* repealer would reject application of *AGC* to this case for the reasons expressed by the courts cited above." *In Re Broiler Chickens Antitrust Litigation* 290 F. Supp. 3d. 772, 816 (2017).

The court went on to conclude: "While courts have disagreed on whether the *AGC* factors apply to Cartwright Act claims—and authority is sparse in either direction—this Court is persuaded by those courts, including the Second Circuit, that have found that the same or substantially similar factors apply. *See Schwab*, 22 F.4th at 120 ("California law substantially incorporates the *AGC* factors."); *see also Salveson II*, 166 F. Supp. 3d at 258…" Report at 37. (The Court's ubiquitous reliance on *Salveson*, a Sherman Act case, is not precedent here.)

2. **Numerous Recent Federal Court Cases Have Held That AGC Does Not Apply In California.**

Contrary to the finding that authority on the *AGC* issue is "sparse," the fact is that a majority of recently decided price fixing consumer antitrust Cartwright Act indirect purchaser cases have concluded that *ACG* does not apply in California. The cases include: *In re Capacitors*

9

*Antitrust Litig.*, 106 F. Supp. 3d at 1072-73 ( ("The application of *AGC* to California state antitrust claims has recently become murky, and that murkiness persuades the Court *AGC* should not be applied."). *In Keurig Green Mountain Single Serve Coffee Antitrust Litigation* 383 F.Supp.3d 187,  (SDNY 2019)   the District Court found: "Although *Vinci* favorably cites *AGC*, subsequent cases from the Supreme Court of California cast doubt on the applicability of the *AGC* factors under California law.  I cannot conclude, therefore, that the Supreme Court of California would apply the *AGC* factors in accordance with federal precedents, if at all, to determine indirect purchaser antitrust standing under the Cartwright Act."

And again:  *Pool Prod. Distribution Mkt.*, 946 F. Supp. 2d at 564 holds:  "These authorities cannot overcome the California Supreme Court's decision in *Clayworth* to allow suit by indirect purchasers under the Cartwright Act and the UCL without applying the *AGC* factors." Older cases in the Northern District of California cases are in accord: *In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1026 (N.D. Cal. 2007) "Standing under each state's antitrust statute is a matter of that state's law. It would be wrong for a district judge, in ipse dixit style, to bypass all state legislatures and all state appellate courts and to pronounce a blanket and nationwide revision of all state antitrust laws. *Id*.   In 2015: "The application of *AGC* to California state antitrust claims has recently become murky, and that murkiness persuades the Court *AGC* should not be applied." *In Re Capacitors Antitrust Litigation* 106 F. Supp. 3d 1051 (N.D. Cal. 2015).

*In re TFT-LCD (Flat Panel) Antitrust Litigation* 586 F.Supp.2d 1109 (2008) is most persuasive.  The court declined to acknowledge *AGC* acceptance in a Cartwright Act repealer action involving price fixing of flat LCD panels installed in televisions and computer products. Consumers sued as indirect purchasers under California's repealer statute.  The court held: "The

10

Court agrees with Judge Alsup that it is inappropriate to broadly apply the AGC test to [indirect purchaser] plaintiffs' claims under their repealer state's laws in the absence of a clear directive from those states' legislatures or highest courts." *Id* at 1123. The court went on to analyze the four AGC factors finding in favor of the consumers standing.

The law provides that if there is *any doubt* as to the state's acceptance of the *AGC* standing rule it is to be resolved *against a*pplying it in the state's antitrust laws. *Id*. This court turns this rule on its head. The finding here, despite acknowledging doubt as to the state's law on the *AGC*. Another case relied upon by the Court is equivocal: "*In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d at 1151 applied *AGC* factors to Cartwright Act claims but also found that: " Instead, courts are to balance the factors 'giving great weight to the nature of the plaintiff's alleged injury.'"' *Id*. ) No such analysis was undertaken here.

