UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------

JOHN PALLADINO, GARIB KARAPETYAN,
STEVE PALLADINO, and JOHN NYPL, *on behalf
of themselves and all others similarly situated*,

Plaintiffs,

v.

JPMORGAN CHASE & CO., JPMORGAN
CHASE BANK N.A., BANK OF AMERICA
CORPORATION, BANK OF AMERICA,
NATIONAL ASSOCIATION, BANK OF
AMERICA N.A., WELLS FARGO & COMPANY,
WELLS FARGO BANK N.A., CITIGROUP INC,
CITIBANK N.A., CITIBANK N.A. (NATIONAL
ASSOCIATION), U.S. BANCORP, US
BANCORP, U.S BANK NATIONAL
ASSOCIATION, PNC FINANCIAL SERVICES
GROUP, INC., PNC, PNC BANK NATIONAL
ASSOCIATION, CAPITAL ONE F.S.B.,
CAPITAL ONE FINANCIAL CORPORATION,
CAPITAL ONE BANK (USA), NATIONAL
ASSOCIATION, CAPITAL ONE, NATIONAL
ASSOCIATION, BANK OF THE WEST, VISA
INC., VISA U.S.A. INC., VISA
INTERNATIONAL SERVICE ASSOCIATION,
MASTERCARD INCORPORATED, and
MASTERCARD,

Defendants.

**MEMORANDUM & ORDER**
23-CV-1215 (MKB) (JAM)

-----------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

Plaintiffs John Palladino, Garib Karepetyan, Steve Palladino, and John Nypl commenced

the above-captioned putative class action on December 30, 2022, in the Superior Court of the

State of California for the County of San Francisco, against Defendants Visa Inc., Visa U.S.A.,

Inc., and Visa International Service Association (together, "Visa") and MasterCard International

Incorporated ("Mastercard"), as well as Visa and Mastercard's member banks, JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. (together, "Chase"); Bank of America Corporation, Bank of America, National Association, and Bank of America, N.A. (together, "Bank of America"); Wells Fargo & Company and Wells Fargo Bank, N.A. (together, "Wells Fargo"); Citigroup Inc., Citibank, N.A., and Citibank, N.A. (National Association) (together, "Citi"); U.S. Bancorp and U.S. Bank National Association (together, "U.S. Bank"); PNC Financial Services Group, Inc., PNC, and PNC Bank National Association (together, "PNC"); Capital One Financial Corporation, Capital One, F.S.B., Capital One Bank (USA) National Association, and Capital One National Association (together, "Capital One"); and BMO Harris Bank N.A., successor-in-interest to Bank of the West ("Bank of the West") (collectively, "Defendants"). (*See* Compl., annexed to Notice of Removal as Ex. A, Docket Entry No. 1-1.)  Plaintiffs, who are California citizens and Visa or Mastercard cardholders, alleged that Defendants violated California's Cartwright Act, Cal. Bus. & Prof. Code § 16700 *et. seq.*, and California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et. seq.* ("UCL").  (*See id.*)  Plaintiffs allege that Defendants, and all the retail merchants who accept Visa or Mastercard payment cards, conspired to fix the price of the interchange fees charged when a consumer uses a Visa or Mastercard to purchase a retail good or service, which harmed competition and resulted in increased retail prices.  (*Id.* ¶¶ 62–65, 72–80, 89–98, 124, 127–40, 147–51, 211.)  Plaintiffs seek monetary damages, disgorgement, and injunctive relief.  (*Id.* ¶¶ 13, 70.)

Currently before the Court is Defendants' joint motion to dismiss the Amended Complaint or, in the alternative, to compel arbitration; all Defendants other than Visa move to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; Visa moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure; and

PNC moves to dismiss for lack of personal jurisdiction.[1]  The Court referred the motion to

Magistrate Judge Joseph A. Marutollo for a report and recommendation.  (Order Referring Mot.

dated July 8, 2024.)  By report and recommendation dated July 31, 2024, Judge Marutollo

recommended (1) denial of Defendants' motion to compel arbitration; (2) dismissal of Plaintiffs'

Cartwright Act and UCL claims pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of

Civil Procedure; and (3) dismissal of Plaintiffs' claims against PNC for lack of personal

jurisdiction ("R&R").  (R&R, Docket Entry No. 92.)  On August 14, 2024, Plaintiffs filed their

objections to the R&R; and on August 28, 2024, Defendants filed their response to Plaintiffs'

objections.[2]  For the reasons set forth below, the Court (1) denies Defendants' motion to compel

arbitration; (2) grants PNC's motion to dismiss for lack of personal jurisdiction; (3) denies

Plaintiffs' request for jurisdictional discovery; and (4) grants Defendants' motion to dismiss

pursuant to Rules 12(b)(6) and 12(c) of the Federal rules of Civil Procedure.

## I.   Background

### a.   Procedural history

On December 30, 2022, Plaintiffs, who are California citizens and Visa or Mastercard

cardholders, commenced this action by filing a complaint in the Superior Court of the State of

---

[1]  (Defs.' Joint Mot. to Dismiss Pls.' Compl. and to Compel Arbitration ("Defs.' Mot."), Docket Entry No. 71; Defs.' Mem. in Supp. of Defs.' Mot., Docket Entry No. 72; Pls.' Mem. in Opp'n to Defs.' Mot., Docket Entry No. 78; Defs.' Reply in Supp. of Defs.' Mot., Docket Entry No. 79.)

[2]  (Pls.' Objs. to R&R, Docket Entry No. 93; Pls.' Corrected Objs. to R&R ("Pls.' Objs."), Docket Entry No. 94; Pls.' Reply in Supp. of Objs. to R&R, Docket Entry No. 96; Defs.' Mem. in Opp'n to Pls.' Objs. ("Defs.' Opp'n"), Docket Entry No. 95.))
    Plaintiffs filed corrected objections on August 19, 2024, which are technically untimely, but the Court nevertheless addresses Plaintiffs' corrected objections because they are substantially identical to Plaintiffs' timely filed objections, and because Defendants have not objected to Plaintiffs' filing of the corrected objections. (*See* Pls.' Objs. to R&R 2–3 (listing eight principal objections); Pls.' Objs. 2–3 (listing the same eight objections).)

California.  (*See* Compl.)  Defendants removed the action to the United States District for the Northern District of California, (*see* Notice of Removal, Docket Entry No. 1), and then transferred the action to this Court for consolidation with *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, (*see* Case Transfer Notice dated Feb. 15, 2023; Conditional Transfer Order, Docket Entry No. 9).  On January 11, 2023, Plaintiffs filed an Amended Complaint.  (*See* Notice of Removal ¶ 7; Am. Compl., annexed to Notice of Removal as Ex. C, Docket Entry No. 1-3.)

On February 9, 2024, Defendants moved to dismiss the Amended Complaint or, in the alternative, to compel arbitration, pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure, and PNC moved to dismiss for lack of personal jurisdiction.  (Defs.' Mot.)  The Court referred the motion to Judge Marutollo for a report and recommendation, (Order Referring Mot. dated July 8, 2024).

On July 31, 2024, Judge Marutollo recommended (1) denial of Defendants' motion to compel arbitration; (2) dismissal of Plaintiffs' Cartwright Act and UCL claims pursuant to Rules 12(b)(6) and 12(c) of the Federal Rules of Civil Procedure; and (3) dismissal of Plaintiffs' claims against PNC for lack of personal jurisdiction.  (R&R.)  On August 14, 2024, Plaintiffs filed their objections to the R&R.  (Pls.' Objs. to R&R; Pls.' Objs.)  On August 28, 2024, Defendants filed their response to Plaintiffs' objections.  (Defs.' Opp'n.)

### b.   Report and recommendation

Judge Marutollo recommended that the Court (1) deny Defendants' motion to compel arbitration and stay the litigation; (2) grant Defendants' motion to dismiss Plaintiffs' Cartwright Act and UCL claims; and (3) grant PNC's motion to dismiss for lack of personal jurisdiction. (R&R 71–72.)

