UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JOHN PALLADINO, GARIB KARAPETYAN,
STEVE PALLADINO, and JOHN NYPL, *on
behalf of themselves and all others similarly
situated*,

                        Plaintiffs,

                      - against -

JPMORGAN CHASE & CO., *et al.*,

                        Defendants.
-----------------------------------------------------------------X

**MEMORANDUM DECISION AND ORDER**

23-cv-1215 (BMC)

**COGAN**, District Judge.

This is a state antitrust case under California law brought by a putative class of California cardholders who allege that defendants, a group of merchant banks and credit card networks, illegally conspired to charge plaintiffs inflated credit card transaction fees in violation of California's Cartwright Act. When plaintiffs failed to properly allege that they had antitrust standing to bring the claim, defendants moved to dismiss under Rule 12(b)(6). The Court (Brodie, C.J.)[1] granted defendants' motion in December 2024 and plaintiffs moved for reconsideration, which the Court denied on May 12, 2025. Plaintiffs now move the Court for reconsideration again, this time of its May 12 decision. For the reasons set out below, plaintiffs' motion is denied.

---

[1] The case was originally assigned to Chief Judge Margo K. Brodie as part of the multi-district litigation, In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation, 05-md-01720 ("MDL"). Judge Brodie reassigned the MDL, including this case, to the undersigned on September 5, 2025.

## BACKGROUND

The facts of this case have been set out in length in Chief Judge Brodie's prior decisions. See Palladino v. JPMorgan Chase & Co., 761 F. Supp. 3d 521, 528-529 (E.D.N.Y. 2024), reconsideration denied, No. 23-cv-1215, 2025 WL 1371786 (E.D.N.Y. May 12, 2025).  But to summarize, plaintiffs, a putative class of California cardholders, brought an action in California state court under California's antitrust law, the Cartwright Act, against defendants, a group of merchant banks and credit card networks, who they allege were part of a conspiracy to charge plaintiffs inflated card transaction fees.  Defendants removed the action to federal court, and it was then transferred to this Court for consolidation with the MDL.

In February 2024, defendants moved to dismiss plaintiffs' complaint under Fed. R. Civ. P. 12(b)(6).  The Court referred the motion to Magistrate Judge Joseph A. Marutollo, who issued a report and recommendation dismissing plaintiffs' Cartwright Act claim, because (1) under Associated General Contractors v. California State Council of Carpenters ("AGC"), 459 U.S. 519 (1983), plaintiffs, as indirect purchasers, lacked antitrust standing; and (2) plaintiffs did not have antitrust standing as "direct joint purchasers" because cardholders did not directly pay interchange fees.  Palladino, 761 F. Supp. 3d at 529.  Chief Judge Brodie adopted Magistrate Judge Marutollo's R&R on December 30, 2024 ("December 2024 Decision").

Plaintiffs moved for reconsideration of the Court's December 2024 decision under Fed. R. Civ. P. 59 and Local Civil Rule 6.3, requesting leave to file a Second Amended Complaint, and arguing that the Court had overlooked plaintiffs' arguments that they participated in the "relevant market where anticompetitive behavior occurred."

Chief Judge Brodie issued a decision on May 12, 2025 ("May 12 Decision") denying plaintiffs' motion and request for leave to amend. The Court adhered to its prior holding that plaintiffs had "describe[d] separate markets, one where the alleged 'horizontal agreements that eradicate competition' occurs, and another where 'cardholders engage in transactions,'" and that plaintiffs had only participated in the latter. See Palladino, 2025 WL 1371786 at *5.

On June 10, 2025, plaintiffs filed a notice of appeal of the court's May 12 Decision. At the same time, they filed the instant motion for reconsideration under Fed. R. Civ. P. 59(e) and 60(b). Specifically, plaintiffs seek reconsideration on the grounds that (1) the Court erred when it dismissed plaintiffs' argument that they sufficiently alleged market participation under California's Cartwright Act; (2) the Court erred when it denied plaintiffs' request for leave to amend; and (3) the Court erred when it denied plaintiffs' request for an oral hearing, which they claim is mandated by the Fifth Amendment.

## DISCUSSION

### I. Jurisdiction

As an initial matter, defendants dispute the Court's jurisdiction to hear the case because plaintiffs did not timely file their motion within the 28 days prescribed under Rule 59, and plaintiffs simultaneously filed a notice of appeal. As a result, defendants assert that Fed. R. App. P. 4(a)(4)(A) completely divests the Court of jurisdiction. Defendants are wrong.