   3. ***Vinci* And Salveson *I – V* Are Readily Distinguishable And Should Not Be Relied Upon As Authority For Applying AGC Standing Requirements To California Consumer Price Fixing Claims.**

The Report eschews the numerous more recent *federal* Cartwright Act cases cited above but instead places controlling reliance on the state court employment dispute *Vinci v. Waste Management Inc.* 43 Cal. Rptr. 2d 337, 338-39 (Ct. App. 1995); See Report at 38. (It is unclear how the Court concludes that the state court decision in *Vinci* should trump so many later federal decisions on *AGC* applicability in consumer price fixing cases.) *Vinci* was a dispute alleging wrongful termination of employment. *Vinci* held: "The loss of a job is not the type of injury that the anti-trust laws were designed to prevent." *Id*. *Vinci* is neither a price fixing case, a consumer class action, an indirect purchaser case nor a product overcharge case. Given the numerous subsequent refusals to apply *AGC* in California in price-fixing cases since *Vinci.* It should not control here.

11

It is interesting to note a holding in *Vinci* as to the issue of incentive to enforce the antitrust laws. *Vinci* cites *Ostrofe v. H.S Crocker* 740 F2d. 739 (9th Cir 1984) wherein an employee was fired for refusing to take part in a price-fixing conspiracy. The employee was granted standing under *ACG* based on the 9th Circuit's finding that: "As the immediate victim of the breach of antitrust policy he was its natural vindicator. No one else had a greater incentive to sue to restore competition in the market for his services. As a victim of an alleged boycott, *Ostrofe* is entitled to an opportunity to prove his charges." *Id,* at 744.

Similarly here there is no one with greater incentive to sue to restore competition than the consumer who has and continues to absorb the overcharge attributable to the interchange fee fix. *Id.*

The credit card carrying consumer deals directly with members of a price fixing conspiracy (the merchants and the Bank that issued his card). He has the greatest incentive to restore competition to the credit/debit processing market place because his money is funding the process. Because the actors know that the fee must of necessity be included in the merchant's price structure and passed on to the consumer, the actors know that the merchant will be reimbursed for the full amount of the fee he is charged. It is the consumer who actually pays more for the products purchased with credit cards than would be the price paid were the interchange fee lower. This is not true for the merchant. It needs credit card processing authorization to remain competitive. And it is being reimbursed when it adds the fee to its prices. Moreover, it knows its competition will do the same. The merchant has little incentive to bite the hand that feeds him.

The state's Supreme Court has not favorably relied upon or echoed any of *Vinci's* findings. Indeed, this Court is respectfully referred to *Clayworth v. Pfizer* 49 Cal 4th 758 (2010)

12

wherein the state's Supreme Court is critical of *Vinci* and *AGC* in its thoughtful recitation the state's policy favoring consumer prosecution of Cartwright Act antitrust actions in the state. To the extent *AGC* was relied upon by Defendants in *Clayworth,* a defensive price-fixing reverse passing on case, it was found inapplicable. Indeed, *Clayworth* held in discussing standing while referencing both *AGC* and *Vinci* that: "Here in contrast, pharmacies are not manufacturers' competitors but their indirect customers and they have properly alleged that the Manufacturers' price-fixing conspiracy caused them injury in the form of higher prices." *Clayworth* at 49 Cal 4th 758, 776.

Price controls. California merchant prices are higher than they would be absent the conspiracy. There is no controlling law that requires this court to apply the *AGC* standing criteria in this action. It should not do so.

### 4. The Knevelbaard Dairies Case Is Readily Distinguishable.

The court cites *Knevelbaard Dairies v. Kraft Foods* 232 F.3d 979 (9th Cir. 2000) as virtually dispositive of the *AGC* issues herein. Although the *AGC* factors were adopted and found not destructive of Plaintiff's antitrust claims, the court was careful to point out that: "Hence judicial interpretation of the Sherman Act, while often helpful, is not directly probative of the Cartwright drafters' intent, given the different genesis of the provision under review." *Knevelbaard Dairies* supra at 985. And further: "[T]hus, federal antitrust precedents are properly included in a Cartwright Act analysis, but their role is limited: they are 'often helpful' but not necessarily decisive." *Knevelbaard Dairies v. Kraft Foods* 232 F.3d 979, 986. The case is consistent with the later federal cases cited herein above affirming California's reticence in formally adopting *AGC*. Nowhere in *Knevelbaard Dairies* is there a definitive finding that *AGC* applies in California.