4

Judge Marutollo (1) concluded that the non-signatory Defendants may not enforce Plaintiffs' arbitration agreements on equitable estoppel grounds under state law in any of the jurisdictions Defendants identified, (*id.* at 21–34); (2) found that Plaintiffs have not established antitrust standing and recommended that Defendants' motion to dismiss be granted as to Plaintiffs' Cartwright Act claims because the factors identified in *Associated General Contractors v. California State Council of Carpenters* (*AGC*), 459 U.S. 519 (1983), weigh against finding that Plaintiffs have antitrust standing as indirect purchasers, (*id.* at 47–61), and Plaintiffs do not have antitrust standing as "direct joint purchasers" because cardholders do not directly pay interchange fees, (*id.* 39–46); and (3) found that the UCL claims warranted dismissal because they are based on the same allegations underlying the Cartwright Act claims. (*Id.* at 62.) In addition and as an alternative ruling, Judge Marutollo recommended that the Court dismiss Plaintiffs' Cartwright and UCL claims as time-barred by the four-year statutes of limitations. (*Id.* at 62–65.) Finally, Judge Marutollo recommended that the Court grant PNC's motion to dismiss for lack of personal jurisdiction because PNC was not subject to either general jurisdiction or specific jurisdiction in California. (*Id.* at 66–70.)

## II.  Discussion

### a.  Standards of review

#### i.  R&R

A district court reviewing a magistrate judge's recommended ruling "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). When a party submits a timely objection to a report and recommendation, the district court reviews *de novo* the parts of the report and recommendation to which the party objected. *Id.*; *see also United States v. Romano*, No. 15-992, 2022 WL

402394, at *3 (2d Cir. Feb. 10, 2022) (citing *United States v. Romano*, 794 F.3d 317, 340 (2d Cir. 2015)).  The district court may adopt those portions of the recommended ruling to which no timely objections have been made, provided no clear error is apparent from the face of the record. *See S.J. v. N.Y.C. Dep't of Educ.*, No. 21-240, 2022 WL 1409578, at *1 n.1 (2d Cir. May 4, 2022) (noting that the district court applied the correct legal standard in conducting *de novo* review of portions of the magistrate judge's report to which specific objections were made and reviewing portions not objected to for clear error).  The clear error standard also applies when a "party makes only conclusory or general objections, or simply reiterates his original arguments." *Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022) (quoting *Thomas v. Astrue*, 674 F. Supp. 2d 507, 511 (S.D.N.Y. 2009)); *Wu v. Good Samaritan Hosp. Med. Ctr.*, 815 F. App'x 575, 579 (2d Cir. 2020) ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under . . . Fed. R. Civ. P. 72(b)." (quoting *Mario v. P & C Food Mkts., Inc.*, 313 F.3d 758, 766 (2d Cir. 2002))); Fed. R. Civ. P. 72(b)(2) ("[A] party may serve and file specific written objections to the [magistrate judge's] proposed findings and recommendations.").  Where, however, a party takes "issue with a specific legal conclusion in the report and recommendation," a district court reviews the objected-to portions of the report and recommendation *de novo*. *Miller*, 43 F.4th at 120–21 (concluding that the plaintiff's objection, although revisiting an issue already argued, should have been reviewed *de novo* where the plaintiff objected to a "specific legal conclusion in the report and recommendation," and noting that clear error is normally applied "when the objections are nonspecific or 'merely perfunctory responses . . . argued in an attempt to engage the district court in a rehashing of the

same arguments set forth in the original petition'" (alteration in original) (citing *Edwards v. Fischer*, 414 F. Supp. 2d 342, 346–47 (S.D.N.Y. 2006))).

### ii.   Rule 12(b)(6)

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court "must construe [the complaint] liberally, accepting all factual allegations therein as true and drawing all reasonable inferences in the plaintiff['s] favor." *Sacerdote v. N.Y. Univ.*, 9 F.4th 95, 106–07 (2d Cir. 2021) (citing *Palin v. N.Y. Times Co.*, 940 F.3d 804, 809 (2d Cir. 2019)); *see also Vaughn v. Phoenix House N.Y. Inc.*, 957 F.3d 141, 145 (2d Cir. 2020) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Bacon v. Phelps*, 961 F.3d 533, 540 (2d Cir. 2020) (quoting *Twombly*, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Roe v. St. John's Univ.*, 91 F.4th 643, 651 (2d Cir. 2024) (same) (quoting *Matson*, 631 F.3d at 63); *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (same) (quoting *Iqbal*, 556 U.S. at 678).  Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678; *Roe*, 91 F.4th at 651 ("Although all factual allegations contained in the complaint are assumed to be true, this rule does not extend 'to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.'" (quoting *Iqbal*, 556 U.S. at 678)).

### iii.    Rule 12(c)

"The standard for reviewing a motion for judgment on the pleadings is the same as that for a motion to dismiss . . . , accepting the material facts alleged in the complaint as true and drawing all reasonable inferences in favor of the plaintiff." *Matzell v. Annucci*, 64 F.4th 425, 433 (2d Cir. 2023) (first citing *Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); and then citing *Kirkendall v. Halliburton, Inc.*, 707 F.3d 173, 178 (2d Cir. 2013)); *see also Doherty v. Bice*, 101 F.4th 169, 172 (2d Cir. 2024) (noting that "[w]hen a defendant moves under Rule 12(c) to dismiss a complaint for failure to state a claim, the standard for granting the motion 'is identical to that for granting a Rule 12(b)(6) motion,'" and a court must "accept all factual allegations in the complaint as true and draw all reasonable inferences in [the plaintiff]'s favor" (first quoting *Lively v. WAFRA Inv. Advisory Grp., Inc.*, 6 F.4th 293, 301 (2d Cir. 2021); and then quoting *Johnson v. Rowley*, 569 F.3d 40, 43 (2d Cir. 2009))). "In assessing a Rule 12(c) motion, the court 'may consider all documents that qualify as part of the non-movant's "pleading," including (1) the complaint *or* answer, (2) documents attached to the pleading, (3) documents incorporated by reference in or integral to the pleading, and (4) matters of which the court may take judicial notice.'" *Goldberg v. Pace Univ.*, 88 F.4th 204, 210 (2d Cir. 2023) (quoting *Lively*, 6 F.4th at 306).

### iv.    Rule 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[a] plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Ent.*, *Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). The showing a plaintiff must make to meet that burden is governed by a "sliding scale," which "varies depending on the procedural posture of

the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). If a defendant challenges personal jurisdiction by filing a Rule 12(b)(2) motion, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *JCorps Int'l, Inc. v. Charles & Lynn Schusterman Fam. Found.*, 828 F. App'x 740, 742 (2d Cir. 2020) (quoting *DiStefano v. Carozzi N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)); *see also Holmes v. Apple Inc.*, 797 F. App'x 557, 559 (2d Cir. 2019) ("A plaintiff has the burden of establishing personal jurisdiction over an entity against which it seeks to bring suit, and to survive a motion to dismiss for lack of such jurisdiction, 'a plaintiff must make a prima facie showing that jurisdiction exists.'" (quoting *Penguin Grp.*, 609 F.3d at 34–35)); *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL (Licci IV)*, 732 F.3d 161, 167 (2d Cir. 2013))). Prior to discovery, a plaintiff need only plead "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Holmes*, 797 F. App'x at 559–60 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *see also Dix v. Peters*, 802 F. App'x 25, 27 (2d Cir. 2020) ("Where the district court grants a Rule 12(b)(2) motion without an evidentiary hearing, we credit the plaintiff's averment of jurisdictional facts as true." (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996))); *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) ("A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998))). After

discovery, the plaintiff's "*prima facie* showing must be factually supported." *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85 (quoting *Ball*, 902 F.2d at 197). "Conclusory allegations based only on information and belief are not sufficient" to provide such factual support. *McGlone v. Thermotex, Inc.*, 740 F. Supp. 2d 381, 383 (E.D.N.Y. 2010) (citing *Jazini*, 148 F.3d at 184).