### A. Rule 59(e)

Rule 59(e) provides that "[a] motion to alter or amend a judgment must be filed no later than 28 days after the entry of the judgment." Fed. R. Civ. P. 59(e). A motion filed beyond this date is "procedurally flawed" for untimeliness and "can be denied on this ground alone." See Yelle v. Mount St. Mary Coll., No. 18-cv-10927, 2021 WL 311213, at *3 (S.D.N.Y. Jan. 29,

3

2021); Bentley v. Varsames, 164 F.3d 617, 617 (2d Cir. 1998) ("because [appellant's] Rule 59(e) motion was not timely, the District Court lacked jurisdiction to consider it . . . ."). "A motion is filed when it is delivered to the clerk, which delivery may be by electronic means." Sigmen v. Colvin, No. 13-cv-0268, 2015 WL 5944254, at *3 (E.D.N.Y. Oct. 13, 2015); see also Fed. R. Civ. P. 5(d)(2), (3); Fed. R. Civ. P. 6(b)(2) ("A court must not extend the time to act under Rule . . . 59[(e)].").

To the extent plaintiffs bring their motion under Rule 59(e), their motion is untimely. The Court issued its original decision denying plaintiffs' motion for reconsideration on May 12, 2025. Plaintiffs filed their Rule 59(e) motion on June 10, 2025 – 29 days after the original decision, and one day over the 28-day deadline mandated by Rule 59(e).[2] Because the motion is untimely, the Court may not consider it under Rule 59(e).

Nonetheless, the Court may consider an untimely Rule 59(e) motion under Rule 60(b) instead. See Ueno v. Napolitano, No. 04-cv-1873, 2007 WL 1395517, at *2 (E.D.N.Y. May 11, 2007) ("the law in this circuit is clear that untimely Rule 59(e) motions may be 'properly considered a motion under [Rule] 60(b).'" (citing Branum v. Clark, 927 F.2d 698, 704 (2d Cir. 1991))).

### B. Rule 60(b)

"Rule 60(b) . . . permits a party to be relieved from a final judgment basically for the following reasons (corresponding to the subdivisions of the Rule): (1) mistake, inadvertence, surprise, or excusable neglect . . . or (6) any other reason justifying relief." United States v. Cirami, 535 F.2d 736, 738 (2d Cir. 1976) (internal quotation marks omitted); see Fed. R. Civ. P.

---

[2] Although plaintiffs' motion is dated June 9, 2025, plaintiffs did not file it until June 10, 2025.

4

60(b).  When an alleged ground for relief under Rule 60(b) "concern[s] mistake, only Rule 60(b)(1) is applicable."  United States v. Erdoss, 440 F.2d 1221, 1223 (2d Cir. 1971); see Sec. & Exch. Comm'n v. Curran, No. 12-cv-2937, 2024 WL 3431953, at *2 (E.D.N.Y. July 15, 2024) ("Even when a party does not move under Rule 60(b)(1), motions to vacate based on judicial mistake must ordinarily be adjudicated under that rule."  (citing Canouse v. Protext Mobility, Inc., No. 22-cv-1335, 2023 WL 3490915, at *3 n.2 (2d Cir. 2023); Leonard v. Lowe's Home Ctrs., 83 F. App'x. 402, 403 (2d Cir. 2003))).

Plaintiffs have not referenced any specific subdivision of Rule 60(b).  They allege, however, that the Court "misinterpreted controlling law and dismissed Plaintiff's claims in without [sic] case or statutory support and in contravention of all relevant authority," for which they request relief "in order to correct a clear error and to prevent manifest injustice."  Accordingly, the Court will consider plaintiffs' motion under Rule 60(b)(1).[3]

Ordinarily, a party has a "reasonable time" to file their motion for reconsideration under Rule 60(b), and more specifically under Rule 60(b)(1), "no more than a year after the entry of the judgment."  See Fed. R. Civ. P. 60(c)(1).  However, a "Rule 60(b)(1) motion based on judicial mistake of law must be filed within the time that would be permitted for an appeal of the judgment being challenged."  Leonard v. Lowe's Home Ctrs., 83 F. App'x. 402, 403 (2d Cir. 2003) (citing In re 310 Associates, 346 F.3d 31, 35 (2d Cir. 2003)); see also In re 310 Assocs., 346 F.3d 31, 35 (2d Cir. 2003) ("Rule 60(b)(1) motions [may] not be permitted past the deadline