### 5. The Remaining AGC Efficient Enforcer Factors – Direct Purchaser Issue. Report At 39 -44. .

Assuming that AGC's efficient enforcer provisions are applicable here they are readily met by the Plaintiffs. The Court first addresses plaintiffs' assertion that they are joint direct purchasers. The Court analyzes the reasons Plaintiffs here are not "direct purchasers and first payers" of interchange fees. Report at 39-44. First, Plaintiffs do not claim to be "direct purchasers or first payers" of interchange fees. To the contrary they claim that they are direct purchasers of transactions. The FAC provides: "Plaintiffs have standing as direct purchasers of *General Purpose Card* Credit and Debit Payment-Card Transactions provided by Defendants' *General Purpose Card Network Services*." FAC ¶57.

The direct purchaser reference is to the fact that the market structure found to be applicable in *Amex* is similarly applicable here. The FAC allegation cited is not intended to suggest that Plaintiffs are "direct purchasers and first payers" of interchange fees. Report at 39.

The interchange fee is not purchased directly by the Plaintiffs. It is charged to the merchant who knows it will be deducted from the gross purchase price paid at the time of sale. In response, he has increased the price of the product purchased to account for the expense he knows is knows is coming. The price of the transaction has been unlawfully inflated and Plaintiffs absorb the increase at the point of sale. FAC 54, 55, 160, 191 – 202.

The essence of the Court's misapprehension of the Plaintiffs' standing claim is the finding that:

Plaintiffs' allegations "acknowledge[d] that the amount withdrawn from a cardholder's account is due, in its entirety, to a merchant for goods or services, and thus there is no increased cost to cardholders from the interchange fee." Report at 42. This was the Plaintiff's position is *Salveson* to be sure. It is not Plaintiff's position here. Plaintiffs here allege that the *price of the*

14

*product* is higher than it would be but for the existence of interchange fee conspiracy. The increase is traceable to fixed interchange fee. FAC 54, 55, 160, 181-202, 208 – 210. This is a classic antitrust passing on theory that was never alleged in S*alveson.*

### 6. The *Salveson* Comparison.

Plaintiffs are not alleging to be direct purchasers of interchange fees. The Court makes extensive reference to and reliance upon the *Salveson I – V* cases. See *Salveson v. J.P. Morgan Chase* 166 F.Supp.3d 242 (2016). *Salveson* is readily distinguishable. It was brought as a federal Sherman Act §1 price-fixing case and originated in Federal Court. The Plaintiffs alleged a nationwide class of persons that were direct purchasers of interchange fees. Plaintiffs there specifically and emphatically refused to assert or allege damage flowing from their purchase of consumer goods at inflated prices. Their claims were dismissed on the sole basis that as direct purchasers they had failed to allege actual damage attributable to the inflated interchange fee.

## G. The Extension Of Credit Finding

Plaintiffs object to the finding that the services provided to cardholders are limited to the "extension of credit." Report at 43. The facts overwhelmingly evidence that cardholders seek and acquire much more than credit in their decision to purchase and use credit/debit cards. The convenience, lower cost, security, record keeping and other services provided the cardholder by the bank issued credit/debit cards are at least as sought-after as credit. Indeed, debit cards do not provide credit at all – just convenience.

## H. The Amex Case

The Court's extensive recitation of *Amex* holding on relevant market is not disputed here and is consistent with the relevant market described by Plaintiffs herein. See FAC ¶57 note 5. The conclusion that Plaintiffs are not direct purchasers of interchange fees is also correct. No contrary assertion is in issue here.

### I. Plaintiffs Participate In The Market Impacted By The Conspiracy.

The Court finds that Plaintiffs do not participate in the market impacted by the conspiracy. Report    To the contrary, Plaintiffs claim to have directly participated in the market impacted by the conspiracy to fix interchange fees when they purchase credit cards for the specific purpose of obtaining access to purchase processing, convenience, cost savings and related benefits provided with credit/debit card usage.  FAC ¶¶55, 100-105, 117-118. Id. The conspirators know and rely upon the merchant's need to include the inflated cost of the interchange fee in its product prices, and the merchant knows the consumer will use his or her credit card to facilitate the purchase of the merchant's products.  When retail customers use their cards to purchase products, they do so in a market that has been impacted by the conspiracy. See FAC at 2. 100 -105, 117-118.