In resolving a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), a district court may consider materials outside the pleadings. *Dorchester Fin. Sec., Inc.*, 722 F.3d at 86 (citing *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir. 2010)); *see also Johnson v. UBS AG*, 791 F. App'x 240, 241 (2d Cir. 2019) ("Courts may consider materials outside the pleadings on a motion to dismiss for lack of personal jurisdiction without converting it into a summary judgment motion."); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676–77 (2d Cir. 2013) (noting that jurisdictional discovery had taken place and requiring evidentiary support for jurisdictional allegations). In addition, the court must "construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci IV*, 732 F.3d 161, 167 (2d Cir. 2013) (citing *Chloé*, 616 F.3d at 163); *see also Lelchook v. Société Générale de Banque au Liban SAL*, 67 F.4th 69, 72 n.1 (2d Cir. 2023); *JCorps Int'l*, 828 F. App'x at 742 (quoting *DiStefano*, 286 F.3d at 84). However, the court need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (quoting *Jazini*, 148 F.3d at 185); *see also Lelchook*, 67 F.4th at 72 n.1 (quoting *Jazini*, 148 F.3d at 185).

### b.    Unopposed portions of the R&R

No party has objected to Judge Marutollo's recommendations that the Court (1) deny Defendants' motion to compel arbitration and (2) grant PNC's motion to dismiss for lack of

personal jurisdiction, and also deny Plaintiffs' request for jurisdictional discovery.[3]  The Court

has reviewed these unopposed portions of the R&R and, finding no clear error, adopts Judge

Marutollo's recommendations and (1) denies Defendants' motion to compel arbitration, (2)

grants PNC's motion to dismiss for lack of personal jurisdiction, and (3) denies Plaintiffs'

request for jurisdictional discovery.  In addition, no party has objected to Judge Marutollo's

conclusion that, if Plaintiffs' Cartwright Act and UCL claims are not dismissed for lack of

standing, Plaintiffs' "damages stemming from transactions before December 30, 2018" are time-

barred.  (R&R 65.)  Although the Court, as explained below, grants the motion to dismiss these

claims, because there is no clear error, the Court adopts Judge Marutollo's recommendation that

any Cartwright and UCL claims stemming from transactions that took place before December

30, 2018 are also time-barred.

### c.   Plaintiffs' objections to the R&R

Plaintiffs raise eight specific objections to the R&R, all of which with one exception,

challenge Judge Marutollo's conclusion that Plaintiffs failed to adequately allege antitrust

standing under the Cartwright Act.  Plaintiffs object to: (1) the application of the *AGC* standing

analysis to the standing analysis under California law; (2) the "finding that the 'transaction

structure' is the same as" alleged in the *Salveson* cases; (3) the "finding" that Plaintiffs are not

"efficient enforcers" and have not alleged antitrust injury; (4) the finding that "Plaintiffs' injuries

derive from an alleged antecedent injury to the merchants"; (5) the finding that Plaintiffs'

allegations "are insufficient to establish a direct link between the alleged price-fixing

conspiracy" and Plaintiffs' injuries; (6) the finding that Plaintiffs did not plausibly allege a

---

[3]  Rather than oppose Judge Marutollo's recommendation that the Court grant PNC's motion to dismiss for lack of jurisdiction, Plaintiffs assert that the jurisdictional "challenge . . . can be cured by amendment."  (Pls.' Objs. 20.)

conspiracy between Defendants and merchants to impose higher fees on Plaintiffs; and (7) the conclusion that damages would be "duplicative and difficult to apportion." In addition to these arguments regarding standing, Plaintiffs object to the finding that if the Court dismisses the Cartwright Act claims, it must also dismiss the UCL claims. (Pls.' Objs. 2–3.)

Defendants argue that the Court should review the R&R for clear error because Plaintiffs' objections "rehash the same arguments already submitted in their opposition to the motion to dismiss," and "do not substantively engage with the [R&R]." (Defs.' Opp'n 8.) In the alternative, Defendants address each of Plaintiffs' objections and argue that "even under *de novo* review, the Court should adopt the [R&R]'s recommendation to dismiss the complaint." (*Id.*; *see also id.* at 8–21.)

Although many of Plaintiffs' objections were raised as arguments in opposition to Defendants' motion to dismiss, (*see* Pls.' Mem. in Opp'n to Defs.' Mot.), the Court considers Plaintiffs' objections *de novo*.

### d. Antitrust standing

#### i. Federal law

"[A]ntitrust standing is a threshold, pleading-stage inquiry and when a complaint by its terms fails to establish this requirement[, the court] must dismiss it as a matter of law." *Gatt, Commc'ns, Inc. v. PMC Assocs. L.L.C.*, 711 F.3d 68, 75–76 (2d Cir. 2013) (first alteration in original) (quoting *NicSand, Inc. v. 3M Co.*, 507 F.3d 442, 450 (6th Cir. 2007) (en banc)). Although federal antitrust law authorizes private rights of action for antitrust violations,[4] "the

---

[4] *See Schwab Short-Term Bond Market Fund v. Lloyds Banking Group, PLC*, 22 F.4th 103, 114 (2d Cir. 2021) ("Section 4 of the Clayton Act provides for a private right of action and treble damages to '[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws.'") (quoting 15 U.S.C. § 15(a)).

Supreme Court has recognized that 'Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" *Id.* at 114–15 (quoting *AGC*, 459 U.S. at 534). The antitrust standing requirement arises from the Supreme Court's recognition of this principle. *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 258 (2d Cir. 2023) ("The antitrust standing requirement 'originates in the Supreme Court's recognition that . . . Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation.'" (internal quotation marks omitted) (quoting *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436–37 (2d Cir. 2005))).

The Supreme Court has identified several factors that courts should consider in assessing the availability of relief for an antitrust violation: "a causal connection between an antitrust violation and harm to the [plaintiffs]"; "improper motive"; whether the Sherman Act was enacted to protect the type of injury at issue; "the directness or indirectness of the asserted injury"; the speculative nature of the damages; and "the potential for duplicative recovery or complex apportionment of damages." *AGC*, 459 U.S. at 537–46; *see also Gatt*, 711 F.3d at 76 (listing similar factors). The Second Circuit has applied these factors using a two-step inquiry: "To establish antitrust standing, a plaintiff must show (1) antitrust injury, which is injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful, and (2) that he is a proper plaintiff in light of four efficient enforcer factors." *In re Platinum*, 61 F.4th at 258–59 (quoting *Schwab*, 22 F.4th at 115); *see also Gatt*, 711 F.3d at 76 (observing that the Second Circuit "has distilled [the *AGC*] factors into two imperatives: we require a private antitrust plaintiff plausibly to allege (a) that it suffered 'a special kind of "antitrust injury,"' and (b) that it is a suitable plaintiff to pursue the alleged antitrust violations

13

and thus is an 'efficient enforcer' of the antitrust laws" (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121–22 (2d Cir. 2007))).

The antitrust injury requirement "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place." *Gatt*, 711 F.3d at 76 (quoting *Atl. Richfield Co. v. USA Petrol. Co.*, 495 U.S. 328, 342 (1990)); *see also U.S. Airways, Inc. v. Sabre Holdings Corp.*, 105 F. Supp. 3d 265, 284 (S.D.N.Y. 2015) (same). To establish antitrust injury, a plaintiff must sufficiently allege facts showing "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *In re Platinum*, 61 F.4th at 258 (quoting *Schwab*, 22 F.4th at 115); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 220 (S.D.N.Y. 2019) (same) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)). The Second Circuit has laid out the following three-step process for determining whether a plaintiff has adequately alleged antitrust injury:

> First, the party asserting that it has been injured by an illegal anticompetitive practice must "identify[] the practice complained of and the reasons such a practice is or might be anticompetitive." *Port Dock*, 507 F.3d at 122. Next, we identify the "actual injury the plaintiff alleges." *Id.* This requires us to look to the ways in which the plaintiff claims it is in a "worse position" as a consequence of the defendant's conduct. [*Brunswick*, 429 U.S. at 486.] Finally, we "compar[e]" the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff alleges." *Port Dock*, 507 F.3d at 122. It is not enough for the actual injury to be "causally linked" to the asserted violation. *Brunswick*, 429 U.S. at 489. Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is "of the type the antitrust laws were intended to prevent and that flows from that which makes [or might make] defendants' acts unlawful." *Daniel*, 428 F.3d at 438 (internal quotation marks omitted).