---

[3] Defendants suggest that "Rule 60(b)(6) could conceivably apply."  But "Rule 60(b)(1) and Rule 60(b)(6) are mutually exclusive, such that any conduct which generally falls under the former cannot stand as a ground for relief under the latter."  Mandala v. NTT Data, Inc., 88 F.4th 353, 359 (2d Cir. 2023) (internal quotation marks omitted) (citing Stevens v. Miller, 676 F.3d 62, 67 (2d Cir. 2012)).  "Thus, '[w]here a party's Rule 60(b) motion is premised on grounds fairly classified as mistake, inadvertence, or neglect, relief under Rule 60(b)(6) is foreclosed.'"  Id.

5

for filing a notice of appeal, thereby preventing Rule 60(b)(1) from becoming a way to assert an otherwise time-barred appeal. . . . [This] approach has remained the law of this circuit.").

Unlike plaintiffs' Rule 59(e) motion, plaintiffs' Rule 60(b)(1) motion is timely. Plaintiffs had 30 days from the Court's May 12 decision to file an appeal. See Fed. R. App. P. 4(a)(1)(A). Therefore, plaintiffs also had 30 days from the decision to file their Rule 60(b)(1) motion.

Because plaintiffs filed their notice of appeal at the same time that they moved under Rules 59 and 60, we are faced with the familiar issue of to what degree, if any, a district court is divested of jurisdiction to consider post-judgment motions while an appeal is pending. The general rule is that a "district court may *grant* a rule 60(b) motion after an appeal is taken only if the moving party obtains permission from the circuit court." Toliver v. Cnty. of Sullivan, 957 F.2d 47, 49 (2d Cir. 1992). That is the purpose of Fed. R. Civ. P. 62.1, which allows the district court, in response to a Rule 60 motion, to issue an indicative opinion, signaling to the Circuit Court that it would reverse the decision under appeal if the Circuit Court returned jurisdiction to it.

However, it is equally well-established that the court may deny the post-judgment motion notwithstanding the pendency of an appeal. See Koch v. Pechota, 632 F. App'x 24, 25 (2d Cir. 2016) ("While a 'district court may *grant* a rule 60(b) motion after an appeal is taken only if the moving party obtains permission from the circuit court,' it remains free to 'entertain and deny the rule 60(b) motion' without such permission."); Fed. R. App. P. 62.1(a) ("If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may . . . deny the motion . . . ."). That is where we are in the present case.

6

Defendants torture the language of Fed. R. App. P. 4 to support their total divestiture argument. But Rule 4 addresses an issue not before me – whether a notice of appeal will be deemed timely. Specifically, defendants rely on two provisions of Rule 4: 4(a)(4)(A)(vi) and 4(a)(4)(B)(i). Rule 4(a)(4)(vi) states that if a party files a Rule 60 motion within the same time limit prescribed by Rule 59 (28 days), the time to file a notice of appeal only begins to run when the court disposes of that motion. Rule 4(a)(4)(B)(i) states that if a party files a notice of appeal after a court enters a judgment, but before it disposes of a motion listed under Rule 4(a)(4)(A) (such as a Rule 60 motion), the notice of appeal becomes effective only after the court disposes of the motion. See Fed. R. App. P. 4(a)(4)(B)(i).[4] In other words, if a party timely files a Rule 60 motion that is timely under Rule 4(a)(4)(A)(vi), the district court retains jurisdiction to consider the motion because Rule 4(a)(4)(B)(i) suspends the effect of the appeal. Nowhere in FRAP 4(a)(4) does it say, however, that if a Rule 60 motion is not timely filed under Rule 4(a)(4)(A)(vi), the district court is totally divested of jurisdiction to adjudicate the motion.