### 1. The Court References But Does Not Define The "Payment Card Market" And The "Network Services Market."  See Report At 44 And 50.

The FAC refers to the relevant market at FAC ¶¶2 71, 102, 183, 226. That market is alleged as follows:

> "The networks provide General Purpose Card Network Services to facilitate authorization, clearance, and settlement of transactions that member banks acquire and process from merchants with whom they are contracted. Visa and Mastercard supply the channels that move transaction data and funds among cardholders, merchants, merchants' banks, cardholders' banks, and among themselves."  FAC ¶2.

Contrary to the relevant market actually alleged, the Court determined that the relevant market at issue here is the "Network Services Market."  Plaintiffs are alleged by the Court to have participated in the "Payment Card Market."  Report at 49, 50.  The first problem is that neither market referenced by the Court is alleged to be the market described in the FAC.  No "Payment Card Market" or "Network Services Market" is alleged anywhere in the FAC.  Indeed neither of these markets is even defined by the Court in its Report. The Court mentions almost in

16

passing, "General Purpose Card Network Services" activity that is present in the FAC at ¶102 to describe the activity Visa MasterCard engage in when dealing with card transactions. This language is intended as market definition. No mention is made in FAC¶ 102 as to any market in which Plaintiffs participate. The Court declares:

> "While the payment transaction is facilitated by the member banks who use the Visa and Mastercard networks, the cardholder's participation is nonetheless limited to the Payment Card Market." See *Id*. ¶[FAC]102." Report at 50.

And the Report continues:

> "Absent specific allegations in the amended complaint that establish Plaintiffs' participation in the Network Services Market, this Court cannot credit Plaintiffs' conclusory arguments made in opposition to Defendants' motion." (Emphasis added) *Id*.

As earlier stated, we are not told what is meant by terms "Network Services Market" or the "Payment Card Market." The terms are not used in FAC. Apparently there is a reference to these market definitions in the *Salveson* litigation in which Plaintiffs there described the nature of card purchase cards and related network services. Plaintiffs here are not bound by claims made by different Plaintiffs in pleadings made in that or any other separate case. Those claims have in no way been adopted here, and the court's reliance upon them is misplaced. The relevant market actually alleged here is the market described in *Ohio v. American Express Co.* 138 S. Ct. 2274 (2018). See FAC ¶2, ¶¶71,102, 183, 226.

### 2. Plaintiffs Allege Participation In The Market In Which The Price Fixing Occurred.

Notwithstanding the market definition issue, the Court found that Plaintiffs do not participate in the market in which the price fixing occurred. Report 44-45. But the FAC specifically alleges merchant participation in a defined relevant market. FAC ¶2, 71, 102, 183, 226. The court is obligated to accept the relevant market allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Indeed, the Court accepted the allegation as true in its

17

Report at page 47. Defendants may seek to prove a more constricted market in which Plaintiffs do not compete, but that is hardly appropriate in this Rule 12 (b)(6) motion. No viable alternative relevant market has been presented here.

There is simply no basis for the Court's finding that Plaintiffs do not participate in the relevant market alleged in the FAC. The Court acknowledges:

> "To that end, antitrust standing is granted only where the plaintiff is a participant in the relevant market—*e.g.*, a consumer or competitor in the relevant market alleged." *Id.*(*emphasis added*.) Report at 48 (Citing *Dram Antitrust Litigation* 516 F. Supp. 2d 1072, 1080, 1090 (N.D. Cal. 2007)).