*Gatt*, 711 F.3d at 76 (second alteration added) (footnote omitted). Given the need to "distinguish the question of whether an antitrust violation occurred from whether plaintiffs have standing to

pursue" a claim, courts may "assum[e] the existence of a violation in addressing the issue of

standing." *Daniel*, 428 F.3d at 437; *see also Gatt*, 711 F.3d at 76 n.9 (observing the difficulty a

court faces when assessing antitrust standing, because it must "posit[] a rationale for the antitrust

laws' prohibition of conduct that may, in fact, not be prohibited").

In addition to antitrust injury, plaintiffs must also demonstrate that they are an "efficient

enforcer" of the antitrust laws.  The Second Circuit has held that "[w]hether a plaintiff is an

'efficient enforcer' depends on the four factors the Supreme Court identified in *AGC*."  *In re Am.

Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 138 (2d Cir. 2021).  The Second

Circuit considers the following in determining whether a plaintiff is an efficient enforcer:

> (1) the directness or indirectness of the asserted injury; (2) the
> existence of more direct victims or the existence of an identifiable
> class of persons whose self-interest would normally motivate them
> to vindicate the public interest in antitrust enforcement; (3) the
> extent to which the claim is highly speculative; and (4) the
> importance of avoiding either the risk of duplicate recoveries on the
> one hand, or the danger of complex apportionment of damages on
> the other.

*In re Platinum*, 61 F.4th at 259 (quoting *In re Am. Express Anti-Steering Rules*, 19 F.4th at 138).

### ii.   California law

California law interpreting the Cartwright Act also requires a plaintiff to demonstrate

antitrust standing.  The Ninth Circuit has recognized that California law affords standing more

liberally than does federal law, *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 987 (9th

Cir. 2000), and the California Supreme Court has instructed that "[i]nterpretations of federal

antitrust law are at most instructive, not conclusive, when construing the Cartwright Act," *Aryeh

v. Canon Bus. Sol.*, 292 P.3d 871, 877 (Cal. 2013).  *See also Schwab*, 22 F.4th at 114, 120

(holding that "California's antitrust standing analysis tracks its federal analog," and "California

law substantially incorporates the *AGC* factors.")

"A key component of analyzing antitrust standing [under the Cartwright Act] is determining whether a plaintiff suffered an 'antitrust injury.'" *Ahn v. Stewart Title Guar. Co.*, 310 Cal. Rptr. 3d 595, 604 (Ct. App. 2023). Antitrust injury under the Cartwright Act requires considering whether the alleged injuries were "(1) of a type the antitrust laws were designed to prevent, and (2) flowed from the anticompetitive nature of [Defendants'] conduct." *Id.* at 181; *see also Flagship Theatres of Palm Desert, LLC v. Century Theatres, Inc.*, 131 Cal. Rptr. 3d 519, 528 (Ct. App. 2011) (holding that under the Cartwright Act, a plaintiff "must prove *antitrust* injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful") (quoting *Brunswick Corp.*, 429 U.S. at 489); *Marsh v. Anesthesia Servs. Med. Grp.*, 132 Cal. Rptr. 3d 660, 672 (Ct. App. 2011) (finding that under the Cartwright Act, "'an "antitrust injury" must be proved; that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful'" (quoting *Morrison v. Viacom, Inc.*, 78 Cal. Rptr. 2d 133, 141 (Ct. App. 1998)).

Thus, under California law, like federal law, a plaintiff must prove "antitrust injury." However, whether the "efficient enforcer" factors from federal law apply under the *Cartwright Act* is less clear. Although the California Supreme Court has not considered the application of the efficient enforcer factors under the Cartwright Act, it has instructed that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act." *Aryeh*, 292 P.3d at 877. In *Aryeh*, the California Supreme Court addressed a statute of limitations question related to a UCL claim. *Id.* at 873. *Aryeh* did not, however, discuss the efficient enforcer factors or analyze antitrust standing under the Cartwright Act. *See id.* at 877. At least one California appellate court has applied the efficient enforcer factors to a Cartwright

16

Act claim. In *Vinci v. Waste Management, Inc.*, the court applied the efficient enforcer factors to the Cartwright Act "[b]ecause the Cartwright Act has objectives identical to the federal antitrust acts," and thus "the California courts look to cases construing the federal antitrust laws for guidance in interpreting the Cartwright Act." 43 Cal. Rptr. 2d 337, 338 n.1 (Ct. App. 1995). The California Court of Appeal in *Vinci* concluded that:

> "[t]he factors . . . which favor a finding that the plaintiff is a proper party include the following: (1) the existence of an antitrust violation with resulting harm to the plaintiff; (2) an injury of a type which the antitrust laws were designed to redress; (3) a direct causal connection between the asserted injury and the alleged restraint of trade; (4) the absence of more direct victims so that the denial of standing would leave a significant antitrust violation unremedied; and (5) the lack of a potential for double recovery."

*Id.* at 339 (citing *AGC*, 459 U.S. at 537–44).

Recently, the Second Circuit relied on *Vinci* to find that the efficient enforcer factors apply to the Cartwright Act's standing analysis. *Schwab*, 22 F.4th at 120. The Second Circuit noted that "the best data point for assessing California's antitrust standing analysis is" *Vinci*, "which expressly described the antitrust standing required under state law in terms of the *AGC* factors." *Schwab*, 22 F.4th at 120. The Court also noted that "[t]he *Vinci* court looked to federal antitrust elements both because the Cartwright Act contains 'similar language' to the federal antitrust statute interpreted in *AGC* and '[b]ecause the Cartwright Act has objectives identical to the federal antitrust acts.'" *Id.* The Second Circuit also found that *Aryeh* "does not compel us to conclude that interpretations of federal and state antitrust standing law always diverge" and that *Vinci* "remains the California case most directly on point" in determining whether to apply the efficient enforcer factors to antitrust claims under the Cartwright Act. *Id.*

The Ninth Circuit has also applied the efficient enforcer factors to Cartwright Act claims. In *Knevelbaard*, the Ninth Circuit applied the efficient enforcer factors to its analysis of the

plaintiff's federal and state antitrust claims, even while noting that the Cartwright Act enlarged "the extent to which antitrust injury is recognized" compared to federal law.  232 F.3d at 991. The Ninth Circuit's standing analysis under the Sherman and Cartwright Acts considered "(1) the nature of the plaintiff's alleged injury; that is, whether it was the type the antitrust laws were intended to forestall; (2) the directness of the injury; (3) the speculative measure of the harm; (4) the risk of duplicative recovery; and (5) the complexity in apportioning damages."  *Id.* at 987–91. In a more recent analysis of a plaintiff's antitrust injury under federal and state antitrust laws, the Ninth Circuit analyzed both together and specifically stated that "[t]he Cartwright Act analysis mirrors the Sherman Act analysis, so we analyze both claims together."  *PLS.Com, LLC v. Nat'l Assoc. Realtors*, 32 F.4th 824, 831–32 (9th Cir. 2022).

### iii.   Application of the *AGC* standing analysis to the Cartwright Act

Plaintiffs argue that Judge Marutollo (1) erred in concluding that the Supreme Court's decision in *AGC* governs the Court's analysis of Plaintiffs' antitrust standing under the Cartwright Act, (Pls.' Objs. 8–13), and (2) erred in his application of the *AGC* standing analysis, including the efficient enforcer factors, to Plaintiffs' Amended Complaint.