Defendants rely on Kinsella v. Bureau of Ocean Energy Management, No. 23-cv-2915, 2025 WL 1548943, at *2 (E.D.N.Y. May 30, 2025), in which the court denied a Rule 60 motion on the basis that "[t]he filing of the notice of appeal divests the District Court of jurisdiction to entertain a post-judgment motion pursuant to Fed. R. Civ. P. 60 unless the motion is brought within 28–days of the entry of judgment." However, Kinsella cited Garcia v. Myears, No. 13-cv-0965, 2015 WL 1015425, at *2 (W.D.N.Y. March 9, 2015), in which the court recognized that "[n]evertheless . . . a district court may entertain and *deny* a Rule 60(b) motion despite the court's

---

[4] See also Fed. R. Civ. P. 62.1 advisory committee's notes to the 2009 amendment ("Appellate Rule 4(a)(4) lists six motions that, if filed within the relevant time limit, suspend the effect of a notice of appeal filed before or after the motion is filed until the last such motion is disposed of. The district court has authority to grant the motion without resorting to the indicative ruling procedure.").

7

lack of jurisdiction." The court acknowledged that "it is only if the district court decides in favor of the motion, that the necessary remand by the court of appeals is to be sought." Id. (cleaned up) (citing Toliver, 957 F.2d at 49).

Accordingly, the Court has jurisdiction to consider plaintiffs' motion. If it is inclined to grant the motion, it may only issue an indicative opinion under Fed. R. Civ. P. 62.1. However, it may deny the motion without regard to the pending appeal.

## II. Standard of Review

"Properly applied[,] Rule 60(b) strikes a balance between serving the ends of justice and preserving the finality of judgments. . . . [I]t should be broadly construed to do substantial justice, yet final judgments should not be lightly reopened." Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986) (internal quotation marks and citations omitted). "Since 60(b) allows extraordinary judicial relief, it is invoked only upon a showing of exceptional circumstances." Id. "Rule 60(b) does not provide a party with the opportunity to relitigate the merits of a case in an attempt to win a point already 'carefully analyzed and justifiably disposed.'" Esposito v. New York, No. 07-cv-11612, 2010 WL 4261396, at *1 (S.D.N.Y. Oct. 25, 2010) (citing In re Bulk Oil (USA) Inc., No. 93-cv-4492, 2007 WL 1121739, at *10 (S.D.N.Y. April 11, 2007)), aff'd, 453 F. App'x 37 (2d Cir. 2011).

"[T]he standard for granting a motion for reconsideration is 'strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.'" Commerzbank AG v. U.S. Bank, N.A., 100 F.4th 362, 377 (2d Cir. 2024) (citing Shrader v. CSX Transp., Inc., 70 F.3d 255, 257 (2d Cir. 1995)), cert. denied, 145 S. Ct. 279 (2024).

### III. Plaintiffs Have Failed To Demonstrate A Basis For Reconsideration

#### A. Plaintiffs' Market Participation Argument

California law interpreting the Cartwright Act requires a plaintiff to demonstrate antitrust standing. See Kolling v. Dow Jones & Co., 137 Cal. App. 3d 709, 723, 187 Cal. Rptr. 797, 807 (Ct. App. 1982). A "key component of analyzing antitrust standing [under the Cartwright Act] is determining whether a plaintiff suffered an 'antitrust injury.'" Ahn v. Stewart Title Guar. Co., 93 Cal. App. 5th 168, 180, 310 Cal. Rptr. 3d 595, 604 (Ct. App. 2023). In Knevelbaard Dairies v. Kraft Foods, Inc., 232 F.3d 979, 987 (9th Cir. 2000), the Ninth Circuit identified "four requirements that must be met in order to conclude that there is antitrust injury: (1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." To satisfy this fourth requirement, plaintiffs must show that they participated in the relevant market where anticompetitive behavior occurred – participating in a "separate, albeit related" market is not sufficient. See In re DRAM Antitrust Litig., 516 F. Supp. 2d 1072, 1090 (N.D. Cal. 2007) (rejecting a claim by plaintiffs that participated in a "separate, albeit related" market because they did not "have grounds from which to argue that they are participants in the allegedly restrained market"); Kolling, 137 Cal. App. 3d at 723-724 (applying California's "market participant rule" to antitrust standing under the Cartwright Act, which requires a plaintiff to "show an injury within the area of the economy that is endangered by a breakdown of competitive conditions.").

In the December 2024 Decision, the Court held that plaintiffs had "sufficiently allege[d] the first three requirements under Knevelbaard as to both their direct and indirect purchaser claims." Palladino, 761 F. Supp. 3d at 541-42. Regarding the fourth requirement, however, the

9

Court found that plaintiffs had "fail[ed] to establish antitrust injury as either direct or indirect purchasers," because they "d[id] not allege cardholder participation in the market where the anticompetitive conduct occurs." Id.