The operative language is the "relevant market *alleged.*"

### 3. Plaintiffs' Standing As Indirect Purchasers.

Plaintiffs allege standing as indirect purchasers as contemplated by California repealer statute. Discussion of issues relating to direct purchaser claims in other cases is not productive here. Plaintiffs' indirect purchaser claim is simple. The defendants conspire and agree to charge merchants a non-competitive fixed interchange fee. They further agree that all participating merchants will include the fee in their product price which, absent the fixed fee, would be lower by the amount of the fee. This is a classic pass on situation. The cardholder is the indirect purchaser of the interchange fee that has been passed on to him

### 4. The Market Definition Issues Are Not Controlling

Whether Plaintiffs participate in the Card Payment Market or the Network Services Market makes no Difference. The Plaintiffs deal directly with the conspirators every time they make a purchase at an inflated price. And their money is used to fund the allegedly separate markets involved. As the result all of the markets in the chain are affected. See *In re TFT-LCD (Flat Panel) Antitrust Litigation* 586 F.Supp.2d 1109 (2008) the court states:

> "Here, the complaint alleges that the direct purchaser plaintiffs purchased TFT-LCD products directly from cartel members at supra-competitive prices as the result of a conspiracy to fix prices. Defendants do not cite any case holding that a

18

plaintiff who purchases directly from an alleged cartel does not have standing."*Id* at 1118.

The products at issue in *LCD* there were flat panel monitors manufactured oversees sold at artificially inflate prices to television and computer makers for installation in their end products who then and sold them the consumer plaintiffs at commensurately inflated prices. The court had no trouble allowing indirect retail purchasers to trace the overcharge back through chain of producers to recoup the overcharge buried in product price.

Tracing the overcharge back through the markets here will be a piece of cake compared to the challenges posed and met in *LCD*. *Id*.

### 5. The Finding That Plaintiffs Do Not Participate Directly In The Relevant Market Is Disputed.

The court concluded that absent specific allegations in the amended complaint that establish Plaintiffs' participation in the **Network Services Market,** this Court cannot credit Plaintiffs' conclusory arguments made in opposition to Defendants' motion. Report at 50. (Emphasis added)

The court has neither defined nor included a reference to the source of its conclusion that either of the two markets claimed here are relevant to plaintiffs' claims. Plaintiffs do not allege the existence of or participation in a "**Payment Card Market** or in a **Network Services Market**" As necessary or even relevant to their indirect purchaser claims. Plaintiffs' object to these findings together with the extent to which the Report relies upon them.

### 6. The Injuries Alleged Are Not Duplicative, Speculative or Remote Nor Derivative

The Plaintiffs antitrust claims herein hinge on the allegation that the merchants are co-conspirators. Once that claim is accepted it becomes clear that the cardholder deals directly with the conspirator at the critical point in the transaction. The defenses raised as to remoteness, failure to participate in the market impacted by the conspiracy, the derivative nature

19

of the damage and the remaining defenses go away,

The Court concludes:

"This Court agrees with Defendants that Plaintiffs' claimed injuries are derivative to those suffered by merchants, who directly pay the interchange fees at the heart of this alleged conspiracy. While Plaintiffs characterize the payment card transaction system as one in which cardholders pay the interchange fees directly, the Rules establish that the interchange fees are exchanged between the member banks, not between the banks and the cardholders." Report at 50-53.

The overcharge is in no way derivative. It is calculated and agreed to jointly by all the participants including the merchant.

### 7. The Remaining Claims As to Standing Under AGC Have No Merit

As for the four factors required to be alleged under AGC the court in *In re TFT-LCD*, *supra* addresses each issue carefully and thoroughly. The case is closely analogous to this action and the same issues are raised. Judge Illston there found that the arguments asserted by the defendants were without merit. The assertions of complexity and apportionment of damage issues were easily dispatched as are the same claims asserted. Defendants *AGC* based motion to dismiss was denied. *In re TFT-LCD (Flat Panel) Antitrust Litigation* 586 F.Supp.2d 1109 (2008) 1113-1118.

### 8. The Remaining Claims will Stand or Fall On the Outcome of the Standing Issues Raised Herein.

The motion to dismiss the UCL claims will stand or fall with the outcome of the Cartwright Act claims. The Jurisdiction challenge raised by PNC Bank can be cured by amendment. Plaintiffs will seek leave to amend in the event the motion to dismiss is granted. In the event the motion is granted Plaintiffs request Leave to amend.

Dated:  August 14, 2024.      _____

                                                            Joseph M. Alioto, Attorney for Plaintiffs