Plaintiffs first argue that Judge Marutollo should not have relied on the *AGC* standing analysis because the California Supreme Court has held that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act, given that the Cartwright Act was modeled not on federal antitrust statutes but instead on statutes enacted by California's sister states around the turn of the 20th century."  (*Id.* at 8 (quoting *Aryeh*, 292 P.3d at 877).)  Second, Plaintiffs argue that federal courts "have regularly declined to apply *AGC* in antitrust *Illinois Brick* repealer cases," citing both California and non-California cases as rejecting the application of the efficient enforcer factors under California state law.  (*Id.* at 9–11

(citing *In re Broiler Chickens Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017) ("The Court finds that any state with an *Illinois Brick* repealer would reject application of *AGC* to this case for the reasons expressed by the courts cited above.");[5] *see also In re Keurig Green Mountain Single Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187 (S.D.N.Y. 2019); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051 (N.D. Cal. 2015); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109 (N.D. Cal. 2008).)  Third, Plaintiffs contend that Judge Marutollo erred in relying on *Vinci* and *Schwab* because *Vinci* and *Schwab* are undermined by decisional law from the California Supreme Court and the Ninth Circuit.  (*Id.* at 8–13 (citing *Clayworth v. Pfizer*, 233 P.3d 1066 (Cal. 2010), and *Knevelbaard*, 232 F.3d 979).)

Defendants argue that the *AGC* analysis applies to Plaintiffs' Cartwright Act claims, relying on the Second Circuit's decision in *Schwab*.  (Defs.' Opp'n 9 (citing *Schwab*, 22 F.4th at 114).)  First, Defendants argue that the Second Circuit's decision in *Schwab* is binding and that "California's antitrust standing analysis tracks its federal analog."  (*Id.*)  Second, Defendants argue that the Court should disregard the cases cited by Plaintiffs because they either precede *Schwab* or do not stand for the proposition for which Plaintiffs cite them.  (*Id.* at 11–12.)

The Court finds that the efficient enforcer factors apply to the Cartwright Act.  In the absence of a ruling by the California Supreme Court, this Court is bound by the Second Circuit's decision in *Schwab*, the Ninth Circuit's decision in *Knevelbaard*, and the California Court of Appeal's decision in *Vinci*, all of which apply the efficient enforcer factors to Cartwright Act claims.  First, a published decision by the Second Circuit is generally binding on future panels and district courts within the Circuit unless the decision is overruled by the *en banc* Second

---

[5]  Plaintiffs' citation to *In re Broiler Chickens Antitrust Litig.*, 290 F. Supp. 3d 772, 816 (N.D. Ill. 2017), is inapposite because the decision does not discuss antitrust standing under the Cartwright Act.

Circuit or by the Supreme Court. *See, e.g.*, *United States v. Afriyie*, 27 F.4th 161, 168 (2d Cir. 2022) ("Published panel decisions . . . are binding on future panels unless they are 'reversed *en banc* or by the Supreme Court.'") (quoting *United States v. Jass*, 569 F.3d 47, 58 (2d Cir. 2009)); *689 Eatery Corp. v. City of New York*, 716 F. Supp. 3d 88, 148 (S.D.N.Y. 2024) (collecting cases); *DoorDash, Inc. v. City of New York*, No. 23-CV-7564, 2023 WL 6118229, at *14 n.3 (S.D.N.Y. Sept. 19, 2023) ("[D]istrict courts are bound to follow controlling Second Circuit precedent unless that precedent is overruled or reversed." (internal quotation marks omitted)); *Grytsyk v. Morales*, 527 F. Supp. 3d 639, 653 (S.D.N.Y. 2021) ("[A district court] must follow a precedential opinion of the Second Circuit 'unless and until it is overruled . . . by the Second Circuit itself or unless a subsequent decision of the Supreme Court so undermines it that it will almost inevitably be overruled by the Second Circuit.'" (quoting *United States v. Diaz*, 122 F. Supp. 3d 165, 179 (S.D.N.Y. 2015), *aff'd*, 854 F.3d 197 (2d Cir. 2017)).  In addition, district courts are also bound by the circuit court's interpretation of state law, at least until the state's highest court has clearly ruled otherwise or the federal appellate court has reconsidered. *See Almazon v. JPMorgan Chase Bank, Nat'l Ass'n*, No. 19-CV-4871, 2020 WL 1151313, at *11 (S.D.N.Y. Mar. 9, 2020) ("While a federal court construing state law must follow the pronouncements of the state's highest court, a district court is also bound by the circuit court's interpretation of state law, at least until the state's highest court has clearly ruled otherwise or the federal appellate court has reconsidered.") (first citing *King v. Town of Wallkill*, 302 F. Supp. 2d 279, 296 (S.D.N.Y. 2004); and then citing *Perks v. Town of Huntington*, 251 F. Supp. 2d 1143, 1160 (E.D.N.Y. 2003)).[6]  Because no Second Circuit or California Supreme Court decision has

---

[6] *See also* 17A Moore's Federal Practice, § 124.22[4] (3d ed. 2010) ("When a higher federal court has ruled on a particular point of state law, a lower court must ordinarily follow that decision in the absence of an intervening authoritative state decision.").

held otherwise, *Schwab*'s conclusion that the Cartwright Act incorporates the efficient enforcer factors is binding Second Circuit precedent. *See Schwab*, 22 F.4th at 120–21 (finding that the efficient enforcer factors apply to a standing analysis under the Cartwright Act).

Second, district courts in the Second Circuit should defer to "a decision made by the court of appeals of another circuit on the law of a state within that other circuit," unless the decision inadvertently overlooked or was superseded by later state authorities. *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 281–83 (2d Cir. 1981). The Ninth Circuit's application of the *AGC* analysis to antitrust standing in *Knevelbaard* thus also weighs in favor of applying those factors to Plaintiffs' claims.

Finally, the Second Circuit has also suggested that a federal court is "obliged to follow the state law decisions of state intermediate appellate courts." *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 199–200 (2d Cir. 2005) (quoting *Pentech Int'l, Inc. v. Wall St. Clearing Co.,* 983 F.2d 441, 445 (2d Cir. 1993)); *see also V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010) ("This Court is bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion." (citing *Pahuta v. Massey–Ferguson, Inc.,* 170 F.3d 125, 134 (2d Cir. 1999))). *Vinci* "remains the California case most directly on point," *Schwab*, 22 F.4th at 121, considering that *Aryeh* was primarily concerned with California's UCL and "does not compel" courts "to conclude that interpretations of federal and state antitrust standing law always diverge." *Id.* at 120.

The Court is unpersuaded by Plaintiffs' arguments that the *AGC* analysis does not apply to the Cartwright Act. First, Plaintiffs' reliance on dicta from *Aryeh* that "[i]nterpretations of federal antitrust law are at most instructive, not conclusive, when construing the Cartwright Act,"

292 P.3d at 877, is insufficient to set aside case law from the Second and Ninth Circuits, and a

California appellate court that applied the efficient enforcer factors to the Cartwright Act. *See*

*Schwab*, 22 F.4th at 120 (applying the *AGC* factors to California's Cartwright Act);

*Knevelbaard*, 232 F.3d at 991 (same); and *Vinci*, 43 Cal. Rptr. 2d at 338 n.1 (same). The claims

in *Aryeh* were unfair competition claims, not antitrust claims. Plaintiffs have not convinced this

Court that it should overlook federal and California state case law based on a passing reference

to the Cartwright Act in *Aryeh*.[7]

      Second, Plaintiffs' argument that "numerous recent federal court cases have held that

*AGC* does not apply in California" is undermined by the federal courts that have held otherwise.

(Pls.' Objs. 9.) Plaintiffs cite several district court cases that declined to apply the *AGC* standing

analysis to the Cartwright Act.[8] In addition to the fact that none of these cases are binding on

---

[7] The California Supreme Court only discussed the Cartwright Act in addressing a question about whether the common law theory of accrual applied to the statute of limitations under California's UCL. *Aryeh*, 292 P.3d at 876–77. *Aryeh* noted that the previous court's decision concluded that the accrual theory did not apply to UCL claims because the theory did not apply to federal antitrust laws, and interpretations of federal antitrust law applied directly to interpretations of the Cartwright Act, which in turn were equally applicable to the UCL. *Id.* Thus, the California Supreme Court did not consider Cartwright Act claims in *Aryeh*, but referenced the Cartwright Act to the extent that a prior decision had used it to interpret UCL claims.