The Court explained that plaintiffs had alleged two separate markets: one, titled "Merchant Acceptance of General Purpose Credit Cards," in which defendant merchants accept credit cards from purchasers, and another titled "General Purpose Card Network Services," in which defendant credit card networks and merchants allegedly conspired to fix prices, and that plaintiffs had only alleged participation in the former, not the latter. See id. at 542-543.

The Court found this conclusion to be consistent with Salveson v. JP Morgan Chase & Co. ("Salveson III"), 663 F. App'x 71, 75 (2d Cir. 2016), a similar antitrust case brought by a group of cardholder plaintiffs against various institutions that issued credit payment cards. See id. at 543-544. In Salveson III, the Second Circuit held that "[c]ontrary to plaintiffs' allegations, the structure of these transactions demonstrates that cardholders do not directly pay interchange fees." Salveson III, 663 F. App'x at 75. The Court compared the transaction structure alleged by plaintiffs in their Amended Complaint with the transaction structure alleged by the plaintiffs in Salveson III, and concluded that they were the same. See Palladino, 761 F. Supp. 3d at 544. And just as the Second Circuit in Salveson III found that the plaintiffs were not direct purchasers based on the transaction structure alleged in their complaint, the Court found that the present plaintiffs were not direct purchasers based on the transaction structure alleged in their complaint. See id. ("As this Court and the Second Circuit concluded in Salveson, cardholders do not participate in the market where the 'allegedly anticompetitive interchange fee is set and paid between financial institutions.'").

10

The Court's May 12 Decision reaffirmed this conclusion, holding that plaintiffs had alleged a "transaction [that] is identical to the structure in Salveson and insufficient to establish that Plaintiffs participated in the relevant market." Palladino, 2025 WL 1371786 at *5.

In the present case, plaintiffs first argue that the Court misapplied Salveson III. They contend that Salveson III is distinguishable because there, the plaintiffs never made allegations that they paid "inflated prices" for goods, and the Court never discussed the plaintiffs' participation in a relevant market. Plaintiffs assert that here, they have properly alleged that the merchant defendants conspired with the card network defendants to inflate transaction fees, which makes cardholders such as plaintiffs, "the only direct victims of the alleged conspiracy."

Plaintiffs' argument is unavailing, however, because it conflates facts with legal conclusions, the latter of which the Court is not bound to accept as true. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"). Whether or not the plaintiffs in Salveson III paid "inflated prices" for goods is a legal conclusion, as is plaintiffs' assertion that the merchants were co-conspirators with the card networks. Such conclusions have no effect on the underlying facts of the transaction between cardholders and defendant networks and merchant banks alleged by plaintiffs. Based on those facts, the Court was unable to determine that plaintiffs had participated in the relevant market for purposes of Cartwright Act standing. That remains the case, as plaintiffs have not provided any controlling authority or data for the Court to conclude otherwise.

Plaintiffs next argue that even if they are not direct purchasers, they still have standing as indirect purchasers, because they indirectly participated in the relevant market. Plaintiffs point out that in Salveson III, the Court only concluded that the plaintiffs were direct purchasers under

11

federal law, without reaching the question of whether the plaintiffs were indirect purchasers under state law.

This is an argument the Court has previously considered and rejected. In his report and recommendation, Judge Marutollo first explained that plaintiffs had not sufficiently alleged antitrust injury, which "alone is grounds to dismiss Plaintiffs' claims," because even as indirect purchasers, plaintiffs had not alleged participation in the relevant market. Palladino v. JPMorgan Chase & Co., No. 23-cv-1215, 2024 WL 3594569, at *26 (E.D.N.Y. July 31, 2024), report and recommendation adopted, 761 F. Supp. 3d 521. Second, applying the other AGC "efficient enforcer" factors,[5] Judge Marutollo found that (1) plaintiffs had not sufficiently established a direct link between the alleged price-fixing conspiracy and plaintiffs' purported injuries, (2) plaintiffs' alleged harm was speculative, (3) there was a risk of duplicative recovery in light of the related MDL action, and (4) plaintiffs' damages would be difficult to apportion. Id. at 26-31. Accordingly, Judge Marutollo concluded that "the AGC factors weigh against a finding that Plaintiffs have established antitrust standing as indirect purchasers to assert claims under the Cartwright Act." Id. at 31.