[8] Pls.' Objs. 9–11 (citing *In re Keurig Green Mountain Single Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 257 (S.D.N.Y. 2019) (holding that recent California state case law interpreting the Cartwright Act has "cast doubt on the applicability of the *AGC* factors under California law," and the court could not conclude "that the Supreme Court of California would apply the *AGC* factors in accordance with federal precedents, if at all, to determine indirect purchaser antitrust standing under the Cartwright Act."); *In re Capacitors Antitrust Litig.*, 106 F. Supp. 3d 1051, 1072 (N.D. Cal. 2015) ("The application of *AGC* to California state antitrust claims has recently become murky, and that murkiness persuades the Court *AGC* should not be applied."); *In re Pool Products Distrib. Mkt. Antitrust Litig.*, 946 F. Supp. 2d 554, 564 (E.D. La. 2013) (finding that indirect purchasers suing under the Cartwright Act did not have to satisfy the *AGC* factors); *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 586 F. Supp. 2d 1109, 1123 (N.D. Cal. 2008) (finding it "inappropriate to broadly apply the *AGC* test to plaintiffs' claims under the

this Court, Plaintiffs also ignore contemporaneous federal district court decisions applying the *AGC* analysis to Cartwright Act claims. *See, e.g.*, *Fonseca v. Hewlett-Packard Co.*, No. 19-CV-1748, 2020 WL 4596758, at \*10 (S.D. Cal. Aug. 11, 2020), *aff'd*, 2021 WL 4796540 (9th Cir. Oct. 14, 2021) ("In considering the question of antitrust standing, the Ninth Circuit has applied the following five-factor test from *Associated General [Contractors]*."); *Contant v. Bank of Am. Corp.*, No. 17-CV-3139, 2018 WL 1353290, at \*3–\*5 (S.D.N.Y. Mar. 15, 2018) (holding that California "would apply some version of the *AGC* factors" because "[a]t least one California intermediate appellate court and the Ninth Circuit" have done so); *see also Los Gatos Mercantile, Inc v. E.I. DuPont De Nemours & Co.*, No. 13-CV-1180, 2014 WL 4774611, at \*6 (N.D. Cal. Sept. 22, 2014) (applying the *AGC* factors to plaintiff's Cartwright Act claims because "at least one [California] intermediate appellate court" and the Ninth Circuit have done so); *Dang v. San Francisco Forty Niners*, 964 F. Supp. 2d 1097, 1110–11 (N.D. Cal. 2013) (same); and *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 516 F. Supp. 2d 1072, 1088–89 (N.D. Cal. 2007) (holding that "plaintiffs here proceeding under the Cartwright Act are required to satisfy general antitrust standing requirements enunciated by the Supreme Court in *AGC*, and embraced by the Ninth Circuit in *Knevelbaard*").  Plaintiffs offer no reason why the Court should find more persuasive law interpreting the Cartwright Act contrary to the Second Circuit's interpretation.

Third, Plaintiffs' attempt to distinguish *Vinci* and *Knevelbaard* is unconvincing. Plaintiffs argue that *Vinci* was "a dispute alleging wrongful termination of employment," and

---

repealer states' laws [including the Cartwright Act] in the absence of a clear directive from those states' legislatures or highest courts"); and *In re Graphics Processing Units Antitrust Litig. ("GPU I")*, 527 F. Supp. 2d 1011, 1025 (N.D. Cal. 2007) (declining to apply *AGC* to the Cartwright Act because that decision "is a matter for the state policy makers to decide, not for a federal judge to impose by fiat.").

that the court concluded "[t]he loss of a job is not the type of injury that the anti-trust laws were designed to prevent." (Pls.' Objs. 11 (citing *Vinci*, 43 Cal. Rptr. 2d at 338–39).) However, the court first decided that the efficient enforcer factors apply to a Cartwright Act standing analysis, and then, in applying the efficient enforcer factors to plaintiff's claim, concluded that the plaintiff did not allege antitrust injury because the plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained." *Vinci*, 43 Cal. Rptr. 2d. at 339–40. The court's determination that the *Vinci* plaintiff did not establish antitrust injury does not undermine the court's decision that the efficient enforcer factors apply to Cartwright Act claims. *Id.* In addition, contrary to Plaintiffs' arguments, the California Supreme Court did not criticize the *Vinci* court in *Clayworth v. Pfizer, Inc.* In *Clayworth*, the California Supreme Court distinguished *Vinci* by characterizing *Vinci* as a case about antitrust causation, or "the notion that to have an antitrust claim one must establish a causal nexus between one's injury and the alleged unlawful restraint of trade," 23 P.3d at 1077, while the issue in *Clayworth* was how damages should be allocated between direct and indirect purchasers harmed by anticompetitive conduct, *id.* at 1069; antitrust standing was not at issue in *Clayworth*. Thus, Plaintiffs have not shown that recent California state court decisions have undermined *Vinci*.

Finally, the Court also rejects as unpersuasive Plaintiffs' argument that *Knevelbaard* is "consistent with the later federal cases . . . affirming California's reticence in formally adopting *AGC*." (Pls.' Objs. 13.) Plaintiffs acknowledge that the Ninth Circuit adopted the efficient enforcer factors in *Knevelbaard*, (*id.*), and cite no contrary Ninth Circuit precedent. Plaintiffs have therefore failed to demonstrate that the Ninth Circuit has displaced *Knevelbaard*. The Court is persuaded based on decisions of the California Court of Appeal, Second, and Ninth Circuits, that the efficient enforcer factors apply to Plaintiffs' claim.

24

e.    **Plaintiffs lack antitrust standing under the Cartwright Act**

Plaintiffs argue that Judge Marutollo erred in concluding that Plaintiffs do not have antitrust standing as direct or indirect purchasers. (Pls.' Objs. 13–20.) First, Plaintiffs argue that they are "direct purchasers of transactions" and have standing "as direct purchasers of *General Purpose Card* Credit and Debit Payment-Card Transactions provided by Defendants' *General Purpose Card Network Services*." (*Id.* at 14.) Second, Plaintiffs argue that they are indirect purchasers of interchange fees because merchants and banks conspire to "pass on" the interchange fee to Plaintiffs. (*Id.* at 3, 18.) Third, Plaintiffs argue that because the cardholder "deals directly with the conspirator," Plaintiffs' injuries as indirect purchasers are not speculative nor at risk of duplication. (*Id.* at 3, 12, 19.)

Plaintiffs also object to Judge Marutollo's conclusion that they do not allege antitrust injury as direct or indirect purchasers because they do not participate in the relevant market where the alleged anticompetitive behavior occurs. (*Id.* at 3, 15–19.) First, they disagree with Judge Marutollo's conclusion that Plaintiffs participate in the "Payment Card Market" rather than the "Network Services Market" where the alleged price-fixing occurs. (*Id.* at 16–19.) Plaintiffs argue that they participate in the relevant market that is properly defined in the Complaint. (*Id.* at 17–18.) Second, Plaintiffs argue that it "makes no [d]ifference" whether Plaintiffs participate in the Payment Card Market or the Network Services Market, because Plaintiffs "deal directly with [a] conspirator[ ] every time they make a purchase at an inflated price." (*Id.* at 18.)

Defendants argue that both Plaintiffs' direct and indirect purchaser claims fail. First, Defendants argue that Plaintiffs' "direct purchaser claims simply reprise the same cardholder claims that failed in *Salveson*." (Defs.' Opp'n 9.) Second, Defendants argue that Judge

25

Marutollo correctly concluded that Plaintiffs' indirect purchaser theory failed to establish that they are "efficient enforcers." (*Id.* at 10–11.)  In support, Defendants argue that Plaintiffs' injuries (1) are not direct and that merchants are better positioned to bring the claims that Plaintiffs allege, (*id.* at 15–17), and (2) are speculative, duplicative, and cannot be easily apportioned, (*id.* at 17–19).