The Court's December 2024 Decision then adopted Judge Marutollo's conclusion, holding that (1) "Plaintiffs fail to establish antitrust injury as either direct or indirect purchasers because they do not allege cardholder participation in the market where the anticompetitive conduct occurs," and (2) the efficient enforcer factors of AGC apply to the Cartwright Act. Palladino, 761 F. Supp. 3d at 542, 537. The Court further noted that even if plaintiffs could

---

[5] The AGC factors are: "(1) the nature of the plaintiff's alleged injury, (2) the directness of the injury, (3) the speculative nature of the harm, (4) the risk of duplicative recovery[,] and (5) the complexity in apportioning damages." See Salveson v. JP Morgan Chase & Co., 166 F. Supp. 3d 242, 259 (citation omitted). For a detailed discussion of how California law incorporates the AGC factors into its Cartwright Act standing analysis, see Palladino, 761 F. Supp. 3d at 533-537.

12

allege antitrust injury, any injury would have occurred outside the relevant market, because "California law does not recognize such injuries that are 'secondary, consequential, or remote.'" See id. at 544 (citations omitted). Plaintiffs' injuries were "secondary, consequential, and remote," because "(1) they rel[ied] on injury to third parties (merchants) and (2) they [we]re an indirect result of merchants' pricing decisions based on Defendants' conduct." Id. at 545 (citation omitted).

Although the Court found Salveson III "consistent" with its conclusion that plaintiffs were not indirect purchasers, the Court did not ultimately rely on Salveson III to reach that conclusion. The Court held that plaintiffs were not indirect purchasers because plaintiffs had not sufficiently alleged antitrust injury, and, applying the AGC factors, plaintiffs were too remote from the alleged injury to be considered indirect participants. And even if plaintiffs could allege antitrust injury, any injuries occurred outside the relevant market, because they were "secondary, consequential, or remote." Accordingly, whether the Second Circuit held in Salveson III that the plaintiffs were direct or indirect purchasers does not alter the Court's conclusion.

Plaintiffs next argue that relevant market determinations are questions of fact to be determined by a jury. But in the federal antitrust context, "[s]tanding is a question of law for the district court to decide. . . . Because the court (and not a jury) decides standing, the district court must decide issues of fact necessary to make the standing determination." In re ATM Fee Antitrust Litig., 686 F.3d 741, 747 (9th Cir. 2012) (citations omitted). That same logic applies to Cartwright Act standing. For a district court to determine whether a plaintiff bringing a

Cartwright Act claim has standing, the court must decide issues of fact necessary to make that determination. Plaintiffs provide no controlling authority holding to the contrary.[6]

Plaintiffs next argue that they are eligible for a "target exception" to the standing requirement, which purportedly exempts victims of a conspiracy from having to demonstrate participation in the relevant market. Again, this is a claim that the Court has already considered and rejected. In the May 12 Decision, the Court explained:

> None of the cases Plaintiffs cite apply the "target exception" to Cartwright Act claims. The Lorenzo court explains that the exception applies to the standing requirement under the federal Clayton Act. [Lorenzo v. Qualcomm, 603 F. Supp. 2d 1291, 1300 (S.D. Cal. 2009)]. The cases Plaintiffs cite in support of their argument that the Court overlooked the "target exception" to the market participation rule also only discuss that exception in the context of the federal antitrust laws. See Blue Shield of Va. v. McCready, 457 U.S. 465, 483-84 (1982) (describing plaintiff's injury as "inextricably intertwined with the injury the conspirators sought to inflict" when evaluating antitrust standing under Section 4 of the Clayton Act) . . . . These cases do not evaluate antitrust standing, or discuss the applicability of the "target exception," under California's Cartwright Act, which is the antitrust law Plaintiffs allege Defendants violated. The Court therefore rejects Plaintiffs' argument that it "overlooked" the applicability of the Blue Shield exception to Plaintiffs' Cartwright Act claim.

Palladino, 2025 WL 1371786 at *6. Nevertheless, plaintiffs again assert that the exception is set out in Lorenzo, and that Lorenzo was a Cartwright Act case.