Defendants also argue that Plaintiffs have not established antitrust injury, and that the allegations in the Complaint suggest that Plaintiffs operate in a separate market from the market where the anticompetitive conduct occurs.  (*Id.* at 15.)  Defendants argue that the Complaint alleges anticompetitive conduct in the Network Services Market and makes no reference to Plaintiffs competing or participating in that market.  (*Id.*)

The Court first considers whether Plaintiffs have sufficiently alleged antitrust injury under the Cartwright Act.  Because the Court concludes that Plaintiffs have not sufficiently alleged injury as either direct or indirect purchasers, the Court finds that Plaintiffs have not shown antitrust injury and therefore do not have antitrust standing.[9]

Antitrust injury considers whether the nature of the injury asserted by a plaintiff is "the type the antitrust laws were intended to forestall."  *Knevelbaard*, 232 F.3d at 987 (quoting *Am. Ad Mgmt., Inc. v. Gen. Tel. Co.*, 190 F.3d 1051, 1054–55 (9th Cir. 1999)).  The Ninth Circuit has "identif[ied] four requirements that must be met in order to conclude that there is antitrust injury:

---

[9] There is no dispute that standing under the Cartwright Act requires "antitrust injury." *See, e.g.*, *Cellular Plus, Inc. v. Superior Ct.*, 18 Cal. Rptr. 2d 308, 312 (Ct. App. 1993) (holding that the Cartwright Act requires a sufficient allegation of antitrust injury); *Kolling v. Dow Jones & Co.*, 187 Cal. Rptr. 797, 807 (Ct. App. 1982) (holding that a plaintiff in a Cartwright Act proceeding must show "antitrust injury . . . that is, the type of injury the antitrust laws were intended to prevent, and which flows from the invidious conduct which renders defendants' acts unlawful.").  Plaintiffs' failure to allege antitrust injury is fatal in itself; thus, the Court declines to consider whether Plaintiffs' allegations satisfy the "efficient enforcer" factors.

(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Id.* (quoting *Am. Ad Mgmt.*, 190 F.3d at 1055). "The requirement that the alleged injury be related to anti-competitive behavior requires, *as a corollary*, that the injured party be a participant in the same market as the alleged malefactors." *In re Flash Memory Antitrust Litig.*, 643 F. Supp. 2d 1133, 1153 (N.D. Cal. 2009) (internal quotation marks and citation omitted) (quoting *Bhan v. NME Hosps., Inc.*, 772 F.2d 1467, 1470 (9th Cir. 1985)); *see also AGC*, 459 U.S. at 539 (dismissing claim asserted where plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained"); *Vinci*, 43 Cal. Rptr. 2d at 339 (dismissing claims for lack of antitrust standing because "plaintiff was neither a consumer nor a competitor in the market in which trade was restrained"); *Tanaka v. Univ. of Southern Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) (explaining that the anticompetitive effects must be felt in the "relevant market"); *In re DRAM*, 516 F. Supp. 2d at 1090 (dismissing antitrust claims asserted by plaintiffs who were "participants in separate, albeit related, markets").

Plaintiffs sufficiently allege the first three requirements under *Knevelbaard* as to both their direct and indirect purchaser claims. Plaintiffs allege that cardholders are "harmed three ways with each transaction" as direct and indirect purchasers. (Am. Compl. ¶ 81.) First, Plaintiffs allege that cardholders pay "inflated prices for everything because interchange is built into ticket prices" and are thus harmed as indirect purchasers with each transaction. (*Id.*) Second, Plaintiffs contend that cardholders are harmed as direct purchasers "the moment a merchant rings the sale" because when the cardholder's purchase is authorized, Visa and Mastercard sell that transaction to "both merchant and cardholder, who jointly share that single transaction." (*Id.* ¶ 82.) Third, Plaintiffs allege that cardholders are harmed by merchants and

Defendants not disclosing that the "cardholder is a joint direct purchaser of each payment-card transaction" and pays an interchange fee for each transaction. (*Id.* ¶ 83.) Plaintiffs therefore conclude that the "interchange-fee contracts are horizontal agreements that eradicate competition among the Visa and Mastercard member banks for merchant-acceptance of their cards," and cardholders, as direct and indirect purchasers of transactions, "pay the illegal transaction price" resulting from that conspiracy. (*Id.* ¶¶ 84, 87.) Plaintiffs conclude that they are injured "as the direct and proximate result of Defendants' anticompetitive conduct." (*Id.* ¶ 88.)

Accepting Plaintiffs' allegations as true, Defendants' alleged conspiracy is per se unlawful horizontal price fixing — the type of "unlawful conduct" contemplated by *Knevelbaard*'s first requirement in its antitrust injury analysis. *See Knevelbaard*, 232 F.3d at 988 ("Horizontal price fixing is a per se violation regardless of whether the prices set are minimum or maximum.") (citing *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332 (1982)). Plaintiffs also sufficiently allege that they are injured in the form of "pass-through overcharges present in the prices of all Visa / Mastercard payment-card purchases," (Am. Compl. ¶ 87), which is injury that "flows 'from that which makes the conduct unlawful,' *i.e.*, from the collusive price manipulation itself." *Knevelbaard*, 232 F.3d at 988.

Plaintiffs' allegations do not, however, identify an injury "of the type the antitrust laws were intended to prevent." *Knevelbaard*, 232 F.3d at 937. To satisfy this fourth requirement under *Knevelbaard*, Plaintiffs must show that they participated in the relevant market where anticompetitive behavior occurred — participating in a "separate, albeit related" market is not sufficient. *See In re DRAM*, 516 F. Supp. 2d at 1090 (dismissing a claim by plaintiffs that participated in a "separate, albeit related" market because they did not "have grounds from which to argue that they are participants in the allegedly restrained market"). California courts apply

28

the "market participant rule" to antitrust standing under the Cartwright Act: a plaintiff "must show an injury within the area of the economy that is endangered by a breakdown of competitive conditions." *Kolling*, 187 Cal. Rptr. at 807; *see also Lorenzo v. Qualcomm Inc.*, 603 F. Supp. 2d 1291, 1302 (S.D. Cal. 2009) (collecting cases); *Vinci,* 43 Cal Rptr. at 339 (noting that the plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").

Plaintiffs fail to establish antitrust injury as either direct or indirect purchasers because they do not allege cardholder participation in the market where the anticompetitive conduct occurs. Plaintiffs assert that the "relevant product market includes *General Purpose Card Network Services*, and takes in markets for merchant acceptance of *general* purpose credit cards and merchant acceptance of debit cards."[10] (Am. Compl. ¶ 71.) Plaintiffs contend that Visa and Mastercard set rules and fee schedules (the "Rules") that establish the interchange amounts that card-issuing member banks must charge. (*Id.* ¶ 74.) In addition, Plaintiffs allege that these Rules are "at the center of the conspiracy" and "provide the essential mechanism for the operation and enforcement of the price-fixing conspiracy." (*Id.* ¶ 6.) Plaintiffs note, however, that the Rules are set in a separate General Purpose Card Network Services Market. (*Id.* ¶ 102 ("Visa and Mastercard operate separate *General Purpose Card Network Services*."); ¶ 134

---

[10] Plaintiffs refer to the relevant market in multiple ways, and it is unclear whether Plaintiffs allege that there are multiple relevant markets or a single relevant market with separate sections. *See, e.g.*, Am. Compl. ¶ 100 ("*General Purpose Card Network Services* is a relevant product market. *Merchant Acceptance of General Purpose Credit Cards* and *Merchant Acceptance of Debit Cards* are relevant product markets."); *id.* ¶ 183 ("The relevant market encompasses *General Purpose Card Network Services* and *Merchant Acceptance of Credit and of Debit Cards*."). It is not clear from Plaintiffs' submissions whether they are arguing that the "General Purpose Card Network Services" is a distinct (but related) market from the "Merchant Acceptance" Networks, or whether Plaintiffs argue that "General Purpose Card Network Services" and the "Merchant Acceptance" Networks are separate parts of one market. Regardless, the Court is not bound by Plaintiffs' descriptions of the relevant market and finds that Plaintiffs do not sufficiently allege participation in the market where the anticompetitive conduct occurs.

("Networks also set operating rules that apply to issuers and acquirers, and merchants are required to comply or risk losing access to that network.").)  Thus, Plaintiffs contend that the alleged "horizontal agreements that eradicate competition among the Visa and Mastercard member banks for merchant-acceptance of their cards" occur in the General Purpose Card Network Services market, (*id.* ¶ 84), which Plaintiffs describe as a separate market from the market where cardholders engage in transactions.