Even at this late stage, plaintiffs still have not explained how the "target exception" from the Clayton Act applies to Cartwright Act claims. They merely repeat their assertion that because the plaintiffs in Lorenzo brought claims under both the Clayton Act and Cartwright Act, the "target exception" of the Clayton Act must also apply to the Cartwright Act. For what it's worth, in Lorenzo, Judge Hayes specifically divided his analysis of Clayton Act standing and

---

[6] Both of the cases upon which plaintiffs rely, Twin City Sportservice, Inc. v. Charles O. Finley & Co., 676 F.2d 1291 (9th Cir. 1982), and Brown Shoe Co. v. United States, 370 U.S. 294 (1962), are inapposite, as neither discuss the relevant market for purposes of standing. The right to a jury trial in the context of determining a relevant market is a wholly different inquiry.

14

Cartwright Act standing into two separate paragraphs. Plaintiffs' "target exception" is discussed in the former, and not at all under the latter.[7]

### B. The Court Properly Denied Leave to Amend

Plaintiffs next argue that the Court abused its discretion when it denied plaintiffs' request for leave to amend their First Amended Complaint based on futility. They assert the old chestnut that leave to amend should be freely given, and that the Court must accept as true its factual allegations, which, they contend, "set out a reasonable and relevant market."

The Court did not abuse its discretion when it denied plaintiffs' request for leave to amend. In the May 12 Decision, Chief Judge Brodie explained:

> Rule 15 of the Federal Rules of Civil Procedure provides that [l]eave to amend should be freely give[n] . . . when justice so requires, but should generally be denied in instances of futility, undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, or undue prejudice to the non-moving party. Futility is a determination, as a matter of law, that proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. . . . Thus, the standard for denying leave to amend based on futility is the same as the standard for granting a motion to dismiss. If the problems with a claim are substantive rather than the result of an inadequately or inartfully pleaded complaint, an opportunity to replead would be futile and should be denied.

Palladino, 2025 WL 1371786 at *8 (cleaned up). The Court then acknowledged that plaintiffs sought to allege additional facts that plaintiffs participated in a "two-sided transaction platform market." Id. Nonetheless, the Court concluded that allowing plaintiffs to amend their complaint

---

[7] Contrast Lorenzo v. Qualcomm Inc., 603 F. Supp. 2d 1291, 1300-1301 (S.D. Cal. 2009) (describing under the subheading, "Standing under the Clayton Act," the "narrow exception" to the "market participant" requirement "for parties whose injuries are 'inextricably intertwined' with the injuries of market participants" and concluding that "the Complaint fails to allege . . . that Plaintiff's alleged injury is inextricably intertwined with Qualcomm's unlawful conduct so as to fit within the "narrow exception" to the market participant requirement"), with id. at 1302-1303 (concluding under the subheading, "Standing under the Cartwright Act," that the Complaint fails to allege an antitrust injury, without discussing any "narrow exception" or "inextricable intertwining" at all).

15

would be futile, because plaintiffs "d[id] not allege cardholder participation in the market where the anticompetitive conduct occurs." Id.

Plaintiffs again appear to confuse factual allegations with conclusory allegations, the latter of which the Court is not bound to accept as true. See Palladino, 2025 WL 1371786 at *9 ("Plaintiffs' additional allegations about their participation in the relevant market are conclusory . . . and do not alter the transaction structure that the Court analyzed in the December 2024 Decision."); see also Twombly, 550 U.S. at 555 ("[O]n a motion to dismiss, courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"). Plaintiffs' allegation that they participated in a relevant market is a legal conclusion, no matter how many times plaintiffs attempt to "couch" it as a factual allegation.[8]

### C. Plaintiffs' Oral Argument Claim

Plaintiffs argue that they have been "deprived of their constitutional rights to notice and opportunity to be heard." In support, plaintiffs argue that no dispositive motion made pursuant to FRCP 12 may be submitted until after a "hearing," citing FRCP 12(i), and the Fifth Amendment's Due Process Clause.

Greene v. WCI Holdings Corp., 136 F.3d 313 (2d Cir. 1998), holds just the opposite of what plaintiffs are arguing – it is a universally applied rule in this Circuit that a hearing is deemed to have occurred if the parties have had a full opportunity to brief their motion, and any further hearing is subject to the discretion of the district court. See, e.g., Hammer v. Malavet, 22

---

[8] Plaintiffs also argue that Visa "admits that purchases or transactions made with a Visa-branded payment card typically involve a cardholder, merchant, acquiring bank, and issuing bank." Plaintiffs then invoke "Collins Online Dictionary" to suggest that the verb "participate" is synonymous with "to be involved in," and that Visa therefore admitted that Plaintiffs participated in the relevant market. It is clear from this context that Visa was merely describing the parties ultimately involved in a card transaction – there is no dispute that cardholders are participants in such a transaction. But as the Court has already explained, the facts alleged do not show that cardholders participated in the "relevant market" for purposes of Cartwright Act standing.