Plaintiffs do not allege that cardholders participate in this market.  Instead, Plaintiffs indicate that cardholders participate in a related market for "*Merchant Acceptance of General Purpose Credit Cards*" and "*Merchant Acceptance of Debit Cards*."  (*Id.* ¶ 100.)  "Most purchases made with payment-cards are made" in these markets, (*id.* ¶ 101), and these markets are where the networks and issuing banks compete to have more cardholders using their cards. (*Id.* ¶ 102. ("Member banks issue the networks' trademarked debit- and credit- *General Purpose Cards* to cardholders, and acquire and process merchant-sales transactions on the cards.  These activities — carried out and managed by member banks — are controlled by the Visa and Mastercard networks, which set the terms of merchant acceptance on behalf of their member banks."))  The General Purpose Card Network Services market, where the alleged conspiracy and price-fixing occur, is thus a separate market from this merchant-acceptance market where cardholders engage in transactions.  Because Plaintiffs are neither consumers nor competitors in the General Purpose Card Network Services, they cannot satisfy California's "market participant rule," *Kolling*, 187 Cal. Rptr. at 807–08, and fail to establish antitrust injury as either direct or indirect purchasers.

This conclusion is consistent with the Court's decision in *Salveson*, which was an antitrust case brought by cardholders alleging that various banks that issued Visa and Mastercard

payment cards "knowingly participated in a conspiracy to fix interchange fees." *Salveson v. JP Morgan Chase & Co. ("Salveson I")*, No. 14-CV-3529, 2014 WL 12770235, at *1 (E.D.N.Y. Nov. 26, 2014). The Court dismissed cardholders' Clayton Act claims for lack of standing, and on reconsideration of the Court's decision to dismiss the Cartwright Act claims, the Court found that cardholder plaintiffs "failed to assert a direct antitrust injury that confers standing under the Cartwright Act because plaintiffs [were] not in the relevant market of the alleged antitrust conduct." *Salveson v. JP Morgan Chase & Co. ("Salveson II")*, 166 F. Supp. 3d 242, 264 (E.D.N.Y. 2016), *aff'd*, 663 F. App'x 71 (2d Cir. 2016) ("*Salveson III*"). The Second Circuit agreed with the Court's conclusion that the "allegations fail to establish that, as cardholders, plaintiffs directly pay interchange fees and are directly injured by their imposition." *Salveson III*, 663 F. App'x at 76. Plaintiffs' argument that *Salveson* is "readily distinguishable" because the *Salveson* plaintiffs brought federal claims and alleged to be direct purchasers of interchange fees is unconvincing. (Pls.' Objs. 15.) Plaintiffs' claims that they are indirect purchasers injured under state law does not alter the structure of the market where the alleged anticompetitive conduct occurs. As Judge Marutollo concluded, the transaction structure in this case is the same as the transaction structure in *Salveson*. (R&R 43.)

> Cardholder presents card to Merchant for a $100 purchase; next . . . Merchant submits $100 transaction to its Bank for approval; . . . [then] Merchant Bank sends an authorization request to the Cardholder's Bank; then, . . . Cardholder Bank approves the transaction, retains $1.70 for the Interchange Fee . . . , and transfers $98.30 to the Merchant's Bank.

*See Am. Compl.* ¶ 4 (emphasis omitted). This transaction is identical to the structure in *Salveson*:

> When a cardholding consumer uses a Visa or MasterCard payment card, the merchant that accepts the card relays the transaction to its "acquiring bank," which in turn transmits it to the network, *i.e.*, Visa or MasterCard, which sends the information to the cardholder's "issuing bank." The issuing bank may approve the transaction and the approval is conveyed to the acquiring bank, which relays it to

> the merchant. The issuing bank then sends the acquiring bank the
> amount of the purchase price minus an interchange fee.

*Salveson III*, 663 F. App'x at 74–75. As this Court and the Second Circuit concluded in
*Salveson*, cardholders do not participate in the market where the "allegedly anticompetitive
interchange fee is set and paid between financial institutions." *Salveson II*, 166 F. Supp. 3d at
261.

Even assuming Plaintiffs are injured by Defendants' conduct, their injuries occur in a
separate market from where the alleged anticompetitive behavior occurs. California law does not
recognize such injuries that are "secondary, consequential, or remote." *Song Fi, Inc. v. Google*,
No. 14-CV-5080, 2016 WL 1298999, at *5 (N.D. Cal. Apr. 4, 2016) (explaining that an injury
under the Cartwright Act "must be the 'direct result of the unlawful conduct,' rather than
'secondary,' 'consequential' or 'remote'") (quoting *Kolling*, 187 Cal. Rptr. at 808); *Lorenzo*, 603
F. Supp. 2d at 1302 ("The California Courts have held that a plaintiff whose injuries 'were not
secondary, consequential, or remote, but the direct result of the unlawful conduct and were the
kind of injuries the antitrust laws seek to prevent' has antitrust standing") (quoting *Cellular Plus*,
18 Cal. Rptr. 2d at 312); *Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1004
(9th Cir. 2008) ("For an injury to be an antitrust injury, it must also be causally related to the
antitrust violation. The harm may not be 'derivative and indirect' or 'secondary, consequential,
or remote.'"); *cf. Cellular Plus*, 18 Cal. Rptr. 2d at 312 ("[The p]laintiff's injuries were not
'secondary' or 'consequential,' since they did not result from injury to third parties; they were
not 'remote,' for they were the direct result of the allegedly illegal conduct."). Plaintiffs' injuries
are secondary, consequential, and remote because (1) they rely on injury to third parties
(merchants) and (2) they are an indirect result of merchants' pricing decisions based on
Defendants' conduct. *See Lorenzo*, 603 F. Supp. 2d. at 1303 (concluding that the plaintiff's

32

injuries were "too remote to support standing under the Cartwright Act" because the plaintiff's injuries "occurred in a different market from the allegedly anticompetitive conduct;" were "separated by at least three intermediaries to the antitrust violation;" and "were not the direct result of [the defendant]'s allegedly unlawful conduct").

Plaintiffs fail to allege antitrust injury because they do not make specific allegations about cardholders' participation in the relevant card-acceptance services market and also do not establish why their injuries are not "secondary, consequential, or remote." *Song Fi, Inc.*, 2016 WL 1298999 at *5. Accordingly, the Court grants Defendants' motion to dismiss for lack of antitrust standing.

### f. Plaintiffs' UCL Claim

While Plaintiffs "dispute and object to the finding that the Unfair Competition claims must fall for the same reason as those set out in the" R&R, (Pls.' Objs. 3), they later concede that their UCL claims "stand or fall with the outcome of the Cartwright Act claims." (*Id.* at 20.) Plaintiffs do not present any arguments to support their bare objection, and the Court concludes that Judge Marutollo's recommendation that the Court dismiss Plaintiffs' UCL claims if the Court dismisses Plaintiffs' antitrust claims is unopposed. (*Id.*) ("The motion to dismiss the UCL claims will stand or fall with the outcome of the Cartwright Act claims."); (Defs.' Opp'n 20.) ("The [R&R] correctly concluded that plaintiffs' Unfair Competition Law claims should be dismissed because they are based on the same allegations underlying their Cartwright Act claims . . . . Plaintiffs do not provide any grounds for objecting to this conclusion.") The Court finds no clear error with Judge Marutollo's conclusion that Plaintiffs' UCL claims should be dismissed with their Cartwright Act claims, and therefore dismisses Plaintiffs' UCL claims.

## III. Conclusion

For the foregoing reasons, the Court (1) denies Defendants' motion to compel arbitration;

(2) grants PNC's motion to dismiss for lack of personal jurisdiction; (3) denies Plaintiffs' request

for jurisdictional discovery; and (4) grants Defendants' motion to dismiss pursuant to Rules

12(b)(6) and 12(c) of the Federal Rules of Civil Procedure.

Dated:  December 30, 2024
       Brooklyn, New York

SO ORDERED:

       /s MKB
       MARGO K. BRODIE
       United States District Judge