16

F. App'x 58, 59 (2d Cir. 2001) ("[Appellant] had no due process right to an oral hearing in district court before the court dismissed his complaint"); Forjan v. Leprino Foods, Inc., 209 F. App'x 8, 10 (2d Cir. 2006) ("[A] district court's decision whether to permit oral argument rests within its discretion."); see also Fed. Commc'ns Comm'n v. WJR, The Goodwill Station, 337 U.S. 265, 277 (1949) ("[W]hen and under what circumstances procedural due process may require oral argument . . . . is not a matter, under our decisions, for broadside generalization and indiscriminate application. It is rather one for case-to-case determination . . . .").

Even so, plaintiffs argue that the "peculiar facts" in Greene are "easily distinguished" from the present case. But there is nothing "peculiar" enough about the facts and holding in Greene to distinguish it. There, the defendants filed a motion to dismiss under Rule 12(b)(6), which the district court granted. The plaintiff filed "extensive written arguments with the district court, which allowed him to address the specific issues of law with which the district court was concerned." Greene, 136 F.3d at 316. Consequently, the Second Circuit held that "whether or not to hold an oral hearing on a motion to dismiss lies in the sound discretion of the trial court. And the district court did not abuse its discretion in denying oral argument in the case before us." Id. The Court emphasized that "the circuit courts that have addressed the question of whether an oral hearing is required on motions to dismiss in civil cases have uniformly held that no oral hearing is required by the Due Process Clause." Id. (citing United States v. One 1974 Porsche 911–S, 682 F.2d 283, 286 (1st Cir. 1982) ("There is no constitutional right to oral argument on a summary judgment motion."); Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 391 (6th Cir. 1975) (denial of an oral hearing before granting a motion to dismiss does not violate "fundamental notions of fairness and due process of law"); Spark v. Catholic Univ., 510 F.2d 1277, 1280 (D.C. Cir. 1975) ("due process does not include the right to oral argument on a

17

motion"); Dredge Corp. v. Penny, 338 F.2d 456, 464 n.14 (9th Cir. 1964) ( "The opportunity to be heard orally on questions of law is not an inherent element of procedural due process, even where substantial questions of law are involved.")).

None of the cases cited by plaintiffs contradict this conclusion. Consequently, the Court sees no reason to abandon Second Circuit precedent, nor to revisit Chief Brodie's exercise of her discretion not to hold further argument. Nor does the Court find oral argument necessary on this second reconsideration motion.

In any event, there is no basis for plaintiffs' claim that they never had the opportunity to be heard, because plaintiffs, in fact, had multiple opportunities to be heard. Presumably, plaintiffs are asserting that they never received a hearing when defendants moved to dismiss under Rules 12(b)(6) and 12(c), because Rule 12(i), which plaintiffs cite, only applies to Rule 12 defenses and motions. See Fed. R. Civ. P. 12(i). However, the minute entry for the status conference held on January 10, 2024, states that "Counsel for the parties appeared." At the pre-motion conference on January 26, 2024, in which the Court addressed defendants' anticipated motion to dismiss, the minute entry likewise states that "Counsel for all parties appeared." According to the transcript of an oral argument held on May 6, 2024, plaintiffs' counsel was also present. Plaintiffs therefore had at least three full opportunities to present their arguments orally before a court, both before and after defendants submitted their motion to dismiss.

Plaintiffs have also had numerous opportunities to submit their arguments in writing. The Court emphasizes that this is plaintiffs' second motion for reconsideration – the first was brought under Local Civil Rule 6.3 and Rule 59(e), and the present under Rules 59(e) and 60(b). Due Process requires no more.

## CONCLUSION

For the foregoing reasons, plaintiffs' motion for reconsideration is denied.

**SO ORDERED.**

_____<br>
*Brian M. Cogan*<br>
U.S.D.J.

Dated: Brooklyn, New York
       October 17, 2025